UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| CHEYENNE RIVER SIOUX TRIBE, | 3:15-CV-03018-KES |
| Plaintiff, | |
| vs. | |
| SALLY JEWELL, Secretary of United States Department of Interior, or her Predecessor in Office, UNITED STATES DEPARTMENT OF INTERIOR, UNITED STATES BUREAU OF INDIAN EDUCATION, KEVIN WASHBURN, in his official capacity as Assistant Secretary of Indian Affairs of the United States Department of Interior, or his Successor in Office, and CHARLES ROESSEL, in his official capacity as Director of the Bureau of Indian Education, or his Successor in Office, | MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS |
| Defendants. | |

On October 10, 2015, plaintiff, Cheyenne River Sioux Tribe, filed a

complaint seeking injunctive relief, declaratory relief, and a writ of mandamus,

that would preclude defendants from carrying out plans to restructure the

Bureau of Indian Education (BIE). Docket 1. Defendants move to dismiss the

complaint for lack of subject matter jurisdiction and failure to state a claim

upon which relief can be granted. Docket 14. The Tribe resists this motion and

requests a transfer of all or part of the case from the United States District

Court for the District of South Dakota, Central Division to the United States

District Court for the District of South Dakota, Southern Division. Docket 20. On January 25, 2016, United States District Judge Roberto A. Lange ordered the transfer of this case from the Central Division to this court. Docket 25. This court will now consider the motion to dismiss.

## BACKGROUND

The facts, construed in the light most favorable to the non-moving party (the Tribe), are as follows:

The Tribe is a federally recognized Indian Tribe. The Tribe's principal headquarters are located in Eagle Butte, South Dakota. Defendant Sally Jewell is Secretary of the Department of Interior. Defendant Kevin Washburn is the Assistant Secretary for Indian Affairs to the Secretary of the Department of Interior; Washburn is responsible for overseeing the reorganization of the BIE. Defendant Charles Roessel is the Director of the BIE. The BIE is responsible for managing school systems on or near Indian reservations that serve over 40,000 American Indian students in 183 elementary and secondary schools.

In September 2013, Secretary Jewell and Arne Duncan, Secretary of the Department of Education, appointed the American Indian Education Study Group. The Study Group had two main goals: research and diagnose challenges facing BIE funded schools, and recommend potential solutions to improve education in these schools. Docket 1-16 at 2. In carrying out these goals, the Study Group conducted research throughout the country. Part of this research included listening sessions between the Study Group and tribal

leaders and tribal educators in New Mexico, South Dakota, Oklahoma, Mississippi, Washington, and Arizona. Docket 1-11 at 7.

In March 2014, Washburn sent a letter to tribal leaders throughout the country; the letter detailed developments in research that had been performed by the Study Group. Docket 1-8. Specifically, Washburn described a "draft framework [of educational reform] based on four pillars[:]" (1) effective teachers and principals; (2) agile organizational environment; (3) budget aligned to capacity building; and (4) comprehensive support through partnerships. *Id.* at 1. The letter also provided the dates and times of four future consultation sessions that were intended to provide an avenue for comments and feedback on the draft framework of reform. Tribal leaders were also invited to submit comments or concerns through a dedicated email address, fax number, or mail sent to BIE.

The Tribe attended the consultation session in Oglala, South Dakota, on April 28, 2014. During the session, the Tribe examined a "Transformation Plan" and a "Draft Proposal to Redesign the U.S. Department of the Interior's Bureau of Indian Education (Draft Proposal)," both of which expanded upon the four pillars of reform but did not contain specifics regarding the future structure of BIE or budget information. *See* Docket 1-10; Docket 1-11. The Tribe was also asked to consult on a "Draft Bureau of Indian Education Strategic Plan 2014-2018" (BIE Draft Strategic Plan) while at the consultation session. *See* Docket 1-13. This BIE Draft Strategic Plan, totaling 41 pages, was not provided to tribal leaders prior to the meeting. Docket 1 at 13-14, ¶ 42. The Tribe, through

3

the Great Plains Tribal Chairman's Association, submitted a formal response to both the Transformation Plan and the BIE Draft Strategic Plan in May 2014. Docket 1-12; Docket 1-14. Defendants did not acknowledge or respond to the Tribe's submissions. Docket 1 at 14, ¶ 45.

