## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH DAKOTA
## CENTRAL DIVISION

| | | |
|---|---|---|
| CHEYENNE RIVER SIOUX TRIBE, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO.: 3:15-cv-03018-KES |
| | ) | |
| ROSEBUD SIOUX TRIBE, | ) | |
| | ) | **INTERVENOR-PLAINTIFF** |
| Intervenor-Plaintiff, | ) | **ROSEBUD SIOUX TRIBE'S** |
| | ) | **MEMORANDUM IN SUPPORT OF** |
| v. | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT, OR IN THE** |
| RYAN ZINKE, Secretary, United States | ) | **ALTERNATIVE, MOTION FOR** |
| Department of Interior, et al., | ) | **PARTIAL SUMMARY JUDGMENT** |
| | ) | |
| Defendants. | ) | |

COMES NOW Intervenor-Plaintiff Rosebud Sioux Tribe and hereby submits its Memorandum in Support of its Motion for Summary Judgment, or in the alternative, Motion for Partial Summary Judgment, and joins with Cheyenne River Sioux Tribe's Memorandum in Support of Motion for Summary Judgment, and incorporates the same herein. Each numbered *paragraph* referred to in this Memorandum from the Plaintiff's Statement of Material Facts shall be referred to as "SMF___."

## INTRODUCTION

This matter arose from an ill-conceived and poorly executed effort in a previous administration by two Departmental Secretaries to attempt to deliver a political victory for the administration by "reforming" of Indian education.  This effort ignored core principles of at least four decades of federal Indian policy on self-determination, deliberately contravened federal law and policy regarding consultation with Indian tribes, tribal school officials and educators, and

1

completely ignored open and repeated tribal assertion of rights to educational support and technical assistance located on Indian reservations – under both the 1868 Ft. Laramie Treaty and the trust responsibility rooted in federal statutes.

This effort to restructure Indian education was enshrouded in secrecy – keeping Indian tribes, members of Congress and particularly tribal educators and school officials in the semi-darkness, during what should have been an open consultation process and joint deliberation with tribes and tribal schools.  The BIE and the American Indian Education Study Group (hereinafter "Study Group") also accelerated the planning and implementation of the restructuring, and shortened up the consultation process, all in order to thwart the emergence of organized tribal opposition.

The departmental and agency effort to "reform" Indian education was driven by a kind of *noblesse oblige* and paternalism not seen in federal Indian policy for a half-century, and not only violated federal law and policy on consultation, but also contravened the self-determination policy underlying consultation.

Federal law states "[i]t shall be the policy of the United States acting through the Secretary, in carrying out the functions of the Bureau, to facilitate Indian control of Indian affairs in all matters relating to education." 25 U.S.C. § 2011 (a).  The involved departments and BIE instead worked to give the appearance of consultation, while engaging in the exact opposite – depriving tribes and tribal educators of authentic opportunities for informed and meaningful consultation.

The BIE and Study Group did not invite tribal, tribal school leadership or tribal experts in education into the American Indian Education Study Group as partners in the design and

authorship of any plan to restructure Indian education, instead filling it mostly with non-tribal members who had no prior experience in Indian education.  They also did not involve tribes and tribal schools in any meaningful role in the drafting or implementation of the restructuring plan. They limited meaningful consultation opportunities, including providing short notice before consultations were held, which prevented tribes, tribal schools and their tribal education experts time to adequately prepare for testimony and written critiques or the drafting of alternatives. They also, until 2015, prevented tribal school officials, tribal educators and interested others from even testifying at the formal consultations.  They also kept formal consultations on the Blueprint for Reform to only four nationally.

This reversed nearly four decades of federal policy that respected tribal self-determination and heavily involved Indian educators and tribal experts in the development of federal legislation, regulation and policy regarding Indian education.[1]  The BIE essentially ignored what tribes in the Dakotas, including Plaintiff tribes, were saying during consultation, and it refused to fully consider and give effect to written and testimonial tribal opposition to the Blueprint for Reform or proposed alternatives.

In the end, the "reform" diminished education support and technical assistance to tribal schools on Indian reservations, particularly in the Dakotas, which is required by statute, the trust responsibility, and treaty obligations.  It also left Indian education support services more

---

[1] *Cohen's Handbook of Federal Indian Law* describes the involvement of tribal educators in the most recent report of the U.S. government on Indian education, saying "Indian communities have become significant players in this process.  Indian educators and leaders were responsible for the most recent major governmental report on Indian education." 22.03[1][a], citing *Indian Nations At Risk: An Educational Strategy for Action, Final Report of the Indian Nations At Risk Task Force*, U.S. Department of Education (1991).

centralized, located mostly in urban areas far away from the very schools they were required to be assisting, with a measurable loss of field level services on Indian reservations in support of tribal schools located there, while upper level management increased. The BIE closed Education Line Offices prematurely or allowed staff to be reduced by various forms of attrition by as much as thirty-eight percent between 2013 and 2015, cumulatively reduced educational support and technical assistance services, in part to create a way to fund the restructuring while remaining "budget neutral."

Despite the BIE's promises to tribes that the restructuring would move resources closer to tribal schools and eliminate bureaucracy, it did the exact opposite, all to the detriment of Indian children and their academic progress. Former and current BIE officials admitted during discovery that there was more focus on the restructuring aspect than there was on academics, that there was no empirical research or data showing that this restructuring would lead to improved academic proficiency for Indian children, or that moving education support and technical assistance offices further away from tribal schools on Indian reservations would help lead to better academic performance by Indian children across the nation.

For the reasons set forth below, there is no genuine issue of material fact regarding what occurred and summary judgment should issue in favor of Plaintiffs on all or, in the alternative, part of the claims of the Plaintiffs.

## FACTS

The Facts are as more fully set forth in the Intervenor-Plaintiff's Statement of Undisputed Material Facts, as well as those set forth by Plaintiff Cheyenne River Sioux Tribe in its Statement of Undisputed Material Facts, incorporated herein by reference, as well as "the respective

4

Complaints and Exhibits of tribal plaintiffs, also incorporated herein by reference.

## AUTHORITIES AND ARGUMENT

### Summary Judgment Standard

As this Court has previously set forth regarding summary judgment,

> Summary judgment on all or part of a claim is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); see also *In re Craig*, 144 F.3d 593, 595 (8th Cir.1998). The moving party can meet its burden by presenting evidence that there is no dispute of material fact or that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir.2005) (quoting *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir.1995)). "Further, 'the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment.... Instead, the dispute must be outcome determinative under prevailing law.' " *Id.* (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir.1992)). The facts, and inferences drawn from those facts, are "viewed in the light most favorable to the party opposing the motion" for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold*, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

*Sprint Commc'ns Co. L.P. v. Crow Creek Sioux Tribal Court*, 121 F. Supp. 3d 905, 909 (D.S.D. 2015).

**A.**  **Defendants Failed to Meaningfully Consult With Plaintiff Tribes Under Federal Law and Policy Before Carrying Out Restructuring of the United States Bureau of Indian Education**

As this Court has previously stated, "meaningful consultation requires, at a minimum, that defendants comply with federal statutes and their own policies defining what constitutes adequate 'consultations.'" *Cheyenne River Sioux Tribe v. Jewell*, 205 F. Supp. 3d 1052, 1058 (D.S.D. 2016).