In June 2014, defendants released "Findings and Recommendations Prepared by the Bureau of Indian Education Study Group Submitted to the Secretaries of the Departments of the Interior and Education," otherwise known as the "Blueprint for Reform." Docket 1-16. *See also* Docket 1 at 14, ¶ 45; Docket 15 at 3. This report details the Study Group's final analysis and formal recommendation for BIE reform. The Tribe alleges that this document is substantially similar to the draft report that was released in April 2014 in that it fails to offer specifics regarding budget proposals, staffing changes, or any meaningful empirical data. Docket 1 at 14, ¶ 45.

Also in June 2014, Secretary Jewell issued Order No. 3334: "Restructuring the Bureau of Indian Education." Docket 1-17. The purpose of this Order was

> to begin the process of implementing those reforms by redesigning and restructuring the BIE into an innovative organization that will improve operations for both tribally-controlled and BIE-operated schools. The redesign and restructuring of the BIE will occur in two phases to ensure an orderly and minimally disruptive transition and will emphasize: (1) improving responsiveness of BIE operational support to schools; and (2) improving performance of individual schools.

*Id.* at 1. The Order established that, in Phase I, a School Operations Division of the BIE shall be established, three current Associate Deputy Directors (ADDs) of BIE will be realigned to supervise different areas of the department,

4

Education Line Offices (ELOs) will be restructured and transitioned into Education Resource Centers (ERSs), and a new Office of Sovereignty and Indian Education will be created. *Id.* at 2. In Phase II, each office of the three ADDs will create Support Solutions Teams. These teams will be responsible for providing greater local support to BIE funded schools. *Id.*

Defendants, or their representatives, met with the Tribe's representatives two times throughout the remainder of 2014. *See* Docket 1 at 17-18, ¶¶ 53-54 (stating that the Tribe met with defendants on July 22, and August 13). In each of these meetings, the Tribe alleges that defendants' representatives indicated that BIE was implementing the changes articulated in the report issued by the Study Group and Order 3334. *Id.* According to reports provided to the Tribe, defendants were moving forward with plans to transition 23 ELOs into approximately 15 ERCs. Docket 1-20 at 12; *see also* Docket 1-23 at 7. The reports also indicated that the BIE-operated school on the Cheyenne Sioux Reservation would report to a new ERC in Flandreau, South Dakota, while the two Tribally-controlled schools on the reservation would report to a new ERC in Belcourt, North Dakota. Docket 1 at 18, ¶ 57.

On April 22, 2015, during a consultation session in Rapid City, South Dakota, the Tribe submitted a formal statement in response to both the final report released by the Study Group and Order 3334. Docket 1-26. The Tribe articulated its position that defendants had not meaningfully consulted with the Tribe as required by 25 U.S.C. § 2011(b) because they had failed to provide any specifics regarding funding and employment information under the

5

proposed restructuring of BIE. *Id.* at 2. The Tribe formally requested specific information at that time, and again in a follow up letter sent in May 2015. Docket 1-27.

Defendants formally responded to the Tribe's request in July 2015. Docket 1-28. The letter provided a list of resources already available to the Tribe that pertained to its requests. *Id.* Defendants indicated, however, that plans pertaining to the budget and potential reallocation of funds were still "being vetted and finalized within the Department of the Interior. During the department's deliberative process, this information is not publically available." *Id.* at 3.

The Department of the Interior submitted a proposal to Congress on September 15, 2015, outlining the changes contained in Order 3334. Docket 1-29. Both the House and Senate Committees on Appropriations have since approved the Department of Interior's proposal. *See* Docket 30 at 6 n.2.

The Tribe then filed a four-count complaint. Docket 1. The complaint alleges the following four counts: (1) the Tribe was not consulted before defendants issued the order restructuring BIE; (2) the restructuring plan is arbitrary and capricious under the Administrative Procedures Act (APA); (3) the restructuring plan breaches the trust responsibility owed to the Tribe under the provisions of the 1868 Fort Laramie Treaty; and (4) the restructuring plan breached the settlement agreement that was entered into in *Yankton Sioux*

6

*Tribe et al. v. Kempthorne et al. Id.* On December 21, 2015, defendants moved to dismiss the complaint under Rule 12(b)(1) and Rule 12(b)(6).[1] Docket 14.