When the Congress enacted the requirement in § 21011 (a), it also required that "[a]ll actions under this Act shall be done with active consultation with tribes." 25 U.S.C. § 2011 (a) and (b)(1).

Both the Department of Interior (hereinafter "Interior") and the United States Bureau of Indian Affairs (hereinafter "BIA") have enacted Departmental and Agency policies that are, as this Court has previously recognized, in some places more stringent than 25 U.S.C. § 2011.

The United States Department of the Interior issued its Consultation Policy, in compliance with Executive Order 13175, in Secretarial Order No. 3317, as amended on December 31, 2012, which is "[b]ased on a renewed commitment to assess [Interior's] practices and the opportunities to enhance consultation with Indian tribes . . . to demonstrate a meaningful commitment to consultation by identifying and involving Tribal representatives in a meaningful way early in the planning process."  Secretarial Order No. 3317, Section 4a.

The Interior Consultation Policy goes on to state as follows:

> [c]onsultation is a process that aims to create effective collaboration with Indian tribes and to inform Federal decision-makers. Consultation is built upon government-to-government exchange of information and promotes enhanced communication that emphasizes trust, respect, and shared responsibility. *Communication will be open and transparent without compromising the rights of Indian tribes or the government-to-government consultation process.*

Secretarial Order No. 3317, Section 4b, emphasis added.  Finally, that

> Bureaus and offices will seek to promote cooperation,
> participation, and efficiencies between agencies with overlapping
> jurisdictions, special expertise, or related responsibilities when a
> Departmental action with Tribal implications arises. *Efficiencies
> derived from the inclusion of Indian tribes in all stages of the
> tribal consultation will help ensure that future Federal action is
> achievable, comprehensive, long-lasting, and reflective of tribal
> input*.

Secretarial Order No. 3317, Section 4c, emphasis added.

Pursuant to Executive Order 13175, the BIA adopted its Government-to-Government

Consultation Policy (hereinafter "BIA Consultation Policy") for proposed federal actions

affecting tribes, which is also the consultation policy for the BIE.  It includes the following

definition of consultation:

> "Consultation" means a process of government-to-government
> dialogue between the Bureau of Indian Affairs and Indian tribes
> regarding proposed Federal actions in a manner intended to secure
> meaningful and timely tribal input. Consultation includes that
> Indian tribes are:
> 1. to receive timely notification of the formulated or proposed
> Federal action;
> 2. to be informed of the potential impact on Indian tribes of the
> formulated or proposed Federal action;
> 3. to be informed of those Federal officials who may make the final
> decisions with respect to the Federal action;
> 4. to have the input and recommendations of Indian tribes on such
> proposed action be fully considered by those officials responsible
> for the final decision; and
> 5. to be advised of the rejection of tribal recommendations on such
> action from those Federal officials making such decisions and the
> basis for such rejections.

BIA Consultation Policy, 4. Definitions.  The Defendants disregarded their obligations under 25

U.S.C. § 2011 and the BIA Consultation Policy and Interior Policy in a number of ways.

The federal statute and departmental and agency consultation policies are remarkable for their stated obligation to be open and transparent, and include tribes in all steps of tribal consultation, and to proceed slowly and carefully when the federal government is considering making significant changes to the way it delivers Indian education and support, and the Plaintiffs would likely not be in this lawsuit if the members of the Study Group and the BIE had read the following section of the BIA Consultation Policy:

> Early consultation with tribal leadership is vital for several reasons. Without early consultation, the Bureau may develop proposals based on an incomplete and anecdotal understanding of the issues that surround a particular matter. As a result, Bureau proposals often create severe unintended consequences for tribal governments. Issues in Indian country are often more complex than they seem at first, in part because of the great diversity among tribes and the circumstances they face, as well as the long history surrounding the development of federal Indian policy.
> An open process in the initial stages creates better and more efficient consultation. For example, early consultation with Tribal governments on the scope and impact of a Bureau proposal may provide the basis for the Bureau determining that no action is necessary. More broadly, pre-draft consultation helps insure that real problems are identified at the beginning and properly studied; that issues that are of no concern do not consume time and effort; that subsequent drafts are balanced and thorough; and that the delays and costs occasioned by redoing an inadequate draft are avoided.

BIA Consultation Policy, VI.A.  This warning in their own Consultation Policy not only went unheeded, it almost became a blueprint for doing the opposite.

The Study Group's Proposal, primarily authored by Don Yu and Kenneth Wong, upon which the Blueprint for Reform was then based, was released on June 6, 2014, *a month and a half* after the Study Group went to the Loneman School.  (SMF 57, 24-25.)  It was a fairly thick document, and other than being sprinkled with e-mail comments made by a few tribal educators

and officials, it was primarily the work of the non-tribal federal officials and consultants.  (CRST Exhibit 16, Docket 1.)  There is no reasonable way to conclude, even taking the facts in a light most favorable to the Defendants, that this document, upon which all subsequent federal action regarding the restructuring of Indian education was based, followed federal law or policy regarding consultation, or that it was anything other than a "proposal based on an incomplete and anecdotal understanding of the issues that surround a particular matter."  (BIA Consultation Policy, VI.A.)  It essentially took theories regarding fragmentation and centralization in urban education in large cities and extrapolated them to tribal schools, without any empirical research supporting that theory, to the detriment of tribal children.  (CRST Exhibit 16, Docket 1-16, SMF 18-24.)

Indian tribes, tribal school officials, tribal educators and their experts did not have time, in a month and a half, working with very limited information provided to them, and inadequate predicate information, to meaningfully consult and jointly deliberate about the Study Group's Proposal or its contents.  (SMF 57-58, 61-63, 153.)

The four Listening Sessions held in 2014, one of which was at Loneman School in the Dakotas, were ill-defined in terms of their stated goals to tribal participants, with little detailed information provided.  (SMF 57-58, 60-61, 63.)  Tribal participants apparently thought it was another of many initiatives to take complaints about the lack of funding, not the origins of a radical transformation of and retreat from federal obligations to educate Indian children, and tribal participants at the Loneman Session were clearly primarily concerned with improving the financial stability of the schools, urging the Study Group members to "don't change anything." (SMF 38-39, 59.)  This early opposition fell on the deaf ears of the Study Group and the BIE,

9

despite their obligation under the Consultation Policy to be responsive to what tribes raised at the consultations.  (SMF 64, BIA Consultation Policy.)

From the earliest moments of this restructuring effort in 2014, the Study Group and the BIE appeared to be intent on creating a kind of speeded-up forward motion, communicating to tribes and tribal school officials that there was a kind of inevitability about the changes to Indian education and suggesting tribal submission in the face of that forward motion.  At some point, it had an effect.