## STANDARD OF REVIEW

Under Federal Rule 12(b)(6), a court must review whether the complaint states a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). A complaint must provide a short, plain statement showing that the pleader is entitled to relief. *See* Fed. R. Civ. P. 8(a)(2). The complaint must also assert "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

When analyzing a complaint following a motion to dismiss, the court assumes that all facts asserted in the complaint are true and construes all reasonable inferences from those facts in a light most favorable to the complainant. *Rochling v. Dep't of Veterans Affairs*, 725 F.3d 927, 930 (8th Cir. 2013). Further, the court may consider the complaint, exhibits attached to the complaint, and matters that are part of the public record in determining if the complaint is plausible. *See Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077,

---

[1] Defendants' motion initially asserted that the Tribe's complaint should be dismissed under a theory of ripeness. Defendants abandoned that argument in their reply brief. *See* Docket 30 at 6 n.2.

1079 (8th Cir. 1999). But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not afforded the same deference. *Iqbal*, 556 U.S. at 678. A well-pleaded complaint should survive a motion to dismiss "even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly,* 550 U.S. at 555-56 (internal quotations omitted).

## DISCUSSION

### A.    Count I: Consultation Requirement

Count I of the Tribe's complaint alleges that defendants failed to consult with the Tribe as is required by 25 U.S.C. § 2011 and defendants' internal policies. Docket 1 at 24, ¶ 84. Specifically, the Tribe's complaint alleges that defendants conducted research, drafted recommendations for reform, and began carrying out BIE reform through Secretary Jewell's Order 3334 without meaningfully consulting with the Tribe. *Id.* at 21, ¶ 69.

Federal statutes set out the baseline obligations of the Bureau of Indian Affairs (BIA) requiring consultation with tribes prior to taking actions affecting Indian Education. *See* 25 U.S.C. § 2011. "It shall be the policy of the United States acting through the Secretary, in carrying out the functions of the Bureau, to facilitate Indian control of Indian affairs in all matters relating to education." 25 U.S.C. § 2011(a). "All actions under this Act shall be done with active consultation with tribes. The United States . . . and tribes shall work in a government-to-government relationship to ensure quality education for all tribal members." 25 U.S.C. § 2011(b)(1). The term " 'consultation' means a

8

process involving the open discussion and joint deliberation of all options with respect to potential issues or changes between the Bureau and all interested parties." 25 U.S.C. § 2011(b)(2)(A). During discussion and deliberation, interested parties like the Tribe shall be given an opportunity

> (i)    to present issues (including proposals regarding changes in current practices or programs) that will be considered for future action by the Secretary; and
>
> (ii)   to participate and discuss the options present, or to present alternatives, with views and concerns of the interested parties given effect unless the Secretary determines, from information available from or presented by the interested parties during one or more of the discussions and deliberations, that there is a substantial reason for another course of action.

25 U.S.C. § 2011 (b)(2)(B)(i)-(ii).

Pursuant to Executive Order 13175, the BIA has also adopted a set of internal policies to define the requirements for government-to-government consultation between tribes and the federal government for proposed federal actions affecting tribes. Docket 1-30 (*BIA Consultation Policy*). The goal of this policy, through government-to-government dialogue, is "to secure meaningful and timely tribal input." *BIA Consultation Policy*. Under this policy, "consultation" includes that tribes are:

> 1. to receive timely notification of the formulated or proposed Federal action;
>
> 2. to be informed of the potential impact on Indian tribes of the formulated or proposed Federal action;
>
> 3. to be informed of those Federal officials who may make the final decisions with respect to the Federal action;

> 4. to have the input and recommendations of Indian tribes on such proposed action be fully considered by those officials responsible for the final decision; and
>
> 5. to be advised of the rejection of tribal recommendations on such action from those Federal officials making such decisions and the basis for such rejections.