Tribal leaders and educators understood both historically, from decades if not a century or more of that kind of grinding government initiative and that, as in the past, the federal government was going to do what it wanted regardless of tribal views. (SMF 207.) They did, however, have the presence of mind to keep registering their opposition to the way in which consultation was being conducted, and kept making a record of opposition to the restructuring, and in the limited time they had before consultations, to attempt to propose alternatives.  (SMF 58, 73, 80, 84, 100, 102, 106, 109, 126, 131.)  It is clear from the record that tribes and tribal schools and educators understood the law and policy regarding consultation, even if restructuring was communicated to tribes as a *fait accompli*.  (*Id.*)

BIE Director Roessel and the Study Group's leadership invented a kind of bureaucratic doublespeak in their branding and selling of the restructuring, and kept repeating it until it sounded true:  that less educational support is more, that diminishment of education support, treaty rights and trust responsibility meant "greater sovereignty," that resources would be moved closer to schools even though the Education Line Offices were closed and resources were moved further away from Indian reservations, that there would be less bureaucracy and red tape,

10

although more was created.  (SMF 60, 85-87, 137, 159, 160, 210, 237, 239.)[2]

They also created a fast-moving process which, it can be reasonably inferred, taking the facts in a light most favorable to the Defendants, deliberately withheld or confused information in order to keep potential tribal opposition (and thus Congressional opposition) off-balance and unable to coalesce, while advancing the restructuring toward approval and reprogramming. (SMF 68-71, 89, 155.)

This fast-moving process persisted through the consultation period for the Blueprint for Reform, and Roessel, the Study Group, the BIE and Interior were clearly after quantity rather than quality of contacts in order to suggest adequate consultation to Congress and others.

Only four actual consultations were held on the Blueprint for Reform, but Roessel counted every time he and his staff showed the same PowerPoint on the Blueprint for Reform (which did not change after July 2014), webinars showing the PowerPoint, telephone calls and attendance at various tribal organization meetings, all as contacts with tribes, to attempt to make it appear that tribes were deliberating with the BIE.   Showing the same slide show over and over, without actual detail about how devastating the budget or personnel changes might be, or without informing tribes that there would be no more Education Line Offices on Indian reservations, was not an open process, not meaningful consultation, or joint deliberation.  It was, quite simply, an elaborate effort using  smoke and mirrors to appear to be complying with federal law and policy

_____

[2] Don Yu admitted in his deposition that "I don't think we ever achieved all of those things.  I mean, I wish we could have. . . I don't think it was ever the goal for our team and the . . . Administration to complete all of those things anyway." Yu said turning around a failing school system is not something you do in one year, two years, three years, four years.  It takes a decade, maybe more.  And it was never my . . . I never thought . . . and I don't think any one of the political appointees thought we would be able to complete all of the goals in there." (SMF 234-235.)

on consultation, while actually keeping tribes in the dark.

No tribal leaders, tribal school officials or tribal educators were involved in the formulation, drafting, planning or implementation of the Study Group Proposal, the BIE Strategic Plan for 2014-2018 (essentially the implementation plan for the restructuring), or the subsequently issued Blueprint for Reform. (SMF 6-7.)  Tribes and tribal schools had no way of knowing what was being cooked up behind closed doors at the Study Group and BIE, and certainly were not apprised of what was being developed in the short time between when the Study Group came through the Dakotas in April 2014 and when the Blueprint for Reform was issued June 12, 2014.

Once the Blueprint for Reform was released six days after the Study Group's Proposal was released, and then Secretarial Order No. 3334, primarily authored by Donald Yu, was issued the next day, the Study Group then merged with the BIE and became focused upon implementation of the Blueprint for Reform (the restructuring).  (SMF 36-37.)

The haste and secrecy continued.   The senior management officials of the BIE directly under then-BIE Director Charles Roessel, titled the Associate Deputy Directors ("ADDs"), were largely left out of the process.  (SMF 41-43.)  The first time tribal leaders and tribal educators could have seen the Blueprint for Reform was on or after June 12, 2014.  They were told in a meeting in July 2014, a month later (and about nine months before the first consultation on the Blueprint for Reform was ever held) that the changes in the Blueprint for Reform were "happening now." (SMF 88.)  There were no further drafts of the Blueprint for Reform after July of 2014.  (SMF 111.)  This essentially marked the end of full consideration and giving effect to tribal input, even though the consultation period ostensibly lasted up until the reprogramming

12

was approved by the House Appropriations Committee in December of 2015, and allegedly by

Senate Appropriations in February of 2016 (there is no written record of approval anywhere.)

On March 17, 2015, before *any* consultations were held on the Blueprint for Reform, BIE

Chief Implementation Officer and budget analyst Wendy Greyeyes, wrote an e-mail to Adrianne

Moss at the Department of Interior on behalf of BIE Director Roessel, telling Interior that

Roessel wanted to move forward formally with the reprogramming request and request for

approval of the restructuring to Congress, *before* the first of four (4) consultations were actually

held beginning on April 22, 2015, and that Roessel "does not see any drastic changes based on

comments from tribes heavily impacted by BIE's realignment" and that "therefore we want to

continue moving forward with the reprogramming letter formally."  (SMF 90-91.)  Clearly, the

die was already cast.

The four consultations on the Blueprint for Reform were held in a mere nine (9) days

from April 22 to early May of 2015, and Roessel does not remember having any concerns about

holding the consultations so quickly, and admits he may have told officials in the Study Group or

above him in the line of authority that consultations could be completed quickly. (SMF 68-69.)

The BIA Consultation Policy requires that

> The Bureau should, at the outset of the consultation process, solicit
> the views of affected tribes regarding how long the consultation
> process shall take. The Bureau should make all reasonable efforts to
> comply with the expressed views of the affected tribes regarding the
> length of the consultation process, taking into account the level of
> impact, the scope and the complexity of the issues involved in the
> proposed federal action. Notwithstanding the overall time for the
> process, consultation should continue throughout the Bureau's
> decision making process . . . .

BIA Consultation Policy B.4.  There is no evidence in the Administrative Record that the BIE

worked with the tribes to comply with this policy.  There was no attempt to ascertain from tribes

13

how long they thought the consultation process should take, and in fact no tribal views were either solicited or complied with, nor were any of the other factors in the policy considered.

When tribal educator and tribal official Dr. Sherry Johnson from the Sisseton-Wahpeton Oyate expressed concern to Don Yu in writing that the process of approving the Blueprint for Reform was moving too fast, Yu admits that this concerned him but he also felt the urgency of reform. (SMF 70-71.)  Her expressed views were not given effect or complied with.

Yu admits he was aware that tribal self-determination was the reason for the consultation policy, and understood that the reason for involving tribes as early as possible in the consultation process was to allow them to maximize their participation in changes in laws, practices and programs that affect their lives, but as one of the responsible federal officials, he did not ever read the consultation policies or statutes.  (SMF 46-47, 50.)

The Study Group's members were essentially the officials who would "listen" to tribes, tribal school officials and tribal educators at the consultations and, in theory, make changes to reflect tribal wishes, but they were at best, motivated to fulfill their political goals of "reform," and at worst some were racially or culturally insensitive (SMF 89), or in the case of BIE Director Roessel, driven by tribal loyalties. (SMF 179)  In an email exchange between Yu and Study Group member Rose, Rose's comments were "[w]hat is wrong with these tribes?  The recommendations are to improve opportunities for children.  The president is visiting a reservation to talk about improving education.  I know there have been hundreds of years of injustice and genocide, but . . . ." (SMF 89.)  This almost appears to be lifted from floor discussion during the passage of the Allotment Act in 1887.

There was a marked lack of information from the BIE and Study Group about budgets or

personnel in the restructuring.  (SMF 61, 63, 78-79.)  At the consultation in Rapid City, South Dakota the Rosebud Sioux Tribe clearly asked for budget information but it was missing.  (SMF 79.)