*Id.* The policy further declares that "[c]onsultation does not mean merely the right of tribal officials, as members of the general public, to be consulted, or to provide comments, under the Administrative Procedures Act or other Federal law of general applicability." *Id.* The BIA's internal consultation policies, which are more rigorous than the baseline consultation requirements set out by statute, govern here. *See Yankton Sioux Tribe v. Kempthorne*, 442 F. Supp. 2d 774, 784 (D.S.D. 2006) (citing *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 713 (8th Cir. 1979) ("An agency must comply with its own internal policies even if those are more rigorous than procedures required by [statute]."))

Defendants argue that the Tribe has failed to state a plausible claim of inadequate consultation. Defendants cite the hundreds of pages of exhibits incorporated in the Tribe's complaint that detail defendants' consultation efforts. *See* Docket 15 at 22-30; Docket 30 at 9-10. Defendants contend that these exhibits cover a two year period spanning from the initial appointment of the Study Group in 2013 to the final submission of the proposal to Congress in September 2015. *See* Docket 30 at 9-10.

But meaningful consultation requires, at a minimum, that defendants comply with federal statutes and their own policies defining what constitutes adequate "consultation." *See* Docket 21 at 18. The Tribe's complaint describes

10

a process where defendants conducted research and executed a plan without providing sufficient opportunity for government-to-government discussion of possible avenues of education reform. According to the complaint, on March 28, 2014, Washburn invited the Tribe to attend one of the four consultation sessions on the BIE's impending reform. Docket 1-8. The consultation located geographically nearest to the Tribe was to take place one month later on April 28, 2014, in Oglala, South Dakota. *Id.* The only attachment to this letter was a one page summary of issues that the Indian Education Study group created during its listening sessions. Docket 1-8.[2] Then, in June 2014, after only four nationally conducted consultation sessions, including the consultation in South Dakota,[3] defendants released a final report and Secretary Jewell's Order 3334. The complaint also alleges defendants initiated structural changes in the administration of BIE that were effective as of July 2014.  Docket 1 at 17, ¶ 53.

Even if defendants' position is true that structural changes were implemented in preparation of congressional approval and subject to additional modification, *see* Docket 15 at 7, the Tribe has also alleged that defendants failed to consult with the Tribe throughout the time period after issuance of Order 3334 in June 2014 through the time of congressional approval in

---

[2] The Draft Proposal, Docket 1-11, was officially released on April 17, 2014, eleven days before the consultation session in Oglala, South Dakota. *See* Docket 1 at 13, ¶ 39.

[3] The Tribe's complaint alleges that the Tribe objected to both defendants' proposed BIE restructuring plan and the lack of an opportunity for meaningful consultation afforded to the Tribe at the Oglala, South Dakota consultation session. Docket 1 at 13, ¶ 41.

September 2015. *See* Docket 1 at 16-20. The complaint alleges that the Tribe submitted formal statements to BIE listing its concerns and requested budget information that may impact the Tribe. *See id.* at 18-19. Defendants allegedly responded by citing broad congressional budget proposals that were "budget neutral" or by stating that it was still formulating final budget information and that the information was not public. *See id.* at 19-20; *see also* Docket 1-28 at 3 ("During the Department's deliberative process [pertaining to details on reallocation of funds at the line item level], this information is not publically available."); *but see Kempthorne*, 442 F. Supp. 2d at 785 (stating "an open discussion of a proposal to reorganize Indian school administration must include a candid discussion about what funds will be used to pay for the reorganization").

When analyzing the statutory consultation requirements, the Indian law canons of construction require the court to construe the statutes liberally in favor of the Tribe, and ambiguous provisions are to be interpreted to the Tribe's benefit. *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 767 (1985). The court must also consider the requirements created by defendants' own consultation policies in assessing the plausibility of the Tribe's complaint. *See Kempthorne*, 442 F. Supp. 2d at 784 (citing *Oglala Sioux Tribe*, 603 F.2d at 713) (requiring the Department of the Interior to "comply with its own internal policies even if those are more rigorous than procedures required by [statute].") Thus, when construing the facts in a light most favorable to the Tribe, the court finds that the Tribe plausibly alleges that defendants failed to consult

with the Tribe in an open, government-to-government discussion regarding the proper means of BIE reform. Defendants' motion to dismiss Count I is denied.