From the Listening Session at Loneman through the Rapid City, South Dakota consultation on April 22, 2015, Tribal Interior Budget Council meetings, various tribal resolutions, the National Congress of American Indians ("NCAI") annual meeting in California in October of 2015, and finally the resolution of the Great Plains Tribal Chairmen's Association sent with a cover letter on November 18, 2015 (and entered in the Administrative Record) the tribes and tribal school officials and educators from the Great Plains, including Plaintiffs, registered consistent criticism of the consultation process itself, regularly testified and submitted in writing detailed opposition to the Blueprint for Reform and proposed alternatives, opposed the closure of Education Line Offices located on Indian Reservations, and asserted their trust and treaty rights to having their education support and technical assistance at the Education Line Offices located on the reservation near the tribal schools being served.  (SMF 79-81, 84, 95-109.)

Up through and after comments and testimony at the consultation in Rapid City on April 22, 2015, no substantive changes were made to the Blueprint for Reform or the restructuring in response to the tribal views.  (SMF 110.)  At the NCAI national meeting in October 2015, BIE Director Roessel and Don Yu were actively campaigning behind the scenes and in public in this national tribal nonprofit's meeting to obtain a resolution of support from NCAI which it could then take to an increasingly reluctant Congress to demonstrate tribal support for the Blueprint.[3]

_____

[3] This may be in violation of the BIA Consultation Policy which states, in pertinent part, that "as nations separate from the United States, the internal affairs of tribes are the responsibility of the tribal entity and are not to be tampered with or interfered with by the United States."  BIA

(SMF 118-123.)   At this meeting, former Oglala Sioux Tribal Chairperson Cecelia Fire Thunder, also a tribal school board Chairperson, who was representing the then-current Oglala Sioux President at this NCAI meeting, rose and vocally opposed the Blueprint for Reform and any resolution by NCAI in support.  (SMF 124.)

Ms. Fire Thunder told the BIE, which was recorded in the BIE's notes, that Pine Ridge opposed reform (SMF 125), that "consultation means BIE should come to the table with a blank paper and create a plan together – not come with a pre-prepared plan (SMF 126), that money taken from the budget to fund restructuring could help tribal schools (SMF 127), that Pine Ridge was ready to create plans based upon what they know they need (SMF 128), that the BIE did not need more employees, the tribes needed more money (SMF 129), that the six tribal schools were prepared to come up with their own plan and just wanted an opportunity to do so (SMF 130), and that the Oglala Sioux Tribe was unhappy with how the consultations took place (SMF 131).

After these issues were raised in October of 2015, the BIE did not give effect to the issues raised by Ms. Fire Thunder and the Oglala Sioux Tribe, which aligned with the opposition to the restructuring by other tribes of the Great Plains, and Roessel admitted the BIE did not go back and make any changes to the restructuring plan.  (SMF 132.)

The Great Plains Tribal Chairmen's Association ("GPTCA"), of which Plaintiff tribes are

---

Consultation Policy, at 1, (SMF 135.)  The NCAI did, in a split vote, approve a resolution of support, which was then delivered to Congress by the BIE as a demonstration of tribal support for the Blueprint for Reform just before the reprogramming was approved by the House Appropriations Committee on December 18, 2015.  The NCAI had a conflict of interest as well, because its executives in Washington, D.C. had been selected by the BIE to serve as the conduit for funding by the Kellogg Foundation, which had expressed reluctance to fund a government agency, and it is reasonable to infer, they had a financial interest in the restructuring.  (SMF 218-235.)

members had, in 2014, submitted a detailed critique of the BIE's 2014-2018 Strategic Plan, which was essentially the implementation plan for the restructuring, as well as written criticism of the restructuring in March of 2014 at a meeting in Washington, D.C., submitted a resolution opposing the Blueprint for Reform and proposing alternatives on November 18, 2015 (part of the Administrative Record).  However, the Administrative Record is devoid of any indication of full consideration or giving effect to the opposition or proposed alternatives, any tribal input or recommendations of Indian tribes.  BIA Consultation Policy 4. (4) and (5).  The Administrative Record is equally devoid of compliance with 25 U.S.C. § 2011, which requires that if the views and concerns of interested parties are not given full effect, that the Secretary of Interior is "to determine, from information available from or presented by the interested parties during one or more of the discussions and deliberations, that there is a substantial reason for another course of action."  25 U.S.C. § 2011 (b)(2)(B)(ii).  No such determination was ever made by the Secretary.

The Defendants contravened both the statute and their own policies on consultation in taking actions that negatively impacted Indian education for Plaintiff tribes and other tribes in the Great Plains, all for a political victory for the administration. (SMF, paras. 72 and 155.)  There was also a conscious effort to prevent tribal opposition from gathering strength, which appears to have been the impetus for both the secrecy surrounding the plan and its implementation, as well as the hurried timetable for consultation. (SMF, paras. 110, 111, 151-155, 67-71.)

As set forth above, most of the conduct by the Study Group and BIE demonstrated actual disregard by them for the views of the affected tribes and tribal schools.  (SMF 70-73, 88-89, 90-93, 103-105.)

At the Rapid City, South Dakota consultation on April 22, 2015, there were tribal

comments in opposition to the restructuring and asserting treaty rights, as well as strong statements opposing the removal of Education Line Offices from the reservations and affirmative support for keeping Line Offices on the reservations, all of which were ignored by the BIE (SMF 100, 102, 106-111.) At the National Congress of American Indians annual meeting in California, a lengthy and detailed presentation by Oglala Sioux Tribal representative Cecelia Fire Thunder that criticized the manner of the consultation process as well as substantively critiquing the Blueprint for Reform, was also ignored.  (SMF 124-133.)

When the decision was made by the BIE to move the tribally-controlled schools ERC in South Dakota from Rapid City, to Eagle Butte, and finally to Kyle, South Dakota, this decision was made *before* the Rapid City consultation on April 22, 2015, because on the record Roessel asked Wendy Greyeyes, who was running his Blueprint for Reform Power Point at the April 22, 2105 Rapid City consultation, where the ERC had been moved, and she said to Kyle on the Pine Ridge Indian Reservation. (SMF 112.)  There is nothing in the Administrative Record about a tribal consultation regarding this change in location of the ERC, but Rosebud Representative Richard Lunderman questioned Don Yu about it and why the Rosebud Tribe was not consulted, and Yu said he would find out and get back to Lunderman but never did. (SMF 113.)  This demonstrated the arbitrary nature of how decisions were being made, without tribal consultation.

The BIE did not utilize an "open process" as prescribed by the BIA Consultation Policy. It states that

> An open process in the initial stages creates better and more efficient consultation. For example, early consultation with Tribal governments on the scope and impact of a Bureau proposal may provide the basis for the Bureau determining that no action is necessary. More broadly, pre-draft consultation helps insure that

> real problems are identified at the beginning and properly studied;
> that issues that are of no concern do not consume time and effort;
> that subsequent drafts are balanced and thorough; and that the
> delays and costs occasioned by redoing an inadequate draft are
> avoided.

BIA Consultation Policy, VI.A. Essentially, this actually describes what the BIE did not do.