### B.    Count II: Arbitrary and Capricious under APA

Count II of the complaint alleges that defendants' planned reorganization of the BIE is "arbitrary, capricious and in violation of federal law" because it fails to comport with the justification originally offered for the reorganization, i.e. "budgetary constraints." Docket 1 at 25, ¶ 25. The Tribe also alleges that defendants took a number of steps to implement Order 3334 prior to receiving Congressional approval of the Order. *See id.* at 16-17, ¶ 52; *id.* at 17-18, ¶ 54. These steps to implement Order 3334, the Tribe argues, constitute the type of "final agency action" necessary to give rise to judicial review under the APA. *See* Docket 21 at 21-22 (citing *Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004)).

Defendants make three arguments in response to the Tribe's APA claim. First, defendants argue that BIE's restructuring proposal "is essentially a major management reorganization which. . . is simply not the type of concrete agency action that can be reviewed under the APA." Docket 15 at 32. Defendants next argue that even if the reorganization under Order 3334 is agency action, the "BIE's decision to restructure is committed to [the agency's] discretion by law." *Id.* at 35 (citing 5 U.S.C. § 701(a)(2)). Defendants' final argument is that due to the Tribe's APA argument in its response to the motion to dismiss, *see* Docket 21 at 21-22, "the Tribe has abandoned Count II's challenge to the plan itself in

13

lieu of a new APA claim mirroring Count I's consultation argument." Docket 30 at 8 (citing *Kempthorne*, 442 F. Supp. 2d at 783).

Under the APA, a court may "hold unlawful and set aside agency action," when such agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). As the plaintiff in this action, the Tribe has the burden "to prove that the agency's action was arbitrary and capricious." *South Dakota v. U.S. Dep't of Interior*, 423 F.3d 790, 800 (8th Cir. 2005) (citing *United States v. Massey*, 380 F.3d 437, 440 (8th Cir. 2004)). Even though "a presumption exists to permit judicial review of agency decisions, the APA only allows review where there exists 'no other adequate remedy in a court.' " *Central Platte Nat. Res. Dist. v. U.S. Dep't of Agric.*, 643 F.3d 1142, 1148 (8th Cir. 2011) (quoting 5 U.S.C. § 704).

In its response brief, the Tribe argues that a "significant basis for this case is that the federal government has once again failed to *meaningfully consult* with the [Tribe] before undertaking major federal action that resulted in hardship to the [Tribe] and its youngest citizens." Docket 21 at 22 (emphasis added). To support this point, the Tribe cites to this court's decision in *Kempthorne* as an example of when a court can exercise judicial review to evaluate whether an agency engaged in required consultation prior to taking action. *See id.* (citing *Kempthorne*, 442 F. Supp. 2d at 783). In *Kempthorne*, this court found the BIA's actions in restructuring the Indian school programs were subject to judicial review under the APA. 442 F. Supp. 2d at 783. Thus, when construing the facts in the light most favorable to the Tribe, the court finds

14

that the Tribe plausibly alleges that defendants arbitrarily and capriciously violated the APA. Defendants' motion to dismiss Count II is denied.

### C.      Count III: Trust Responsibility and 1868 Fort Laramie Treaty

Count III of the complaint alleges that defendants breached the trust responsibility owed to the Tribe by defendants and breached provisions of the 1868 Fort Laramie Treaty. Specifically, the Tribe's complaint alleges that defendants violated their trust obligations by failing to provide the Tribe with the "actual costs of restructuring, or the source of funds for the proposed restructuring," or to account for the use of those funds. Docket 1 at 25, ¶ 88. The Tribe's complaint also alleges that defendants violated Articles V and VII of the 1868 Fort Laramie Treaty by creating and implementing a plan that eliminated a local office responsible for discharging and overseeing the educational service provided to children of the Tribe. *Id.* at 25, ¶ 90.

Defendants responded to the Tribe's allegations in Count III with three arguments. Defendants first argue that because the Tribe "offers no authority for the proposition that meaningful consultation demands that every tribe be given all budgetary information that it deems to be 'essential,'" the tribe fails to state a plausible trust claim. *See* Docket 15 at 28.[4]  Defendants next argue that because the Tribe's treaty "assertions have no basis in the treaty's text," the Tribe has failed to plead a plausible violation of the 1868 Fort Laramie Treaty.