According to ADD Jeff Hamley, the BIE was conscious from the beginning that there had been a previous lawsuit (the lawsuit before this Court in 2006-2007, *Yankton Sioux Tribe v. Kempthorne*) and it was in the minds of BIE officials that there was going to be an organized resistance by the tribes against the restructuring. (SMF 151.)  Rather than try to define and address what that opposition was before they further committed to the Blueprint for Reform, the Department of Interior, the Study Group and BIE essentially dealt with it by hiding the ball.  For example, the Chief of Staff of Assistant Secretary of Interior for Indian Affairs, Kevin Washburn, sent a memorandum on August 8, 2014 telling some employees "just FYI, for future reference, we are really trying to stay away from calling the BIE Study Group or its recommendations a 'realignment'." (SMF 152.)

Director Roessel hid the ball not only from tribes and tribal schools, but from his own senior executives, the ADDs, something which concerned ADD Jeff Hamley who was a person who favored tribal consultation, and the same propensity was observed by his Assistant to the Director Jacquelyn Cheek. (SMF 153.)

Both ADD Bart Stevens and ADD RoseMarie Davis believed that the Blueprint for Reform may have been more acceptable if tribal leaders and school officials and educators and the senior leaders of the BIE had been involved in its drafting. (SMF 154.)  Instead, it was largely written by two individuals, Yu and Wong, who had no prior experience with tribal education or

19

Indian education. (SMF 11, 24.)

There is a strong inference from the facts that a part of Roessel's own desire to hide the ball came in part from his willingness to use his knowledge of tribal politics against Indian tribes and tribal school officials, and in part to use the restructuring to enhance the benefits for his own Navajo tribe.[4]  The Dakotas appear to have been somewhat punished in the restructuring and ERC design by sending their education support and technical assistance far away from Indian reservations where their tribal or BIE-operated schools were located, to North Dakota, Minnesota, and Flandreau, and for a while all the way to Albuquerque, with only one Education Resource Center ("ERC") for tribal schools located in South Dakota, first at Rapid City, then Eagle Butte and finally to Kyle, South Dakota (presently in Minneapolis, Minnesota at the ADD office for tribal grant schools.)  However, in the restructuring the Navajo Reservation received its own ADD office – the only one that was by *geography* rather than role (*i.e.* ADD for tribally-controlled schools or ADD for BIE-operated schools), and received *three* ERCs all located *on* the Navajo Reservation.  (SMF 175-180.)  Don Yu was unaware of the ADD and three ERC's on the Navajo Reservation (SMF 179.)

Don Yu admits that there was some tension between adequate consultation with tribes and tribal school officials, and on the other hand, trying to get his restructuring done before the end of the administration. (SMF 155.)  Clearly, adequate tribal consultation was the loser in that tension.

---

[4] Roessel was removed as BIE Director because of an Office of Inspector General investigation published March 16, 2016 revealing he in appropriately hired two individuals from the Navajo Tribe, a relative in the Navajo Tribal school system, and his Budget Analyst and Chief Implementation Officer Wendy Greyeyes, with whom he was having a romantic affair. (SMF 177, *Affidavit of Charles Abourezk,* Exhibit 33.)

The BIE also appears to have committed a *per se* violation of 25 U.S.C. § 2011, by first not allowing tribal school officials and educators to testify in tribal consultations during the restructuring effort, and then by finally relenting and allowing them to testify after February 2015, but then only with the approval of their particular Indian tribe. (SMF 115-116.)

The statute states, in pertinent part, that [d]uring discussions and joint deliberations, *interested parties (including tribes and school officials) shall* be given an opportunity – (i) to present issues . . . and  (ii) to participate and discuss the options presented, or to present alternatives, with the views and concerns of the interested parties given effect . . . ."  25 U.S.C. § 2011 (b)(2)(B)(ii), emphasis added.  Roessel admits in 25 U.S.C. § 2011, there is no requirement that there be tribal consent for tribal school officials and interested parties to participate in consultation. (SMF 117.)

Cecelia Fire Thunder expressed the harm done by preventing tribal school officials and educators to testify, stating at the October 2015 NCAI meeting that there were few educators invited to consultations, only tribal leaders, and they did not know educational issues like the educators and that school board officials were elected by the people and "we know what we want and need." (SMF 114.)

### B.     The Defendants' Restructuring Plan, the Manner in Which They Carried Out Consultations, and Implementation of That Plan Violated the Administrative Procedures Act

This section overlaps with and incorporates the facts and discussion in Section A above. The Administrative Procedures Act, in pertinent part, sets forth as follows:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning

or applicability of the terms of an agency action. The reviewing court shall–

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be–

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law . . .
>
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

> The judiciary may . . . in certain contexts review an agency's compliance with its own regulations when the regulations impose binding norms on the agency. *Vitarelli v. Seaton*, 359 U.S. 535, 539–40, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Ngure [v. Ashcroft]*, 367 F.3d 975, 982 [(8ᵗʰ Cir. 2004)]. "As a general rule, an agency pronouncement is transformed into a binding norm if so intended by the agency [,] and agency intent, in turn, is ascertained by an examination of the statement's language, the context, and any available extrinsic evidence." *Id.* (quoting *Padula v. Webster*, 822 F.2d 97, 100 (D.C.Cir.1987)). Judicial review is appropriate where agency rules were "intended primarily to confer important procedural benefits upon individuals in the face of otherwise unfettered discretion." *Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 538–39, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970). When the procedural rule is designed primarily to benefit the agency in carrying out its functions, however, judicial review may be prohibited. *Id.* at 539, 90 S.Ct. 1288.

*Yankton Sioux Tribe v. Kempthorne*, 442 F. Supp. 2d 774, 782–83 (D.S.D. 2006).  This Court

went on to hold in *Kempthorne*, a case also involving restructuring of Indian education, that

> federal statutes and BIA policies require the BIA to consult with
> Tribes before making changes in Indian school programs. See 25
> U.S.C. § 2011(b)(1) & (2); 25 C.F.R. § 32.2(g); 25 C.F.R. §
> 32.4(a)(1) & (2); and BIA Consultation Policy. The explicit
> language of these statutes, regulations, and policies indicates an
> intent to confer important procedural benefits upon the tribes in the
> face of agency discretion and thus the agency action is subject to
> judicial review. See, e.g., *Yankton Sioux Tribe v. U.S. Dep't of
> Health & Human Services*, 869 F.Supp. 760, 765 (D.S.D.1994)
> (distinguishing *Lincoln* in case involving alleged failure to comply
> with statute requiring tribal consultation before expending IHS
> construction funds). Thus, the court finds that the BIA decision to
> restructure is subject to judicial review.

*Kempthorne*, at, 783 (D.S.D. 2006), emphasis added.  The federal statutes regarding consultation

at 25 U.S.C. § 2011, and consultation policies of both Interior and BIA/BIE are clearly designed

not to "primarily benefit the agency in carrying out its functions" but rather to ensure that the

federal policy of self-determination for Indian tribes is enforced and rises above Agency

discretion.  The BIA Consultation Policy states that "[c]onsultation does not mean merely the

right of tribal officials, as members of the general public, to be consulted, or to provide

comments, under the Administrative Procedures Act or other Federal law of general

applicability."  *Yankton Sioux Tribe v. Kempthorne*, 442 F. Supp. 2d 774, 783–84 (D.S.D. 2006),

citing the BIA Consultation Policy.