---

[4] Defendants also state that their trust obligations, if any, were satisfied when defendants provided the Tribe with requested budgetary information and informed the Tribe that the reorganization was intended to be "budget neutral". Docket 15 at 25; *see also id.* at 35.

*Id.* at 36-37.[5]  Defendants' final argument alleges that, by failing to address defendants' trust obligation and treaty arguments in the Tribe's response to defendants' motion to dismiss, the Tribe abandoned its trust responsibility and treaty claims. Docket 30 at 7-8. Given that defendants cite no binding precedent for their abandonment argument, the court will consider the Tribe's trust responsibility and treaty arguments as stated in the complaint.

### 1.    Tribe's Trust Responsibility Claim

"There is a 'general trust relationship between the United States and the Indian People.'" *Ashley v. U.S. Dep't of Interior*, 408 F.3d 997, 1002 (8th Cir. 2005) (quoting *United States v. Mitchell*, 463 U.S. 206, 225 (1983)). This trust relationship "is defined and governed by statutes rather than the common law." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 174 (2011). In order "to establish a trust duty," the burden is on the Tribe to " 'identify a substantive source of law that establishes specific fiduciary or other duties, and allege that

---

[5] Defendants further assert that, as a threshold matter, the Tribe failed to show a required waiver of sovereign immunity for its treaty claim. Docket 15 at 35. The case cited by defendants for this proposition, however, addressed treaty based claims seeking monetary relief that the court analyzed as if brought under the Indian Tucker Act. *Skokomish Indian Tribe v. United States*, 410 F.3d 506, 510-11 (9th Cir. 2005) (citing 28 U.S.C. § 1505). All of the Tribe's claims here, however, seek "relief other than money damages." 5 U.S.C. § 702. And it is well understood that treaties between Indian tribes and the government, which set out the rights and obligations of each party, are meant to be enforced. *See, e.g.*, *United States v. Sioux Nation of Indians*, 448 U.S. 371, 423-24 (1980) (concluding that where treaty provisions were violated by the federal government, the tribe had a right to recover under the treaty); *cf. Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 675 (1979) (citation omitted) (observing how "[a] treaty, including one between the United States and an Indian tribe, is essentially a contract between two sovereign nations.").

the Government has failed faithfully to perform those duties.' " *Sisseton-Wahpeton Oyate v. U.S. Dep't of State*, 659 F. Supp. 2d 1071, 1083 (D.S.D. 2009) (quoting *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003)). But "[w]hile the government's obligations are rooted in and outlined by the relevant statutes and treaties, they are largely defined in traditional equitable terms." *Cobell v. Norton*, 240 F.3d 1081, 1099 (D.C. Cir. 2001); *see also* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 5.05, at 426-28 (Nell Jessup Newton ed., 2012) (discussing the scope of trust duties between the federal government and tribes, and how private trust law principles "are most often invoked in controversies involving the direct management of tribal resources and funds").

The complaint alleges that in June 2014, defendants released their *Blueprint for Reform*. Docket 1 at 14, ¶ 45. This plan failed to address the concerns laid out by the Tribe in prior communications it sent to defendants. *Id.* For example, through the Great Plains Tribal Chairman's Association, the Tribe submitted a number of objections that pertained to both the BIE Draft Strategic Plan and the Draft Proposal. *Id.* In its objection, the Tribe opposed the establishment of an Indian Sovereignty Office—a key component of Order 3334 and the BIE Draft Strategic Plan[6]—that is designed to help tribes implement capacity building initiatives. Docket 1-14 at 9. The Tribe also opposed the creation of Centers of Excellence, *see* Docket 1-11 at 11, which the Tribe felt would only serve to benefit the BIE by expanding the BIE's personnel. Docket 1-14 at 12.

---

[6] *See* Docket 1-17 at 2; Docket 1-13 at 22.