As this Court discussed and held in *Kempthorne*,

> Agency action taken without statutory authorization, or which
> frustrates the congressional policy which underlies a statute, is
> invalid. *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707,
> 715 (8th Cir.1979). An agency must comply with its own internal
> policies even if those are more rigorous than procedures required
> by the APA. Id. at 713 (citing *Morton v. Ruiz*, 415 U.S. 199, 235,
> 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974)). Where the BIA has
> established a policy requiring prior consultation with a tribe, and
> therefore created a justified expectation that the tribe will receive a

> meaningful opportunity to express its views before policy is made,
> that opportunity must be given. *Lower Brule Sioux Tribe v. Deer,*
> *911 F.Supp. 395, 399 (D.S.D.1995) (citing Oglala Sioux Tribe, 603*
> *F.2d at 721).*

*Kempthorne*, at 784, emphasis added.  In the present case, not only are the consultation policies

of both Interior and the BIA/BIE rigorous, but the "baseline obligations" in statute  at 25 U.S.C.

§ 2011 are also rigorous.

The Defendants contravened both the statute and their own policies on consultation in

taking actions that affected Indian education, thus failing to comply both with a federal statute

and their own departmental and agency policies.  The facts and discussion set forth in Section A

of this Memorandum are incorporated herein by reference, for the sake of brevity.

As a result, the failure to follow and comply with 25 U.S.C. § 2011 and the Interior and

BIA Consultation Policies, violated the Administrative Procedures Act, specifically 5 U.S.C. §

706(2)(A).  Plaintiffs have more than met their burden in showing that most of the BIA

Consultation Policy was not complied with by the BIE.  There was no inclusion of tribes, tribal

school officials or tribal educators in the American Indian Education Study Group, which was

clearly designated to come up with a proposal to reform the BIE and Indian education, and then a

restructuring plan and a plan for implementation of that restructuring.  Other than seeking

superficial and uninformed comments from randomly selected  tribal educators and tribal school

officials, who had no clue as to the magnitude of what they were commenting upon or how it was

going to be used by the Study Group and the BIE, there was no inclusion of these folks in any

substantive way in drafting, planning or implementation of the restructuring.  This was expressly

contrary to the requirements of the law and policy on consultation.

24

Furthermore the manner in which the consultation period was constructed was designed in a way that deprived the tribes and tribal schools and educators of opportunities for meaningful consultation or involvement in drafting possible alternatives.  In other words, the design of the process itself – the haste with which it was conducted, the tendency to keep its intentions, methods and goals hidden from tribes, and the limited and uninformed consultation opportunities (only four in nine days nationwide) actually deprived tribes and tribal school officials of meaningful opportunities to consult and jointly deliberate with the BIE under the BIA Consultation Policy, and thus the BIE further violated its statutory obligation to "facilitate Indian control of Indian affairs in all matters relating to education." 25 U.S.C. § 2011 (a).  In this instance, the BIE and Interior covertly wanted to retain their control of the process, for political gain by the administration, not tribal control, and the destructive results of this ultimately revealed themselves.  Tribes deserve to have judicial review here and a final order so that they do not have to perpetually exhaust their time and resources over decades trying to get the BIE to follow federal law and its own policies.

In addition to the Administrative Procedures Act violations relating to consultation, the BIE, while still ostensibly in the required consultation phase and before obtaining Congressional authorization and reprogramming of already-appropriated funds for FY 2015, began taking concrete and final agency actions and decisions which began to diminish and in some cases terminate educational support services and technical assistance for tribal schools – by closing or allowing to be diminished by attrition the Education Line Offices which, in the Dakotas, were

located on Plaintiffs' Indian reservations, as well as on others in the Great Plains.[5]

The Administrative Procedures Act sets forth, in pertinent part, that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [and] (C)  in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706 (2)(A) and (C).

The United States District Court for South Dakota has previously held that

> [t]he APA provides that '[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The Supreme Court has read the APA as embodying a "basic presumption of judicial review." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). However, the Supreme Court has again recently made clear that, under 5 U.S.C. § 701(a)(2), agency action is not subject to judicial review " 'to the extent that' " such action " 'is committed to agency discretion by law.'

*Yankton Sioux Tribe v. U.S. Dep't of Health & Human Servs.*, 869 F. Supp. 760, 764 (D.S.D. 1994); citing *Lincoln v. Vigil,* 508 U.S. 182, 113 S.Ct. 2024, 124 L.Ed.2d (1993).

However, according to the District Court, where Congress has specifically appropriated funds or placed statutory conditions upon the expenditure of funds, then the agency no longer has discretion.  *Id.*, at 765.  In that case, the District Court ruled that the agency (Indian Health

---

[5] "Reprogramming is the shifting of funds within an appropriation to purposes other than those contemplated at the time of appropriation.  More specifically, it is the application of appropriations within a particular account to purposes, or in amounts, other than those justified in the budget submissions or otherwise considered or indicated by congressional committees in connection with the enactment of appropriation." *Principles of Federal Appropriations Law*, Page 2-44 GAO-16-464SP; citing " *GAO, A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP (Washington, D.C.: Sept. 2005), at 85.

Services) had not been left with discretionary authority to take action, precluding judicial review. *Id.* In the present case, the BIE was restricted by its previous appropriation, which is why it had to apply for reprogramming of funds already appropriated, approval it did not have when it began to diminish staff and move Education Line Offices, and decrease education support and technical assistance to tribal schools.

There are a number of statutory schemes, in addition to treaty rights (set forth more fully in Section C below), which do not leave discretion to the BIE and Interior to abandon or diminish their obligations to educate Indian children or to continue to provide educational support and technical assistance to tribal schools carrying out those obligations by statutory scheme such as the Tribally-Controlled Schools Act (P.L. 100-297.)

Their acts to allow the Education Line Offices to deteriorate and then close or diminish services to the point of being nonfunctional and ultimately removing them from the reservations before they had any Congressional authority to do so, were contrary to a number of federal laws passed by the Congress, including but not limited to Public Laws 93-638, 100-297, 95-561, and 25 U.S.C. § 2006. (SMF 255-257.)  There was full agreement by all BIE officials who were deposed that there is still an obligation to provide educational support and educational assistance to tribal schools, by both treaty and statute, these obligations still have not ceased, and that there was a reduction in services at the field level, at the Education Line Offices. (SMF 169-170, 172-174, 176, 182, 185-217.)  Plaintiff Cheyenne River Sioux Tribe's Education Line Office was closed in December of 2014, and the Rosebud Sioux Tribe's Line Office was effectively closed June 30, 2015. (SMF 187-188.)

Roessel sought in advance to make room for the restructuring and to fund it, while

remaining "budget neutral," by allowing the attrition of Education Line Office staff between 2013 and 2015, and eventually closing the Line Offices and reducing the 22 Education Line Offices to 15 centralized Education Resource Centers which were, in the case of Plaintiff tribes, located at considerable distances from their reservations, all before any Congressional approval to reprogram already-appropriated and restricted funds, and in spite of questions being raised around this time by Congress, Interior, the White House, and even BIE auditors. (SMF 170-171, 173-175, 205-206, 214, 216-217.)  This was done without advance notice of affected tribes, and without acknowledgment, and thus without proffering even a facially-valid reason.  (SMF 188.) There was measurable harm as a result of these Education Line Offices being diminished or closed, and educational support and technical assistance being reduced, which still persists to this day. (SMF 208-211.)