17

The Tribe's complaint is filled with allegations that defendants failed to provide the essential budgetary or staffing information that would be necessary in order for the Tribe to gauge how the BIE's restructuring would affect the delivery of education services to Indian children in "BIE funded and/or operated schools." *See, e.g.*, Docket 1 at 14-15, ¶ 45; *id.* at 22, ¶¶ 73-74 (discussing how defendants have failed to demonstrate what effect the restructuring will have on the education of Indian children and ignored the Tribe's suggestions regarding the proposed restructuring). The Tribe began requesting this budgetary information as early as April 2, 2012. Docket 1-3. The Tribe alleges this initial request, and many others like it, were never fully responded to by defendants. *See* Docket 1 at 22, ¶ 72. The Tribe also alleges that defendants have a statutory obligation to provide this budgetary information. *See id.* (citing 25 U.S.C. § 2009(c) and 25 U.S.C. § 2015); *see also id.* at 25, ¶ 89 (citing 25 U.S.C. § 2006(d) and 25 U.S.C. § 2010). The statutes cited to by the Tribe in its complaint demonstrate the burden imposed on defendants by Congress to provide the Tribe with the budgetary information it requested. *See* 25 U.S.C. § 2006(d) (stating that all personnel under the direction and supervision of the Director of the BIE must provide services to support programs "with respect to personnel matters involving staffing action and functions" and provide assistance in areas such as "budgeting").

Indian law canons of construction "are rooted in the unique trust relationship between the United States and the Indians." *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985). Here, the canons require the

court to construe the statutes cited in the complaint liberally in favor of the Tribe and to resolve any ambiguous provisions to the Tribe's benefit. *See Blackfeet Tribe of Indians*, 471 U.S. at 767. Thus, the Tribe identified substantive sources of law to establish a trust duty and has alleged that defendants failed to perform those duties. *See Sisseton-Wahpeton Oyate*, 659 F. Supp. 2d at 1083 (D.S.D. 2009). Liberally construing the statutes in favor of the Tribe and construing all the facts asserted in the complaint as true, the court finds that the Tribe plausibly alleged that defendants breached their trust responsibility owed to the Tribe. Therefore, defendants' motion to dismiss the trust responsibility claim in Count III is denied.

### 2.    Tribe's 1868 Fort Laramie Treaty Claims

On April 29, 1868, the United States and the Great Sioux Nation[7] entered into the 1868 Fort Laramie Treaty. 15 Stat. 635 (1868). The Fort Laramie Treaty was entered into with the hopes of officially ending hostility between the Sioux tribes and the United States following the Powder River War of 1866-1867. *Sioux Nation*, 448 U.S. at 374. The 1868 Fort Laramie Treaty contained several agreements, two of which are at-issue in this dispute.

The Tribe's complaint alleges that defendants violated Articles V and VII of the 1868 Fort Laramie Treaty when defendants created and implemented a

---

[7] "The Great Sioux Nation" refers collectively to the signatory tribes of the Fort Laramie Treaty of 1868, which included the Tribe. *See* Cheyenne River Sioux Tribe Equitable Compensation Act, Pub. L. No. 106–511, § 103(1), 114 Stat. 2365 (2000)("The term 'Tribe' means the Cheyenne River Sioux Tribe, which is comprised of the Itazipco, Siha Sapa, Minniconjou, and Oohenumpa bands of the Great Sioux Nation that reside on the Cheyenne River Reservation, located in central South Dakota.").

plan that eliminated a local office responsible for discharging and overseeing the educational service provided to children of the Tribe. Docket 1 at 25, ¶ 90.

Article V, in relevant part, states:

> [t]he United States agrees that the agent for said Indians shall . . . keep an office open at all times for the purpose of prompt and diligent inquiry into such matters of complaint by and against the Indians as may be presented for investigation under the provisions of their treaty stipulations, as also for the faithful discharge of other duties enjoined on him by law.

15 Stat. 635 (1868).  Article VII provides:

> [i]n order to insure the civilization of the Indians entering into this treaty, the necessity of education is admitted . . . the United States agrees that for every thirty children between said ages who can be induced or compelled to attend school, a house shall be provided and a teacher competent to teach the elementary branches of an English education shall be furnished, who will reside among said Indians, and faithfully discharge his or her duties as a teacher. The provisions of this article to continue for not less than twenty years.