Taking the facts in a light most favorable to the Defendants, their officials have admitted that they have acted arbitrarily and capriciously, and/or exceeded their statutory obligations and authority by diminishing or ending educational support and technical assistance to the Plaintiffs' tribal schools and, in the case of Cheyenne River Sioux Tribe, also to its BIE-operated school. They have also admitted there are problems providing that support from the Minneapolis ADD office because of the loss of staff who provided those services.  There is measurable damage to the Plaintiffs tribal schools as a result. (SMF 169-170, 172-174, 176, 182, 185-217.)  Plaintiffs have met their burden taking the facts in a light favorable to the Defendants, showing this is also a violation of the Administrative Procedures Act.

     C.     **Treaties and Trust Responsibility**

         1.     **Trust Responsibility**

The trust relationship that is enforceable in this matter arises from federal statutes and the 1868 Ft. Laramie Treaty, rather than from the general trust relationship which the United States government has with the Plaintiff tribes. *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 131 S.Ct. 2313180 L.Ed.2d 187 (2011); *United States v. Mitchell*, 463 U.S. 206, 224, 103 S. Ct. 2961, 2972, 77 L. Ed. 2d 580 (1983). See, also, *Blue Legs v. U.S. Bureau of Indian Affairs*, 867 F.2d 1094, 1100 (8th Cir. 1989)("The existence of a trust duty between the United States and an Indian or Indian tribe can be inferred from the provisions of a statute, treaty or other agreement, 'reinforced by the undisputed existence of a general trust relationship between the United States and the Indian people.'")

The trust responsibility arises from several statutes and/or Public Laws, including  93-638, 100-297, 95-561, 25 U.S.C. § 2006 and 25 U.S.C. § 2011. (SMF 255-257.)  Another source of the trust responsibility, discussed more fully below, is the 1868 Ft. Laramie Treaty, 15 Stat. 635 (1868).  The treaty and these statutes, including the Indian Self-Determination and Education Assistance Act, taken together are "substantive sources of law that establish specific fiduciary or other duties" of the federal government and its departments and agencies. *Jewell*, at 1061; citing *Sisseton–Wahpeton Oyate v. U.S. Dep't of State*, 659 F.Supp.2d 1071, 1083 (D.S.D. 2009) (quoting *United States v. Navajo Nation*, 537 U.S. 488, 506, 123 S.Ct. 1079, 155 L.Ed.2d 60 (2003)).

The BIE and Interior have failed to faithfully perform these trust obligations arising from statute and the 1868 Treaty. *Id.*  As set forth above in Sections A and B of this Memorandum, there was a marked lack of information from the BIE and Study Group about budgets or personnel during the Study Group and later when the Blueprint for Reform was rolled out and

consultation sessions were held regarding it. (SMF 61, 63, 78-79.)  At the consultation in Rapid

City, South Dakota the Rosebud Sioux Tribe clearly asked for budget information but it was

missing. (SMF 79.)  No staffing information was ever provided during the life of the consultation

period.  (SMF 61-62, 78.)

Both the Rosebud Sioux Tribe, and its Sicangu Owayawa Oti, and the Cheyenne River

Sioux Tribe repeatedly and continuously raised questions about the manner in which consultation

was conducted, as well as substantive opposition to the restructuring, expressed through their

common tribal organization, the GPTCA, as well as individually at the Listening Session and at

the tribal consultation held in Rapid City, South Dakota on April 22, 2015, as well as in prolific

correspondence between the Rosebud Sioux Tribe and the Study Group (the Rosebud Sioux

Tribe did not trust Roessel, so many of the one-on-one communications were made with Don Yu

or others). (SMF 71, 73-74, 244-257, and 259-264.)

The consultation policy of the department and agency does not exist in isolation, it grows

from a general statutory policy " . . . to facilitate Indian control of Indian affairs in all matters

relating to education."  25 U.S.C. § 2011 (a).  Of course, this statutory statement of policy has its

origins in the Indian Self-Determination and Education Assistance Act, Public Law 93-638,

which established the self-determination federal policy era in which we are still in today.  It is

literally and practically impossible to achieve consultation or self-determination or to facilitate

Indian control in all matters relating to education if tribes and tribal schools are kept in the dark

by BIE,  in order to preempt the growth of tribal opposition and achieve a political victory for the

administration.  This was not an inadvertent violation of the trust responsibility, it was deliberate,

for a political end, one which defeated the very stated statute and policy requiring consultation

and facilitation of Indian control of Indian affairs.

This deliberate obfuscation stretched from the ill-defined public descriptions of the goals of the Study Group, and the choice not to put any tribal leaders or tribal school officials or educators on the Study Group or to allow tribal leaders and educators to co-author the Proposal of the Study Group or the Blueprint for Reform, to the choice to both hurry consultations and only hold four formal ones, to the decision not to provide any budgetary or staffing information, and this appears to have been in order not to disclose what the Study Group and BIE director Roessel already knew internally – that the education support and technical assistance to tribal schools would largely be removed form the reservations and placed in urban areas, with fewer offices (Education Resource Centers) and fewer support staff in the field, while BIE management was increased. All of this occurred while tribes were being told that resources would be pushed "closer" to schools and that there would be less bureaucracy.  This was more than obfuscation, it was a lie, and a breach of the government's trust responsibility to Indian tribes.[6]

The BIE did not maintain adequate educational support and technical assistance on the reservations required by both the 1868 Ft. Laramie Treaty, and 25 U.S.C. § 2006, between 2013 and 2015, and diminished or closed Education Line Offices prior to receiving authorization from the appropriate committees of Congress to reprogram their appropriations, accomplished in February of 2016.  The Education Line Offices were closed on the reservations and educational support and technical assistance staff reduced without fully replacing those services, resulting in

---

[6] The BIE also told Congress in its Budget Request in 2013, as it prepared for the restructuring, that "BIE will consult with the tribes to identify the best strategies and organizational structure to ensure that tribal needs and priorities are addressed."  OVERVIEW OF FY 2013 BUDGET REQUEST, Green Book Fiscal Year 2013, IA-OVW-5.

a net reduction in staff and support services, to the detriment of Indian children.  (SMF 156-217.)

The BIE, seeking to win support of tribes for the restructuring, established an Indian Sovereignty Office and then took monies which had been appropriated by Congress for school improvement for tribal schools, to award ten "sovereignty grants" to tribes for approximately $200,000 or less each, without obtaining any reprogramming permission, at least anywhere on the record to do so, to the detriment of their trust responsibilities to Indian children at the Plaintiff tribes.  Then BIE Director Roessel believes he had permission from Interior if he rebranded the grants as "sovereignty *enhancement* grants" because school *enhancement* dollars were being used. (SMF 236-243.)

The foregoing establishes substantive sources of law, statutes and treaty rights which establish and trust duties, which Defendants have failed to perform.  *Sisseton–Wahpeton Oyate*, at 1083.

### 2.    1868 Ft. Laramie Treaty

This Court has previously set forth the applicable canons of construction regarding treaties:

> When interpreting provisions of a treaty between a tribe and the United States, the Indian law canons of construction require that the treaty "be construed liberally in favor of the Indians with ambiguous provisions interpreted for their benefit." *County of Oneida [v. Oneida Indian Nation]*, 470 U.S. [226], 247, 105 S.Ct. 1245 (1985). Courts, therefore, interpret treaties to give the effect to the treaty's terms that the Indians themselves would have had at the time the treaty was made. [Citations omitted.] See *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999); see also *[Washington v. Wash. State] Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 676,  99 S.Ct. 3055 (1979)(stating that treaties must "be construed, not according to the technical meaning of its words to

32

> learned lawyers, but in the sense in which they would naturally be
> understood by the Indians") [citation omitted]. The Indian canons
> of construction also require courts to "look beyond the written
> words to the larger context that frames the Treaty, including 'the
> history of the treaty, the negotiations, and the practical construction
> adopted by the parties.' " *Mille Lacs Band*, 526 U.S. at 196, 119
> S.Ct. 1187 (quoting *Choctaw Nation v. United States*, 318 U.S.
> 423, 432, 63 S.Ct. 672, 87 L.Ed. 877 (1943)).

*Jewell*, at 1060–63.

Plaintiffs are members of the Great Sioux Nation and were signatories to the 1868 Ft.

Laramie Treaty.  15 Stat. 635 (1868).  The 1868 Treaty has two key provisions, Article V and

Article VII, which the Rosebud Sioux Tribe understands creates the obligation to provide

education to Rosebud Sioux Tribal children, and to maintain an office on the Reservation to deal

with questions regarding the provision of the treaty right to education. (SMF 212, 257.)

Article V of the 1868 Ft. Laramie Treaty states that

> [t]he United States agrees that the agent for said Indians shall . . .
> *keep an office open at all times for the purpose of prompt and
> diligent inquiry into such matters of complaint by* and against *the
> Indians as may be presented for investigation under the provisions
> of their treaty stipulations*, as *also for the faithful discharge of
> other duties enjoined on him by law*.

1868 Ft. Laramie Treaty, Article V, emphasis added.  Article VII provides that

> [i]n order to insure the civilization of the Indians entering into this
> treaty, the necessity of education is admitted . . . the United States
> agrees that for every thirty children between said ages who can be
> induced or compelled to attend school, a house shall be provided
> and a teacher competent to teach the elementary branches of an
> English education shall be furnished, who will reside among said
> Indians, and faithfully discharge his or her duties as a teacher. The
> provisions of this article to continue for not less than twenty years.

1868 Ft. Laramie Treaty, Article VII.

The two provisions, agreed upon at the same time, must be read together.  Article VII has been interpreted to mean the treaty right to an education for children of the Rosebud Sioux Tribe, essentially made permanent in the Act of Congress of 1877. 19 Stat. at L. 254-256.  See, *Reuben Quick Bear v. Leupp*, 210 U.S. 50, 28 S.Ct. 690, 52 L.Ed. 954 (1908).[7]   If Article VII is read to provide a treaty right to education for the children of the tribe, then effect must also be given to Article V as carrying out, in part, the agreement to provide education by making an agent available on the Rosebud Sioux Indian Reservation for "prompt and diligent inquiry into such matters of complaint by . . . the Indians as may be presented for investigation under the provisions of their treaty stipulations, as also for the faithful discharge of other duties enjoined on him by law."  1868 Treaty, Article V.  The federal government has the ongoing obligation to provide education to the children of the Rosebud Reservation, a duty it has allowed the tribe to carry out for it, through a an annual grant to operate its school at St. Francis Indian School and the Sicangu Owayawa Oti dormitory with federal educational support and technical assistance provided by the BIE.  This educational support and technical assistance has always been available at the Education Line Office of the Bureau of Indian Education (formerly the Bureau of Indian Affairs before 2006 on the reservation.)  That educational support and technical assistance on the reservation is necessary for the successful provision of education and related services of

---

[7] "[I]n 1868 the United States made a treaty with the Sioux Indians, under which the Indians made large cessions of land and other rights. In consideration of this the United States agreed that for every thirty children a house should be provided and a teacher competent to teach the elementary branches of our English education should be furnished for twenty years.  In 1877, in consideration of further land cessions, the United States agreed to furnish all necessary aid to assist the Indians in the work of civilization, and furnish them schools and instruction in mechanical and agricultural arts, as provided by the treaty of 1868."  *Leupp*, at 80; citing 19 Stat. at L. 254-256, Act of Congress of February 28, 1877, chap. 72.

the school and dormitory and essential face-to-face contract with BIE officials providing support. Those services have been reduced by the restructuring and closure of the Education Line Offices, and a loss or reduction of services and assistance as a result of the reduction in field level personnel of the BIE – much of that loss carried by the office of the ADD for tribally-controlled schools, to the detriment of the Indian children of the Rosebud Sioux Tribe.  (SMF 79-81, 84, 95-109 169-170, 172-174, 176, 182, 185-217.)

     As a result, the Rosebud Sioux Tribe argues that closure of the Education Line Office at Rosebud has violated Articles V and VII of the 1868 Ft. Laramie Treaty, which requires both education for tribal children and an office ("agent") on the reservation to carry out statutory obligations and be available for "prompt inquiry."

## CONCLUSION

     For all of the foregoing reasons, as well as the Plaintiff Rosebud Sioux Tribe's Statement of Undisputed Material Facts and attachments, the Affidavits of Deborah Bordeaux and Charles Abourezk and exhibits, the Plaintiff Cheyenne River Sioux Tribe's Complaint and Exhibits, and the Rosebud Sioux Tribe's Complaint, the Tribe hereby respectfully moves this Honorable Court for summary judgment on all counts, or in the alternative, partial summary judgment.

     Dated this 12 day of February, 2018.

                          /s/Charles Abourezk
                         Charles Abourezk
                         Abourezk, Zephier & LaFleur, P.C.
                         Attorney for Rosebud Sioux Tribe
                         P.O. Box 9460
                         Rapid City, South Dakota 57709
                         (605) 342-0097
                         Fax (605) 342-5170

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing *Intervenor-Plaintiff Rosebud Sioux Tribe's Memorandum in Support of Motion for Summary Judgment, or in the Alternative, Motion for Partial Summary Judgment* was served via e-filing, upon the following person(s):

Tracey Zephier
Fredericks, Peebles & Morgan, LLP
520 Kansas City Street, Ste 101
Rapid City, SD 57701

Attorney for Plaintiff Cheyenne River Sioux Tribe

Kevin Snell, Trial Attorney
Daniel Bensing, Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW, Room 6108
Washington, SD 20530

Attorneys for Defendants

this 12th day of February, 2018.

/s/Charles Abourezk
Charles Abourezk

36

**CERTIFICATE OF COMPLIANCE**

I certify that the foregoing *Intervenor-Plaintiff Rosebud Sioux Tribe's Memorandum in Support of Motion for Summary Judgment, or in the Alternative, Motion for Partial Summary Judgment* complies with the Court's Order of January 25, 2018, granting Intervenor-Plaintiff Rosebud Sioux Tribe to exceed the brief page requirements of 25 pages to 35 pages (Document 75).

Therefore, the foregoing brief is 35 pages in length.

Dated this 12th day of February, 2018.

/s/ Charles Abourezk