*Id.* The complaint also alleges that a theme of defendants' discussions with the Tribe over defendants' proposed restructuring plan was that defendants sought to "shirk its federal trust and treaty responsibility to operate schools on Indian reservations, and instead shift that responsibility to Tribal government." Docket 1 at 14-15, ¶ 45. Defendants' action of creating the Office of Sovereignty and Indian Education, through Order 3334,[8] violates Article VII, according to the Tribe, by granting additional funds to the BIE that "would be better spent at the local level" through direct allocations to the Tribe. *Id.* at 16, ¶ 50. The Tribe further alleges that Phase II of the BIE's restructuring plans, as described

---

[8] *See* Docket 1-17 at 2, § 4(b)(iii).

in Order 3334,[9] also violates Article VII because it moves the BIE "completely
out of the school operations business and places that burden on Tribes such as
Plaintiff." *Id.* at 16, ¶ 51.

When interpreting provisions of a treaty between a tribe and the United
States, the Indian law canons of construction require that the treaty "be
construed liberally in favor of the Indians with ambiguous provisions
interpreted for their benefit." *County of Oneida*, 470 U.S. at 247. Courts,
therefore, interpret treaties to give the effect to the treaty's terms that the
Indians themselves would have had at the time the treaty was made. *See
Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196 (1999);
*see also Commercial Passenger*, 443 U.S. at 676 (stating that treaties must "be
construed, not according to the technical meaning of its words to learned
lawyers, but in the sense in which they would naturally be understood by the
Indians") (citing *Jones v. Meehan*, 175 U.S. 1, 11 (1899)). The Indian canons of
construction also require courts to "look beyond the written words to the larger
context that frames the Treaty, including 'the history of the treaty, the
negotiations, and the practical construction adopted by the parties.' " *Mille Lacs
Band*, 526 U.S. at 196 (quoting *Choctaw Nation v. United States*, 318 U.S. 423,
432 (1943)).

The Tribe's complaint alleges that defendants' actions violated the terms
of the 1868 Fort Laramie Treaty. *See, e.g.*, Docket 1, ¶¶ 45, 50, 51, 90. While
defendants contend that other facts will discredit the Tribes facts, when

---

[9] *See* Docket 1-17 at 2-3, § 5.

considering a motion to dismiss, this court must assume as true all the facts alleged by the plaintiff in the complaint. *See Rochling*, 725 F.3d at 930. Thus, after considering the terms of the treaty in favor of the Tribe, and assuming as true all the facts asserted in the complaint and drawing all reasonable inferences from those facts in a light most favorable to the Tribe, the court finds that the Tribe plausibly alleged that defendants breached its obligations owed under the 1868 Fort Laramie Treaty. Therefore, defendants' motion to dismiss the treaty claims in Count III is denied.

### D.   Count IV: Settlement Agreement

Count IV of the complaint alleges that defendants breached the settlement agreement that was entered into in *Yankton Sioux Tribe, et al. v. Kempthorne, et al.*, No. 4:06-CV-4091-KES, Docket 73. In *Yankton Sioux Tribe*, the court recently held that the settlement agreement executed in 2007 was only applicable to the 2005 restructuring of the BIE. *Yankton Sioux Tribe*, No. 06-4091, Docket 111 at 5. Thus, defendants' motion to dismiss Count IV of the complaint is granted.

### CONCLUSION

Defendants abandoned their argument that the Tribe's complaint should be dismissed under a theory of ripeness. *See* Docket 30 at 6 n.2. Defendants move to dismiss Counts I-III of the Tribe's complaint for failure to state a claim upon which relief can be granted and to dismiss Count IV of the Tribe's complaint for lack of subject matter jurisdiction. The court finds that Counts I-

III of the Tribe's complaint plausibly state a claim for relief. Count IV of the Tribe's complaint, however, is duplicative and is dismissed. Thus, it is

ORDERED that defendants' motion to dismiss (Docket 14) is granted in part and denied in part consistent with the court's opinion.

Dated September 6, 2016.

BY THE COURT:

/s/ *Karen E. Schreier*

KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE