## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH DAKOTA
## CENTRAL DIVISION

| | | |
|---|---|---|
| CHEYENNE RIVER SIOUX TRIBE, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO.: 3:15-cv-03018-KES |
| | ) | |
| ROSEBUD SIOUX TRIBE, | ) | |
| | ) | |
| Intervenor-Plaintiff, | ) | **INTERVENOR-PLAINTIFF** |
| | ) | **ROSEBUD SIOUX TRIBE'S** |
| v. | ) | **STATEMENT OF UNDISPUTED** |
| | ) | **MATERIAL FACTS** |
| RYAN ZINKE, Secretary, United States | ) | |
| Department of Interior, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## STATEMENT OF UNDISPUTED MATERIAL FACTS

In compliance with Local Rule 56.1, Intervenor-Plaintiff Rosebud Sioux Tribe hereby

submits the following statement of undisputed material facts, as to which there is no genuine

issue to be tried.   The Rosebud Sioux Tribe moves to join Cheyenne River Sioux Tribe's

Statement of Undisputed Material Facts filed in support of its Motion for Summary Judgment

and Memorandum in support of the same, filed on February 12, 2018, and incorporates the same

herein by reference.

Intervenor-Plaintiff Rosebud Sioux Tribe may be referred to variously as "RST" or

"Rosebud."  Plaintiff Cheyenne River Sioux Tribe may be referred to variously as "CRST" or

"Cheyenne River."  Defendant United States Bureau of Indian Affairs shall be referred to as

"BIA."   Defendant United States Bureau of Indian Education shall be referred to as "BIE."

Defendant United States Department of Interior, by and through its Secretary Ryan Zinke, shall

1

be referred to variously as either "Interior" or "DOI."

The restructuring effort by the BIE, DOI, and the United States Department of Education (hereinafter "Education Dept,") beginning in 2013 and through 2016 up until the present, shall be referred to variously as the "Blueprint for Reform," the "Blueprint," the "restructuring," the "reform," or the "realignment."  The American Indian Education Study Group, formed by DOI Secretary Sally Jewell and United States Department of Education Secretary Arne Duncan shall be referred to as the "Study Group."

The Undisputed Material Facts below are separated into categories that are loosely aligned with each of the issues before the Court in summary judgment, with subcategories to additionally organize some of the facts, for the convenience of the Court.  However, each and every statement of fact is not exclusive to a particular issue and is intended to support the entirety of Rosebud Sioux Tribe's motion for summary judgment, because of the overlapping and interlocking nature of the facts underlying all of the claims in support of summary judgment.

### Background Facts

1.      The idea for reform and restructuring of the Bureau of Indian Education ("BIE") and American Indian education came from the Executive Branch, rather than Congress, as a result of a joint effort between Secretary of Education Arne Duncan and Secretary of Interior Sally Jewell.  (Roessel 31:24-32:1, 13:6-8, 16:3-7.)

2.      The American Indian Education Study Group (hereinafter "Study Group") idea was then germinated from discussions between Donald Yu and BIE Director Charles Roessel. (Yu Dep. 44:17-22.)

3.      The Study Group was convened by the Education and Interior Secretaries on

September 13, 2013, and had two <u>stated</u> primary goals: to research and diagnose challenges facing BIE funded schools, and to recommend potential solutions to improve education in these schools. (Roessel Dep. 32:2-8, CRST Docket 16.)

4.    Education Secretary Arne Duncan was new to the federal government and he did not know that there was actually a school system at Interior, and did not have a lot of knowledge about [Indian education]. (Yu Dep. 32:11-17.)

5.    Donald Yu and BIE Director Charles Roessel were treated as the leaders of the Study Group, and other members included Kenneth Wong, Merilee Fitzgerald, Charles Rose and, for a short period of time, United States Department of Education official William Mendoza. (Roessel Dep. 13:9-21, 138:3-12.)

6.    Study Group members were either non-Indians or government officials.  (Roessel Dep. 13:9-21.)

7.    There were no elected tribal leaders or elected tribal school officials who were members of the American Indian Education Study Group. (Roessel Dep. 14:2-5, Hamley Dep. 64:17-22.)

8.    Associate Deputy Directors (hereinafter "ADDs") were in the senior leadership at the BIE, SES-level senior executives, situated next in line below the BIE Director in the organizational chart.  (Hamley Dep. 23:10-15, RST Exhibit 4.)

9.    Two of the ADDs, RoseMarie Davis and Jeff Hamley shared the same concerns as many of their colleagues, questioning why these particular members of the American Indian Study Group were chosen and what their qualifications were, since they lacked experience in Indian education.  (Davis Dep. 28:4-21, Hamley Dep. 65:8-19.)

3

10.     Yu and Rose were lawyers, having previously worked together at the same Chicago law firm with Education Secretary Arne Duncan, Ken Wong was a college educator, Fitzgerald was a former United States Defense Department official, and Roessel and Mendoza were then-current federal officials.  (Yu Dep. 8:12-9:18, Roessel 13:15-21, Hamley Dep. 65:15-19.)

11.     Yu had no prior experience in Indian education or tribal education.  (Yu Dep. 11:7-10.)

12.     Yu began working for the United States Department of Education in June of 2009, brought in by Secretary Arnie Duncan's General Counsel Charles Rose, and he was, in the beginning, more connected to Secretary Duncan than to Secretary Jewell, having previously worked under Duncan at the Education Department. (Yu Dep. 8:12-22, Roessel Dep. 29:23-25.)

13.     Yu was detailed to the Interior Department in September of 2013, and by November 2014, he was a full time Department of Interior employee. (Yu Dep. 19:18-20:2, 13:5-18, Roessel Dep. 30:2-9.)

14.     Yu was designated as Arne Duncan's liaison to Indian Education in some Listening Sessions in 2014.  (Roessel Dep. 16:12-14.)

15.     Yu was considered the "Chief Schools Transformation Officer" within the Study Group, and later within the BIE, a title he suggested to the Assistant Secretary of Interior for Indian Affairs Kevin Washburn, and he was offered and accepted an SES executive level position.  (Yu Dep 20:8-21:2, 26:6-11.)

16.     Wong had produced a study of the Chicago Public Schools regarding the fragmentation of the school system. (Yu Dep. 40:18-21.)

4

17.     Yu was enamored of an experiment by Ken Wong that showed that [reductions in fragmentation] for a school system "*likely* led to improved outcomes for low-income and minority students." (Yu Dep. 41:7-12, emphasis added.)

18.     Donald Yu was aware of the federal obligations to provide educational services to Native students that are unique and . . . treaty obligations, and was aware that these do not apply to African American students, Latino students, or API (Asian Pacific Island) students. (Yu Dep. 254:2-13.)

19.     Yu was influenced by Ken Wong, an educator he brought into the Study Group because he considered him an expert on the issue of school system fragmentation and how it can be corrected. (Yu Dep. 40:15-18.)

20.     Yu agrees that when fragmentation is presented as the "problem," then the cure is centralization or consolidation.  (Yu Dep. 47:2-8.)

21.     Rosebud Sioux Tribe Education Department analyst Deb Bordeaux states in her affidavit that "from the tribal perspective, fragmentation of tribal education and of BIE educational support and technical assistance for tribally-operated schools is an asset and a positive value, because of the unique needs of tribes and tribal communities, and their efforts to preserve culture and language and retain these unique aspects of tribal culture and language at the local level as much as possible.  The more BIE officials have daily face-to-face interaction with tribal children and tribal educators, in our experience, the more likely they are to care about, be responsive to, and tailor educational support services to local tribal needs."  (Deborah Bordeaux Affidavit, para. 2.)

22.     Wendy Greyeyes, the BIE's Chief  Implementation Officer for the restructuring,

describes the large number of tribal schools funded by the BIE and that the BIE had 182 different models and tribally-controlled schools, so trying to fit a one size fits all model was not the concept, but rather trying to understand the variations and fluctuations of each school, because each school structure was really different.  (Greyeyes Dep. 28:10-21.)

23.    Rosebud Sioux Tribe's Rule 30 (b)(6) designee Deborah Bordeaux testified that the Rosebud Sioux Tribe asked that the Line Office not be close at Rosebud, there was no evidence the Line Office needed to be closed, that the BIE and drafters of the restructuring did not understand the unique needs of the individual tribes int eh Great Plains area, that every tribe is different, are very unique and have their own needs, and the kind of services provided by the Rosebud Education Line Office were taken away.  (Bordeaux Dep. - Vol. II 47:12-23.)

24.    Study Group members Donald Yu and Kenneth Wong were the primary authors of the Study Group Proposal to Reform Indian Education, and the other Study Group members contributed different elements to the Proposal.  (Roessel Dep. 24:10-12, 15:17-21.)

25.    The Study Group Proposal was released on June 6, 2014.  (Roessel Dep. 32:5-8.)

26.    The Study Group Proposal was not co-authored with any Indian tribes or tribal school officials, and they were not included as drafting partners.  (Roessel Dep. 15:10-12, 23:14-21.)

27.    Don Yu admitted he was involved in the aspect of restructuring that would convert BIE staff above the school level and "make them more like management consultants than bureaucrats." (Yu Dep. 192:12-19.)

28.    Yu agreed the concept of management consultants was a corporate concept and not really a public, governmental concept.  (Yu Dep. 193:13-18.)

29.     Yu was trying to change the "culture" at the BIE by calling BIE officials "management consultants" rather than bureaucrats.  (Yu Dep. 194:10-19.)

30.     Phase I of the Blueprint for Reform was supposed to utilize existing BIE resources and focus on improving BIE operational support to BIE schools.  (Roessel Dep. 35:14-17.)

31.     Improving BIE operational support was supposed to occur through the realignment of the BIE and consolidating and centralizing educational support and technical assistance functions.  (Roessel Dep. 35:18-36:20.)

32.     In the Study Group Proposal, Don Yu proposed that the BIE director should, in the future, retain approximately 10 percent of Indian education funds, where previously only 1 percent was retained by the BIE Director.  (Yu Dep. 197:9-21.)

33.     Donald Yu believed that in addition to centralization or consolidation, the BIE Director should have increased decision-making authority about a number of things involving school operations, procurement, information technology, and other operational services provided to BIE grant schools or federally operated schools. (Yu Dep. 48:19-49:18.)

34.     Yu admitted that the lack of control by the BIE Director was related to the BIE restructuring and separation from the Bureau of Indian Affairs in 2006. (Yu Dep. 50:21-51:5, 51:16-20.)

35.     Following the Study Group's Proposal, the plan for restructuring the BIE, entitled the "Blueprint for Reform" was then released on June 12, 2014, one week later.  (Roessel Dep. 32:9-11.)

36.     Secretarial Order No. 3334, signed by Interior Secretary Jewell but primarily authored by Don Yu, subject to vetting in DOI, was issued on June 13, 2014, one day after the

7

Blueprint for Reform.  (Roessel Dep. 32:12-14, Yu Dep. 233:4-17.)

37.     Once the Blueprint for Reform was released, the Study Group continued, but morphed to focus on implementation.  (Roessel Dep. 37:18-38:1.)

38.     The Blueprint for Reform changed the emphasis in how federal Indian education policy and self-determination were to be implemented.  (Roessel Dep. 31:8-14.)

39.     The restructuring plan was designed to get the BIE out of the business of running BIE-operated schools and transfer direct operations to tribes.  (Roessel Dep. 40:12-41:1, 41:25-42:4.)

40.     About two-thirds of all tribal schools already have grants to operate their own schools under the Tribally-Controlled Schools Act, and only three tribal schools still have contracts to operate their own schools, rather than grants, under the Indian Self-Determination and Education Assistance Act.  (Yu Dep. 156:6-17, Hamley Dep. 32:4-6.)

41.     The Associate Deputy Directors ("ADDs") were largely excluded from the process of review and comment upon the Blueprint for Reform before it was introduced.  (Davis Dep. 30:15-20.)

42.     Rosemarie Davis was the ADD who oversaw 94 tribal grant schools and 4 dormitories for the BIE, including the tribal grant schools in the Dakotas, and specifically those at the Rosebud Sioux Reservation and Cheyenne River Sioux Reservation, and before that she was the ADD in charge of the ADD East geographical region that included, among other states, the Dakotas.  (Davis Dep.  4:5-10, 5:13-21.)

43.     ADD Davis was never asked to review the Blueprint for Reform and make comments on it before it was rolled out.  (Davis Dep. 30:12-14.)

44.     The tribes in the Dakotas were among those impacted by the proposed

realignment or restructuring.  (Wendy Greyeyes Dep. 35:5-8.)

   **A.     Defendants Failed to Fulfill or Violated Consultation Requirements Under
   Federal Statutes and Applicable Policies of the BIA/BIE and Department of
   Interior**

45.     BIE Director Roessel admits RST Exhibit 17, the BIA Government-to-

Government Consultation Policy and 25 U.S.C. § 2011 Exhibit 18, specifically applied to the

BIE at all times pertinent to this lawsuit, and requires tribal consultation. (Roessel Dep. 76:12-22,

RST Exhibit 17.)

46.     The Chief Transformation Officer Don Yu and the Chief Implementation Officer

Wendy Greyeyes were aware that the federal policy of self-determination for Indian Tribes was

the reason for the [BIA Government-to-Government] Tribal Consultation Policy. (Yu Dep.

168:8-169:1; Greyeyes Dep. 60:3-6.)

47.     Yu also had the understanding that the reason for involving tribes as early as

possible in the consultation process is to allow them to maximize their participation in changes in

laws, practices, and programs that affect their lives. (Yu Dep. 185:9-14.)

48.     Don Yu remembers the Solicitors telling him that because of the case filed by the

tribes in the Great Plains against another previous restructuring [the 2006-2007 litigation before

this Court], and the result in that case, the BIE and Yu needed to be sure they did the

consultations by the book and make sure that "we do ABC, XYZ kinds of things." (Yu Dep.

187:9-20.)

49.     Donald Yu admits he did not know much about tribal consultations, how they

should be conducted and where, and things like that. (Yu Dep. 77:7-10.)

50.     As one of the responsible federal officials, Don Yu did not ever read the consultation policies or statutes. (Yu Dep. 115:7-20.)

51.     Even though Don Yu was a responsible federal official, he deferred to Department of Interior staff regarding consultation statutes and policies, because that was their expertise. (Yu Dep. 115:1-6, 77:7-12.)

52.     The American Indian Education Study Group held only four "Listening Sessions" around the country in 2014, one of which was at Loneman School, on the Pine Ridge Indian Reservation.  (Roessel Dep. 32:5-8.)

53.     Former BIE Director Roessel who was also a member of the Study Group, did not believe that the Study Group used those four Listening Sessions as consultations, which would come later [in the four consultations on the Blueprint for Reform.] (Roessel Dep. 33:2-6.)

54.     Although the BIE visited tribes during the restructuring effort, and had conversations with or visits to tribes, these were not considered consultations either.  (Wendy Greyeyes Dep. 17:4-7.)

55.     Webinars were not considered to be "consultation."  (Roessel Dep. 172:23-25.)

56.     Notice to tribes and identification of documents is important to adequate consultation.  (Roessel Dep. 146:16-19.)

57.     Roessel does not recall any consultation documents provided at the Loneman Listening Session on April 28, 2014, nor any internal documents formulated in detail by the Study Group.  (Roessel Dep. 60:1-7, 58:21-24.)

58.     Deborah Bordeaux, who was present at the Loneman Listening Session, did not consider it a because the tribal participants had not been given time prior to review documents

10

before going to the session and [then] being able to give a good response to what was going on, and they did not receive sufficient information about the proposed alignment. (Bordeaux Dep. I-24:1-9, 27:23-28:1.)

59.     Participants at the Loneman School Listening Session were concerned with improving the financial stability of the schools and urged the Study Group members (including Roessel) to "don't change anything."  (Roessel Dep. 59:19-23.)

60.     At the Loneman Listening Session in April 2014, Donald Yu told the tribal participants, in pertinent part, the following: "the second pillar here about agile organizational environments [is] kind of eliminating bureaucracy and making sure you guys are receiving customized service," and later, "but, again, the big shift here is no more big apparatus no more big bureaucracy . . . ." (Yu Dep. 95:4-17.)

61.     The Study Group did not inform the tribes at the Loneman Listening Session how staffing would change in a future restructuring or what future budgets would look like.  (Roessel Dep. 63:3-10.)

62.     ADD RoseMarie Davis, who was in charge of 94 tribal grant schools including the Dakotas, Rosebud and Cheyenne River, only first saw information about how staffing was going to change in the restructuring process in organizational charts in the latter half of 2015 [well after the four consultations on the Blueprint for Reform were held.] (Davis Dep. 34:13-20.)

63.     Davis did not ever see any solid budget information about the restructuring, and certainly not at the Rapid City, South Dakota consultation on April 22, 2015.  (Davis Dep. 34:2-12.)

64.     There is an obligation under the Consultation Policy and law regarding

11

consultation to be responsive to what tribes raise at the consultations.  (Roessel Dep. 49:11-14.)

65.     During the life of the American Indian Education Study Group, it held only two sessions in the Dakotas:  the Listening Sessions at Loneman School on April 28, 2014 (which BIE Director Roessel deemed to not be consultations) and the April 22, 2015 consultation in Rapid City, South Dakota at the Ramkota Hotel.  (Roessel Dep. 173:20-174:4, 174:5-11.)

66.     Before the Blueprint for Reform was put into effect, the BIE had an obligation to inform Indian tribes, in a detailed way, of the potential impact on Indian tribes, of the Blueprint for Reform. (Roessel Dep. 114:1-6.)

67.     Once the Blueprint for Reform was released, the BIE held only four (4) consultations in a period of nine (9) days (including the Rapid City, South Dakota consultation on April 22, 2015). (Roessel Dep. 96:18-25, Yu Dep. 71:20-72:2, 181:17-20.)

68.     Roessel does not remember having any concerns about the plan to hold these four consultations within two weeks, or whether it would comply with consultation law and policy. (Roessel Dep. 84:17-20.)

69.     Roessel may have told officials connected with the Study Group or persons above him in the line of authority that he thought consultations could be completed quickly. (Roessel 86:10-14.)

70.     Educator and tribal official Dr. Sherry Johnson (Sisseton-Wahpeton Oyate) expressed concern to Don Yu in writing that the process of approving the Blueprint for Reform was moving too fast, and the feedback from a tribal educator and official that the Blueprint was moving too fast concerned Don Yu, but he also felt the urgency of reform. (Yu Dep. 110:10-22.).

12

71.   On July 9, 2015 Richard Lunderman sent an e-mail to Don Yu stating in pertinent part "Don-We are just looking for some answers, we know the reorganization is well on its way like a snowball rolling down hill . . . I don't think [Roessel] gets it or wants to get it until this whole reorganization is done."  (Affidavit of Deborah Bordeaux, para. 11 and Exhibit 6, Response to Request for Production No. 4 (28).)

72.   Donald Yu admits he and the BIE would have done more consultation, but he did feel pressure to get stuff done before the end of the Administration. (Yu Dep. 71:1-19.)

73.   Don Yu states that it was likely conveyed to him at some point by at least one tribal leader that there was a lack of adequate consultation. (Yu Dep. 113:11-114:1.)

74.   On November 11, 2015 Deborah Bordeaux sent an email to Don Yu stating, in pertinent part, that she had not heard back from Yu about an email sent out by the BIE to a wide range of people but which did not include the RST Education Department, or to the superintendent for Tiospa Zina School [on the Cheyenne River Reservation]. . . .  She then raised the issue with Yu that "I think it is important to TALK and WORK  with the [B]ureau funded schools and tribes.  The US DOE does now have a process for consultation and I am sure the Bureau does to[o] - isn't this something that should be discussed with educators for input - not just a select few that give you what you want."  (Affidavit of Deborah Bordeaux, para. 11 and Exhibit 6, Response to Request for Production No. 4 (32).)

75.   Before the Blueprint for Reform was put into effect, the BIE had an obligation to provide timely notification of the formulated, proposed action to tribes. The notice in the Federal Register for the April 22, 2015 consultation in Rapid City, South Dakota was posted on March 25, 2015, less than 30 days prior to the consultation.  (Roessel Dep. 113:21-25, Bordeaux

13

Affidavit, para. 11, Exhibit 6.)

76.     The Tribal Consultation Booklet was not provided to affected tribes until the day of the first consultation on the Blueprint for Reform on April 22, 2015 at the Ramkota Hotel in Rapid City, South Dakota. (Roessel Dep. 115:21-23, Greyeyes Dep. 60:16-18, RST Exhibit 5.)

77.     Other than the Power Point on the Blueprint for Reform, the Tribal Consultation Booklet was the only information for tribes to review regarding the consultation. (Roessel Dep. 115:24-116:1, RST Exhibit 5.)

78.     The Tribal Consultation Booklet used in support of the Blueprint for Reform did not contain detailed budget information or staffing information.  (Herrin Dep. 23:11-24:2, RST Exhibit 5.)

79.     The Rosebud Sioux Tribe clearly asked for budget information at the Tribal Consultation in Rapid City, South Dakota on April 22, 2015, but it was missing. (Bordeaux Dep. Vol. II 36:10-20.)

80.     At both the Loneman School Listening Session and the April 22, 2015 consultation in Rapid City, South Dakota, tribes expressed substantive concerns about the restructuring as well as concerns about treaty rights to education.  (Roessel Dep. 152:11-17.)

81.     Former BIE Director Roessel admits that when he represented the BIE [regarding the restructuring] at various consultations and meetings with tribes, he had an obligation to be truthful with tribes, in part because of the consultation requirements.  (Roessel Dep. 52:3-9.)

82.     Roessel and the BIE made a presentation to the TIBC (Tribal-Interior Budget Council), which is composed of tribal representatives and government officials, on July 22, 2014 regarding the Blueprint for Reform.  (Roessel Dep. 51:11-19, RST Exhibit 16.)

14

83.     Roessel represented to the tribal TIBC participants that under the Blueprint for Reform, the "BIE is to become less top heavy and more resources would be driven to the schools during the restructuring as a result of restructuring."  (Roessel Dep 56:18-57:8, RST Exhibit 16, at 2.)

84.     Roessel admits that at the consultations on restructuring, a number of tribes wanted the BIE to lessen its growing upper level management and get money back out into the field to the schools themselves, and that he was aware of those concerns.  (Roessel 57:9-16.)

85.     BIE Financial systems Specialist Joe Herrin is a 50 year employee of the BIE and its predecessor government agency the BIA, and his office is at BIE headquarters in Washington, D.C.  (Joe Herrin Dep. 4:17-19, 6:10, 4:11-12.)

86.     Herrin reviewed BIE documents at RST Exhibits 9 and 10, turned over in discovery by the Defendants, and calculated that according to RST Exhibit 9 [which sets forth the BIE Management functions before and after the restructuring was implemented], there were 95 Management FTEs before the restructuring and 113 Management FTEs after the restructuring for a net increase of 18 Management FTEs.  (Herrin Dep. 50:16-51:4, 52:17-19, Exhibit 9.)

87.     Herrin examined RST Exhibit 10 [which sets forth the Proposed Changes in the Field Structure], which was primarily Education Line Offices, showing the changes by consolidating Education Line Offices into Education Resource Centers, and Herrin calculated there would be a net reduction of 33 field level FTEs [most of them were Education Line Office personnel] after the restructuring.  (Herrin 51:13-52:16, RST Exhibit 10.)

88.     White House Indian Affairs Advisor Jodi Gillette announced to tribal representatives at Rapid City, South Dakota in July 2014, about nine months before the first

15

consultation on the Blueprint for Reform was ever held and over one year prior to Congressional approval of reprogramming and approval of restructuring, that the changes in the Blueprint for Reform were "happening now," and both Roessel and Yu agree she was correct in this. (Roessel Dep. 117:12-16, Yu Dep. 241:10-20.)

89.      Two members of the Study Group, who were the federal officials receiving tribal comments in the consultations, had this e-mail exchange on June 12, 2014, shortly after an article containing tribal criticism of the Study Group's restructuring Proposal came out in the national periodical Education Week: *Charles Rose*: "I read the ed week article.  What is wrong with these tribes?  The recommendations are to improve opportunities for children.  The president is visiting a reservation to talk about improving education.  I know there have been hundreds of years of injustice and genocide, but . . . ."  *Don Yu*: "The reporter was also an idiot and is just trying to be inflammatory.  She spoke to all of the haters.  Most people were either lukewarm or were supportive.  B/c of that stupid article, I was calling all day tribal leaders trying to get support for the plan and get statements from them."  (Deb Bordeaux Affidavit, para. 11, Bordeaux Exhibit 6.)

### 1.    BIE Requests Reprogramming and Approval of Restructuring Before Any Tribal Consultations Are Held

90.      On March 17, 2015, Budget Analyst Wendy Greyeyes, who had been named Chief Implementation Officer for the Blueprint for Reform by Roessel, wrote an e-mail to Adrianne Moss at the Department of Interior, on behalf of BIE Director Roessel, telling Interior that Roessel wanted to move forward formally with the reprogramming request and request for approval of the restructuring to Congress, *before* the first of four (4) consultations were actually

held beginning on April 22, 2015.  (Greyeyes Dep. 35:22-37:10, RST Exhibit 27, Roessel Dep. 105:11-13.)

91.     In that same e-mail, Greyeyes told Interior that Roessel "does not see any drastic changes based on comments from tribes heavily impacted by BIE's realignment" and that "therefore we want to continue moving forward with the reprogramming letter formally." (Greyeyes Dep. 36:18-37:4, RST Exhibit 27.)

92.     Roessel gave a directive to the BIE Human Resources Director Thomas Hettich on June 12, 2015, before reprogramming was approved, to start cross-walking positions and prepare for RIF's assignment and retirements within the BIE in preparation for Blueprint for Reform. (Roessel Dep. 119:16-120:14, RST Exhibit 4.)

93.     Roessel, through Wendy Greyeyes, required the ADDs to sign the new organizational charts on June 11, 2015 [while the consultation period was still open and underway], because the ADDs were told that their signatures were needed in order for Congressional approval of the restructuring to move forward.  (Hamley Dep. 111:14-112:21, RST Exhibit 4.)

### 2.     Significant Tribal Opposition To Restructuring and Closing or Diminishing Education Line Offices on Indian Reservations in South Dakota Not Fully Considered or Given Effect by the BIE After July 2014

94.     Roessel admits the views of tribally-controlled school boards and tribal educators are important in consultation. (Roessel Dep. 75:12-15.)

95.     In March 24-25, 2014 in Washington, D.C. at the Tribal Interior Budget Council Meeting, the Great Plains Tribal Chairmen's Association (of which Plaintiffs Rosebud and

Cheyenne River Sioux Tribes are voting members)  provided the BIE with a plan for what they wanted to see in terms of education management for the Great Plains.  (Roessel 193:4-8, CRST Exhibit 5.)

96.     This GPTCA plan was not fully considered or given effect by the BIE.  (Deborah Bordeaux Affidavit, para. 5.)

97.     The Great Plains Tribal Chairmen's Association, which included the Rosebud and Cheyenne River Sioux Tribes, was asked to consult on the BIE's 2014-2018 Draft Strategic Plan and the tribal chairpersons sent a detailed critique of Plan in 2014, but this was not given effect by the BIE.  (Roessel Dep. 99:14-100:7, 103:7-14, CRST Complaint Exhibit 14, Docket No. 1.**)**

98.     The Great Plains Tribal Chairmen's Association Resolution (5-10-30-15) and cover letter opposing the restructuring (the Blueprint for Reform) and proposing its own alternative to the Blueprint for Reform to the BIE (which is included in the Administrative Record) was submitted on November 18, 2015, but neither of those documents was fully considered or given effect by the BIE, and the Secretary of Interior did not make a determination giving substantial reasons why Great Plains Tribal Chairmen's Association resolution and letter was not being given effect.  (Roessel Dep. 99:14-100:7, 103:7-14, Affidavit of Deborah Bordeaux, para. 6, and Bordeaux Exhibit 1, AR 4105 - 4111.)

99.     The BIE knew, coming into the reorganization that the Great Plains tribes wanted their education management offices (Education Line Offices) on the reservations.  (Roessel Dep. 215:15-20.)

100.     ADD Davis recalls hearing a lot of tribal opposition to the restructuring, particularly from the Dakota tribes during the Rapid City, South Dakota consultation of April 22,

2015.  (Davis Dep. 33:17-22.)

101.    A number of tribes from the Dakotas, including the Rosebud and Cheyenne River Sioux Tribes, expressed substantive opposition to the restructuring plan.  (Greyeyes Dep. 37:23-38:4.)

102.    There was significant support at the tribal consultations for keeping the Education Line Offices on the reservations. (Roessel Dep. 98:22-25.)

103.    The Great Plains Tribal Chairmen's Association communicated to the BIE that it needed to move [or retain] education management offices on reservation lands and that the Cheyenne River education management office needed to be on the reservation.  (Roessel Dep. 214:21-215:5.)

104.    In 2014, the Standing Rock Sioux Tribe submitted a resolution to the BIE saying "we do not want the reorganization you're proposing."  (Roessel Dep. 221:11-14.)

105.    The Oglala Sioux Tribe and the Cheyenne River Sioux Tribe also submitted resolutions by their tribal councils saying they were opposed to the reorganization.  (Roessel 221:11-20.)

106.    The Rosebud Sioux Tribe, through its representatives and its Sicangu Owayawa Oti, also opposed the restructuring and the Blueprint for Reform during the consultation period, including a June 26, 2015 email from Richard Lunderman stating "We in Great Sioux Nation still oppose the reorganization and disagree that Monty Roessel has properly consulted with Tribes and kept us current with updates as promised, and that he is telling Congress another story." (Bordeaux Affidavit, para. 11, and Bordeaux Exhibit 6, Roessel 47:5-20, Greyeyes 37:23-38:4, RST Exhibit 28.)

19

107.    There were concerns expressed by tribal leaders that the reorganization added more employees and added bureaucracy to the BIE. (Yu Dep. 77:14-21.)

108.    ADD Davis admitted that after one of the Rosebud tribal organizations raised the issue "we want to keep our Line Office local so we can have face-to-face interaction with them," the BIE did not change the structure of the Blueprint for Reform to leave Line Office personnel on the reservations.  (Davis Dep. 39:16-24.)

109.    The Rosebud Sioux Tribe's Sicangu Owayawa Oti was very specific in its presentation at the April 22, 2015 tribal consultation, about wanting Rosebud's education support services to stay local on the reservation because the BIE had become too top heavy, specifically requesting that the Education Line Offices remain open and fully staffed on the reservations, about not wanting BIE to grow its upper level management, and substantively raising the issue of their treaty rights in relation to the government obligation to provide education, and wanting their treaty rights regarding education to be respected by the BIE. (Yu Dep. 219:21-221:1, RST Exhibit 28, Greyeyes Dep. 39:1-40:19, 40:25-41:23.)

110.    After the consultation, and the specific statements in opposition by Rosebud's Sicangu Owayawa Oti, no changes were made to the restructuring plan or to the ERC structure, such as placing an ERC on the Rosebud Sioux Reservation, and the Rosebud ELO staff had already left and the ELO was still expected to close. (Greyeyes Dep. 51:20-52:25.)

111.    There was not another draft of the Blueprint for Reform after July 2014. (Roessel Dep. 116:24-117:9.)

112.    The decision to move the ERC from Eagle Butte or Rapid City to Kyle, South Dakota was made *before* the April 22, 2015 consultation in Rapid City, because the decision was

discussed at the consultation between Roessel and Greyeyes; after the decision was made to

move the ERC from Eagle Butte to Kyle [on the Pine Ridge Reservation], the BIE did not hold a

formal consultation regarding the proposed change in location of the ERC.  (Affidavit of

Deborah Bordeaux, para. 8, and Bordeaux Exhibit 3,  Greyeyes Dep. 62:12-18.)

113.    The Rosebud Sioux Tribe wanted to know what was going to be happening with

the Education Resource Centers, it was not included in any discussions regarding moving the

Education Resource Center from Rapid City to Kyle, on the Pine Ridge Indian Reservation, and

Rosebud's representative Richard Lunderman had contacted Don Yu and wanted to know if the

Rosebud Sioux Tribe was going to be consulted about the ERC being moved to the Pine Ridge

Reservation and how that came about, and Yu was specifically asked in an e-mail by Lunderman

why the Rosebud Sioux Tribe was not consulted on this, and Yu responded on June 25, 2015,

"Don't know of a plan to have the ERC in Pine Ridge, I will find out and get back to you," but

never replied to Lunderman's inquiry.  (Dep. Vol II - 36:16-37:4, 38:12-13, Bordeaux Affidavit,

para. 11, and Bordeaux Exhibit 6.)

### 3.    The BIE Refused To Allow Tribal School Officials or Tribal Educators To Testify or Consult Following the Release of the Blueprint for Reform, For a Period of At Least Eight Months During the Restructuring Period, Until February 2015

114.    Cecelia Fire Thunder, a tribal grant school Chairperson from the Pine Ridge

Reservation. told BIE Director Roessel in October of 2015 at a NCAI meeting in California that

there were few educators invited to consultations, only tribal leaders, and that they did not know

educational issues like the educators, but that school board officials were elected by the people

and "we know what we want and need."  (Roessel 141:19-22, RST Exhibit 23.)

21

115.    There was a period of time before ADD Bart Stevens left the BIE for a period of time in 2014 to work for the BIA) when the BIE and leadership, or executives such as ADDs thought that the consultation policy only applied to Indian tribes, and not to tribal schools or tribal educators.  (Bart Stevens Dep. 22:9-15.)

116.    Roessel admits that around February 20, 2015, about 8 months after BIE released the Blueprint for Reform, the BIE began allowing tribal school officials to participate in tribal consultations, but with the condition that they had to have the permission of their tribe. (Roessel Dep. 72:21-73:7.)

117.    Roessel agrees that in 25 U.S.C. § 2011, there is no requirement that there be tribal consent for tribal school officials and interested parties to participate in consultation. (Roessel Dep. 77:6-10, Exhibit 18.)

**4.      BIE Lobbying at NCAI in Violation of BIA Government-to-Government Consultation Policy and Not Giving Effect to Specific Consultation Comments by Oglala Sioux Tribal Representative Cecelia Fire Thunder**

118.    In the final months of the effort to obtain Congressional support for the reprogramming, the BIE, Roessel and Don Yu worked to obtain support from a number of regional and national tribal organizations, because tribal organization endorsements would convince Congress that the reprogramming was accepted by Indian tribes. (Roessel Dep. 136:13-137:8.)

119.    The tribal organizations it sought endorsements from included the National Congress of American Indians and the National Indian Education Association. (Roessel Dep. 137:9-13.)

120.   A resolution of support from the NCAI in October of 2015 was important to demonstrate to Congress that the BIE had tribal support for the restructuring. (Yu Dep. 215:7-12.)

121.   Roessel and Don Yu traveled to the NCAI national meeting in California in the fall of 2015, while the consultation record was still open, to try to get their endorsement for the Blueprint for Reform. (Roessel Dep. 137:14-23.)

122.   Roessel worked behind the scenes at the NCAI meeting to obtain support from the tribal delegates.  (Roessel Dep. 144:4-9.)

123.   Don Yu admits that he, Director Roessel and possibly Bill Mendoza were at the NCAI national meeting in October of 2015 actively campaigning for a resolution of support at that meeting among the tribal representatives. (Yu Dep. 218:20-219:9.)

124.   At the meeting Cecelia Fire Thunder, representative of the Oglala Sioux Tribe and the chairperson of the Little Wound School Board (a tribal grant school), vocally opposed the Blueprint for Reform and any resolution by NCAI supporting the restructuring.  (Roessel 138:13-139:1.)

125.   Ms. Fire Thunder told Roessel and NCAI members that Pine Ridge opposed the reform.  (Roessel Dep. 139:24-140:2, RST Exhibit 23.)

126.   At the NCAI meeting, Ms. Fire Thunder also told Roessel that "consultation means BIE should come to the table with a blank paper and create a plan together – not come with a pre-prepared plan."  (Roessel Dep. 140:3-7, RST Exhibit 23.)

127.   Ms. Fire Thunder also told Roessel that the money taken from the budget to fund restructuring could help tribal schools.  (Roessel Dep. 140:8-13, RST Exhibit 23.)

23

128.     Ms. Fire Thunder also told Roessel that Pine Ridge was ready to create plans based upon what they know they need.  (Roessel 140:14-18, RST Exhibit 23.)

129.     Ms. Fire Thunder told Roessel that the BIE did not need more employees, the tribes needed more money.  (Roessel Dep. 141:2-5, RST Exhibit 23.)

130.     Ms. Fire Thunder told Roessel that the six tribal schools at Pine Ridge were prepared to come up with their own plan and just wanted an opportunity to do so.  (Roessel 141:23-142:1, RST Exhibit 23.)

131.     Ms. Fire Thunder told Roessel that the Oglala Sioux Tribe was unhappy with how the consultations took place.  (Roessel 142:2-8, RST Exhibit 23.)

132.     After Ms. Fire Thunder raised those issues with the BIE officials present in October of 2015 at NCAI, Roessel admits the BIE did not go back and make any changes to the restructuring plan.  (Roessel Dep. 142:15-18, RST Exhibit 23.)

133.     After the BIE did not give effect to the issues raised by Cecelia Fire Thunder, Roessel and the BIE did not tell either Ms. Fire Thunder or the Oglala Sioux Tribe why it was not considering their recommendations.  (Roessel 142:19-25.)

134.     Roessel was able to obtain from NCAI at that national meeting a resolution in support of the restructuring, which the BIE then used to demonstrate to Congress that there was significant tribal support for the restructuring, and the BIE submitted that resolution to Congress. (Roessel Dep. 144:10-21.)

135.     The BIA Government-to-Government Consultation Policy specifically states "as nations separate from the United States, the internal affairs of tribes are the responsibility of the tribal entity and are not to be tampered with or interfered with by the United States.  (BIA

24

Consultation Policy, RST Exhibit 17, at 1, Roessel Dep. 144:22-145:4.)

### 5.    Concerns Congress Being Misled by Interior and BIE

136.    Some BIE employees and some ADDs were concerned that Congress was being misled, and were concerned about what Congress was being told about the restructuring. (Hamley Dep. 110:1-14.)

137.    Director Roessel testified, in a prepared statement, before the U.S. Senate Committee on Indian Affairs on May 13, 2015, that one of the recently-initiated actions the BIE had taken was to improve student outcomes by improving the quality of instruction in BIE-funded schools and improve quality of education by restructuring and streamlining the BIE bureaucracy, improving day-to-day operations. (Roessel Dep. 130:3-24, Exhibit 25.)

138.    BIE Director Roessel also testified to the Senators that the administration undertook a "rigorous assessment" of BIE and "conducted extensive tribal consultations consistent with the Department's tribal consultation policy, to develop the Blueprint for Reform released in 2014. (Roessel Dep. 133:8-14, Exhibit 25.)

139.    There were a number of questions raised by both the House and Senate about the restructuring. (Roessel Dep. 134:24-135:4.)

140.    The House and Senate Appropriations Committees sent the BIE specific questions they wanted answered about the restructuring. (Roessel Dep. 135:5-9.)

141.    A letter was sent to House Appropriations Committee Chairman Calvert by Congressman John Kline, Chair of the Committee on Education and the workforce, and Congressman Todd Rokita, Chairman of the Subcommittee on Early Childhood Education expressing some of the same concerns that tribes in the Dakotas, including Plaintiff Tribes, were

25

raising to the BIE. (Roessel Dep. 109:16-23, RST Exhibit 3, 111:12-14.)

142.    Among the concerns raised by the two Committee Chairs about the restructuring
was that the reorganization proposal would add new employees to the agency without an
examination of its current workforce or staffing needs, which would add to the confusing maze
of bureaucracy, concern about the growing of total FTE's of the BIE. (Roessel Dep. 110:5-16,
RST Exhibit 3.)

143.    The two Committee Chairs were concerned that taking money away from direct
education services or instruction to pay salaries of additional government workers will be
harmful to vulnerable Indian students. (Roessel Dep. 110:20-23, RST Exhibit 3.)

144.    The two Committee Chairs also wanted the BIE to seek to ensure any
reorganization abides by the boundaries of federal law, including the Tribally-Controlled Schools
Act, because any effort running afoul of the letter and spirit of the law would undermine an
important effort to improve support and educational services for Native American children.
(Roessel Dep. 110:20-111:6, RST Exhibit 3.)

145.    Roessel understood that the two Committee Chairs were raising [major] concerns
with the restructuring, but the BIE told its staff, in a set of sample questions and answers about
the restructuring for the staff, believed prepared by Don Yu, that these two Committee Chairs
were expressing support for the BIE proposal, when the Committee Chairs were actually raising
questions about the restructuring. (Roessel Dep. 112:8-25, RST Exhibit 31.)

146.    On September 17, 2015, Plaintiff was provided a copy of a letter from Defendant
Department of Interior dated September 15, 2015, addressed to the House Appropriations
Committee, Subcommittee on Interior Appropriations, requesting authorization to reprogram and

restructure the BIE, and the Committee sent a letter in December of 2015 conditionally approving reprogramming of dollars for the restructuring phase for FY 2015. (Roessel Dep. 135:14-19,  ECF 1-29.)

147.    The U.S. Senate Appropriations never sent a written official approval of the reprogramming. (Roessel Dep. 135:20-22.)

148.    Roessel claims approval was communicated informally by the Senate Appropriations Committee staff, around February 2016. (Roessel Dep. 135:23-136:5.)

149.    At the time of alleged informal approval by the U.S. Senate, the Senate still had hard questions about the restructuring. (Roessel Dep. 136:6-7, Hamley Dep. 120:10-11.)

150.    The full Congress never voted as a body to approve the restructuring as it was laid out in the Blueprint for Reform. (Roessel Dep. 136:9-12.)

**6.    The BIE Did Not Utilize an Open Process During Consultation**

151.    In response to a question about whether BIE Director Roessel was trying to prevent tribes from getting upset and organizing against the Blueprint for Reform, ADD Jeff Hamley stated based upon the last lawsuit which the tribes won [the 2006-2007 litigation in this Court], there was always that reality in the [BIE employees'] minds that there going to be an organized resistance by tribes, so that was a concern.  (Hamley Dep. 121:8-13.)

152.    There was a memorandum written by the Chief of Staff of the Department for Assistant Secretary of Indian Affairs Kevin Washburn, Sarah Harris, on August 28, 2014, in which she was telling BIE employees "just FYI, for future reference, we are really trying to stay away from the calling the BIE Study Group or its recommendations a 'realignment.'" (Yu Dep. 185:15-186:7.)

27

153.    ADD Jeff Hamley was concerned about BIE Director Roessel's tendency to keep things close to the vest, in his inner circle, as Hamley was a person who was in favor of tribal consultation, and Roessel's assistant Jacquelyn Cheek also observed Roessel would hold things close.  (Hamley Dep. 122:12-123:6, Cheek Dep. 41:15-22.)

154.    Both ADD Bart Stevens and ADD RoseMarie Davis believe the Blueprint for Reform would have been a more acceptable plan if tribal leaders and school officials and educators and the senior leaders of the BIE had been involved in its drafting.  (Stevens Dep. 44:10-45:2, Davis 28:4-21.)

155.    Don Yu agrees there was some tension between adequate consultation with tribes and tribal school officials, and on the other hand trying to get his restructuring done before the end of the Administration. (Yu Dep. 111:12-17.)

**B.      Defendants' Restructuring Plan, Consultation on the Plan, the Manner in Which the Plan was Implemented, Including Premature Closure of Education Line Offices and Diminishment of Educational Support for BIE - Funded School Was Arbitrary and Capricious, and Violated the Administrative Procedures Act.**

156.    ADD Jeff Hamley felt that the BIE already had laws in place that required BIE to improve [BIE-funded] schools and [they were adequate] if the BIE would just carry those out without a massive reorganization.  (Hamley Dep. 80:19-81:7.)

157.    Hamley was not sure that the Blueprint for Reform would be a fix to some of the [school] problems.  (Hamley Dep. 81:10-16.)

158.    Hamley believed it was good to give the BIE some of the structural authority retained by the BIA after the 2006 restructuring, but was concerned as to whether, where the restructuring [Blueprint for Reform] went beyond those structural issues, the BIE would really

28

end up providing better educational services to Indian students.  (Hamley Dep. 82:10-16.)

159.    The BIE told tribes repeatedly that in the restructuring, the BIE would become less top heavy and more resources would be driven closer to schools, and told Congress that resources would be located closer to schools and the restructuring would streamline the BIE bureaucracy, but the opposite was true, there are now less services and more bureaucracy.  (Roessel Dep. 56:19-23, 57:1-6, Bordeaux Dep. - Vol. II 76:7-16.) RST Exhibit 16, and Exhibit 25.)

160.    Contrary to this, the monies appropriated for management increased BIE-wide. (Herrin Dep. 30:3-5.)

161.    In the restructuring, the BIE increased its management level positions by at least 18 FTEs or federal positions, and decreased its field level (mostly at the reservation level) FTEs by at least 33.  (Herrin Dep. 50:16-51:4, 51:13-52:12, RST Exhibits 9 and 10.)

162.    The BIE Central Office in Washington, D.C. increased from eight (8) in 2015 to fifteen (15) at present.  (Herrin Dep. 30:7-15.)

163.    Don Yu talked with tribes about making the BIE less bureaucratic, and having less "red tape" so tribes and their schools could access or receive services in a more efficient manner. (Yu Dep. 80:13-81:1.)

164.    When told about Joe Herrin's testimony that there was a growth of 18 management positions in the BIE and a diminishment of 33 field level positions after the restructuring, Don Yu said "that was never the plan for that to happen ever" and that "if that is what happened . . . that was never the plan. (Yu Dep. 199:5-200:4.)

165.    When Yu was asked if it actually did happen, would that constitute a failure of the restructuring plan as he envisioned it and he replied "no, I would not call it a failure because we

succeeded on many other fronts.  I didn't succeed in everything, and I will admit to you with tremendous regret that I failed on some things.  And they bother me still." (Yu Dep. 200:5-12.)

166.    Roessel agrees that when Don Yu and Marilee Fitzgerald were working in the Study Group, the focus was more on structural changes to the organization than an academic improvement. (Roessel Dep. 81:9-14.)

167.    There was no empirical research or data compiled by the Study Group or BIE, which proved a direct link or connection between the restructuring proposals and the actual improvement of student scores, improvement of performance of individual tribal grant schools and BIE -funded schools like Rosebud and Cheyenne River, or actual academic outcomes for Indian students. (Roessel Dep. 81:15-82:11, Hamley Dep. 129:2-9, Davis 36:17-22.)

168.    The obligation of Education Line Offices, prior to restructuring, was to (1) monitor and education BIE programs, (2) provide all services and support functions for education programs with respect to personnel matters and staffing issues, (3) to provide technical [coordinating] assistance in areas such as procurement, contracting, budgeting, personnel, curriculum and operation and maintenance of school facilities. (Roessel Dep. 126:3-7.)

169.    The BIE had a statutory obligation to continue to provide educational support services and technical assistance until Congress allowed reprogramming of BIE monies. (Roessel Dep. 128:19-129:6.)

170.    Some officials in the White House and the Department of Interior raised questions with the BIE about closing the Education Line Offices too early and even moving forward with closure at all - concerns which reached the BIE Director. (Roessel Dep. 129:7-19.)

171.    Administration officials at the White House raised questions about the overall Transformation Plan and whether it is going to be effective or improve outcomes for the students, as well as broad questions about the [evidentiary] base and the effectiveness of the overall Plan. (Yu Dep. 108:15-22.)

172.    ADD for tribal grant schools RoseMarie Davis struggled to keep up with the additional workload after that occurred in mid-year 2015. (Roessel Dep. 109:12-15.)

173.    Roessel agrees there was a net loss of field level positions at the line offices after the Blueprint for Reform was implemented. (Roessel Dep. 107:18-108:3.)

174.    In its restructuring, the BIE centralized and consolidated educational support services and technical assistance, going from 22 Education Line Offices down to 15 Educational Resource Centers.  (Herrin Dep 27:15-21.)

175.    Don Yu admits that the Education Resource Centers were being placed away from the reservations, but he deferred to Roessel, who had a big hand in deciding where the ERC's would be located on the geography because he was the BIE Director, and Roessel and Greyeyes knew the geographical distance better. (Yu Dep. 223:1-16, 227:20-228:7.)

176.    Don Yu admits that there is no evidence, scientific data or empirical research which shows that moving education support and technical assistance offices further away from Indian  reservations would help lead to better academic performance by Indian children across the nation. (Yu Dep. 160:11-162:21.)

177.    Director Roessel had been removed as BIE Director because of an Interior Office of Inspector General ("OIG") Report posted March 30, 2016, in which the OIG found Roessel inappropriately hired two individuals from the Navajo tribe, his Program Analyst Wendy

31

Greyeyes with whom he was having a romantic relationship, and one of his relatives who had worked within the Navajo Nation School System. (Roessel Dep. 5:15-24, Affidavit of Charles Abourezk, Exhibit 33.)

178.    With regard to the BIE-funded schools at Cheyenne River, it was 355 miles from Eagle Butte to Turtle Mountain Reservation in Belcourt, North Dakota, 167 miles to Kyle, South Dakota and 297 miles Flandreau, South Dakota from the Cheyenne Indian Reservation. (Yu Dep. 226:9-21.)

179.    Don Yu was unaware that after the restructuring was implemented, while he was still an employee, that the Navajo Reservation – Director Roessel's home reservation – acquired three Educational Resource Centers [and have their own ADD located within the Navajo reservation.] (Yu Dep. 228:9-21, Roessel Dep. 156:8-13.)

180.    BIE Director Roessel was the person who made most of the decisions about what is at question in this lawsuit, including the diminishment of the Education Line Office staff at Rosebud. (Yu Dep. 240:2-20.)

181.    Don Yu admits that a lot of what he planned in the Blueprint for Reform was dependent upon both adequate funding, and the BIE being willing to execute on the plan in a fair way for all Indian tribes. (Yu Dep. 275:16-20.)

182.    In the Dakotas, ADD RoseMarie Davis and her office in Minneapolis had to take on a lot of positions after the Education Line Offices effectively closed, around mid-year 2015. (Roessel Dep. 109:5-11.)

183.    Secretaries Duncan and Jewell, Roessel and Yu were in a hurry to get the Blueprint for Reform approved and the money reprogrammed, because there was pressure from

the Secretaries' offices to get the restructuring done before the end of the terms of the two

Secretaries [Duncan and Jewell].  (Yu Dep. 15:16-22, Hamley Dep. 84:2-85:2.)

184.    The federal Office of Management and Budget raised general concerns about the

Blueprint for Reform, wanting to know how the BIE, based upon the kind of financial investment

in the things that BIE was requesting: school construction, tribal grant support costs, information

technology, broadband . . . would get a return on that investment through improved educational

outcomes for American Indian children. (Yu Dep. 142:22-143:12.)

185.    The tribal grant schools in South Dakota (including Rosebud and Cheyenne River

Sioux Tribal Schools) are located on Indian reservations. (Roessel Dep. 49:22-25.)

186.    Prior to the Blueprint for Reform being implemented, all of the Education Line

Offices in South Dakota were located on Indian Reservations. (Roessel Dep. 113:16-20.)

187.    The Cheyenne River Sioux Tribe and Lower Brule Sioux Tribe Line Offices were

closed in December 2014. (Roessel Dep. 122:15-22, 125:9-11, Davis Dep. 13:2-4.)

188.    The Rosebud Sioux Tribe's Line Office closed June 30, 2015, and the Rosebud

Sioux Tribe was not notified in advance it would be closing. (Davis Dep. 10:13-11:3, Roessel

Dep. 123:17-19, Bordeaux Dep. Vol II - 36:16-37:4.)

189.    Between 2013 and 2014, the Education Line Office staff nationally was reduced

by about 38 percent.  (Davis Dep. 12:5-9, Stevens Dep. 64:19-22, Greyeyes Dep. 70:12-17.)

190.    ADD RoseMarie Davis is unaware of any legal authority that allowed BIE

Director Roessel to diminish or close Education Line Offices in 2013 through the middle of

2015.  (Davis Dep. 18:17-20.)

191.    During this period of time, from 2013 to 2015, the BIE still had an obligation under the law to provide educational support and technical assistance to tribal grant schools. (Davis Dep. 18:20-19:2.)

192.    Prior to June 30, 2015, a number of Education Line Office staff were reduced by attrition, such as people who retired did not have their vacancies filled, and vacant positions were not rehired.  (Davis Dep. 11:22-12:4.)

193.    There was a lot of need out in the field [Education Line Offices] because the attrition was already evident.  (Davis Dep. 18:13-16.)

194.    Chief Implementation Officer Wendy Greyeyes remembers that before the BIE filled the vacancies, the BIE team wanted to figure out what was going on with the restructuring, to get it approved before there were any hires, until there was approval on the reprogramming, so the restructuring stalled the hiring and filling of those positions.  (Greyeyes Dep.71:17-72:3.)

195.    Around January 21, 2014, one of ADD RoseMarie Davis' staff, Donna Eaglestaff, who was working at Standing Rock Sioux Reservation and with two South Dakota schools, wrote to Davis telling her there was a need for more staff to assist with the duties of the vacated ELO positions.  (Davis Dep. 18:9-12, RST Exhibit 29.)

196.    ADD Bart Stevens was concerned with the reduction of Education Line Office staff, that the staff were no longer there and this was concerning to Stevens because he did not know, out of the existing personnel, where technical assistance [for tribal schools] would continue to come from and how far away that technical assistance would be, which would require either phone calls or travel in order to provide on site, face-to-face [interaction.]  (Stevens Dep. 66:1-20.)

197.    Stevens was concerned that fewer people were going to be asked to perform more functions after the Education Line Office personnel were reduced.  (Stevens Dep. 66:21-67:3.)

198.    BIE Director Roessel sent a June 12, 2015 memorandum to Director of BIE Human Resources Thomas Hettich giving Human Resources "Restructuring Assignments." (Hamley Dep. 111:17-112:1, RST Exhibit 4.)

199.    The Roessel memorandum directed Hettich to "complete the cross-walk of positions for the restructuring of the Bureau of Indian Education."  (RST Exhibit 4.)

200.    Roessel continued "this will entail the attached organizational charts, the direct reassignments, positions being transferred to other office or locations, and any actions that need to be taken in order to get our positions and employees notified of opportunities and possible reductions-in-force."  (RST Exhibit 4.)

201.    Chief Implementation Officer Greyeyes recalls the purpose of the crosswalk as a way to determine which jobs would be impacted by the restructuring.  (Greyeyes Dep. 72:9-16.)

202.    The request to begin cross-walking of positions was sent before the request for reprogramming went to Congress, by several months, and [six months] before the first of two houses of Congress conditionally approved the reprogramming.  (Greyeyes Dep. 75:5-19.)

203.    Roessel then stated "[w]e appreciate the work of the Human Resources Office, but find that we must move quicker than the norm as we want to have certain requirements of Secretarial Order 3334 in place prior to the start of school year 2015-2016 and the end of the 2015 fiscal year." (RST Exhibit 4.)

204.    As early as July 2014, Wendy Greyeyes was requesting data necessary for the realignment from NASIS (school data system) and, as requested by Adrianne Moss at the

35

Department of Interior, looking at vacancies that existed within the BIE Education Line Offices. (Greyeyes Dep. 100:10-101:9.)

205.    Around this period of time, BIE Director Roessel was attempting to keep the restructuring "budget neutral."  (Davis Dep. 19:23-20:3.)

206.    BIE Director Roessel was attempting to utilize the vacant positions and closed Education Line Offices to help fund the restructuring plan, without having to ask for an expansion in the budget.  (Davis Dep. 20:4-11.)

207.    The Rosebud Sioux Tribe interpreted the phrase "Budget Aligned to Support New Priorities" in the Blueprint for Reform slide show as meaning the BIE was "going to align the budget that they developed to support themselves and their larger . . . administration and they were taking money away from the schools to be able to do that. (Bordeaux Dep. - Vol. II 13:10-25.)

208.    There was no evidence or data to support how the closure of the Education Line Office at Rosebud was going to make a difference and help improve education for the students at St. Francis or who were in the dormitories, and St. Francis continues to have struggles in helping their students improve their academics; they don't get a reasonable answer from anybody [in the BIE] and when the Rosebud Education Department calls for help from Minneapolis [ADD Office] we don't always get an answer.  (Bordeaux Dep. - Vol. II 52:10-25.)

209.    Ms. Bordeaux states that the premature closure of the Education Line Offices created a number of problems for the tribal schools at Rosebud, and they had concerns about the services going further away from the schools, because the number of FTEs that were at the Line Office in Rosebud had been decreased; Rosebud had previously been assured that there would be

36

three to four staff members at each line office – which included the Line Officer and the support

staff that the Line Officer needed, which included school improvement services, but now there

[are] no school improvement services provided, so it was just a decrease in services. (Bordeaux

Dep. Vol 1- 21:4-22)

210.    There has been a loss or diminishment of education support services and technical

assistance from what was previously provide, there are less services and more bureaucracy, there

used to be three to four BIE employees in the Rosebud Education Line Office but now there is

only a part time employee there, Charmaine Weston, and trying to get a hold of her has been

difficult, as she is part time at Rosebud, she has no published telephone number, and it is difficult

to reach her. (Bordeaux Dep. - Vol. II 76:12-25, 77:20-78:18.)

211.    As a result of the ELO closure on the Rosebud Reservation, a number of events

occurred: the Tribe and its educational institutions, without audit assistance, fell behind on audits

and has not had completed an audit since the 2014 audit;  the Tribe was unable to obtain timely

draw downs on several of its educational contracts, including its Higher Education contract, its

Special Education/Early Childhood Program, and its Johnson-O'Malley Program;  the Tribe's St.

Francis Indian School academic data is not available;  schools which depend on the Line Office

ot distribute Johnson O'Malley funds, such as Winner, Todd County, White River, and the St.

Francis Indian School are not receiving those funds in a timely manner;  education funds for the

Rosebud Sioux Tribe Educational Department have been delayed and are not [timely] available;

timely draw-downs for academic support services have decreased;  there is limited to no

technical assistance provided;  no training for new business office personnel, school board

members, or tribal council members;  and there are facility problems for the dorms at the Tribe's

Sicangu Owayawa Oti.  (Rosebud Sioux Tribe's Response to Defendant's Interrogatories, Responses to Interrogatory No. 12, attached to Bordeaux Affidavit, para. 9, Bordeaux Exhibit 4.)

212.    The Rosebud Sioux Tribe has the position that those educational support services and technical assistance lost since the restructuring should be provided on the Rosebud Reservation.  (Bordeaux Dep. - Vol. II 77:1-7.)

213.    In a September 19, 2014 memorandum from Roessel to Assistant Secretary-Indian Affairs Kevin Washburn, Roessel said, in pertinent part, after attaching the Interim Organizational Chart for BIE, that "the Interior Organization Chart may be used to complete staffing actions and other necessary changes in the organizational chart during the restructuring period."  (RST Exhibit 4, BIE 0152.)

214.    The Organization Chart affecting the Tribally-Controlled Schools [which affected both the Plaintiffs] was originally effective on September 19, 2014, but was signed by Roessel on 4-8-15 ad ADD for Tribally Controlled Schools RoseMarie Davis on 4-15-15, and initiated the Education Resource Centers and eliminated Education Line Offices from the Organizational Chart of the BIE, [ten months] before final approval by Congress of the reprogramming which was allegedly completed in February 2016.  (RST Exhibit 4.)

215.    The Organizational Chart for the Bureau-operated Schools, also signed around this time, imposed similar organizational structural changes, which then affected Plaintiff Cheyenne River Sioux Tribe's BIE-operated school on its reservation. (RST Exhibit 4, BIE 0159 and 0155, Davis Dep.: 66:2-21)

216.    On December 2, 2014 one of the BIE auditors, David Gilbert asked for clarification after finding out that some Education Line Offices had been closed in December

2014 [including Cheyenne River Sioux Tribe's ELO], stating in his e-mail to Director Roessel and his Assistant Jacquelyn Cheek, that "[p]lease correct me if I'm wrong, but, according to the reorganization document, the ELOs should still exist, but report up to the ADDs."  (Roessel Dep. 124:6-125:11, (Cheek Dep.: 28:6-31:13, RST Exhibit 7.)

217.    Director Roessel did not respond to this, nor did Jacquelyn Cheek, nor to her knowledge, did the BIE Chief of Staff or anyone else.  (Cheek Dep. 28:6-31:13, RST Exhibit 7.)

### 1.    The  National Congress of American Indians, the Kellogg Group, and the ERCs

218.    The NCAI was integral to the BIE's efforts to restructure pursuant to the Blueprint for Reform, and having their input, feedback and buy-in on the entire Blueprint was important. (Yu Dep. 188:14-22.)

219.    Don Yu had regular communication with NCAI officials all during the process of trying to get the Blueprint for Reform approved. (Yu Dep. 189:19-190:6.)

220.    The BIE used the NCAI to disseminate information it was proposing about things like consultation schedules, and they also actually set up a number of meetings for the BIE at their conferences, such as the NCAI annual meeting in San Diego (referenced otherwise in the Statement of Material Facts). (Yu Dep. 190:7-20.)

221.    The Kellogg Group was a private nonprofit corporation which was brought in by the Study Group and BIE to assist with funding of parts of the restructuring. (Roessel Dep. 87:5-17, 18-21, 92:14-16, 93:12-14, 94:1-12, Exhibits 21 and 32.)

222.    Initially the BIE and Secretaries Duncan and Jewell sought to obtain funding for the BIE from the Kellogg Foundation but the Kellogg Foundation raised issues about funding a

government agency, so Don Yu and the BIE arranged to have the National Congress of American Indians be the grant recipient from Kellogg, rather than the BIE, and the NCAI would carry out, with consultant Paul Vallas, the plan to have Kellogg Group/Foundation assist with design of the school solutions teams at the Education Resource Centers in the newly restructured BIE and for training of BIE staff for the ERCs, and for the BIE's intention to change the Education Line Office structure. (Yu Dep. 127:1-134:14, RST Exhibits 39, 32, 2, Roessel Dep. 93:21-24.)

223.    Yu became aware of a state statute passed in Illinois that consolidated [and centralized] a lot of functions for Chicago Public Schools, under a new position which became the CEO of Chicago Public Schools, which was first held by Paul Vallas, one of the consultants used by Yu and the BIE in the restructuring process. (Yu Dep. 40:22-41:6.)

224.    Paul Vallas used to be the CEO of Chicago Public Schools, and was Secretary of Education Arnie Duncan's boss before Duncan became the CEO of Chicago Public Schools. (Yu Dep. 173:2-6.)

225.    Donald Yu brought Paul Vallas into the restructuring effort, specifically to deal with retraining of BIE staff, and agrees that and was aware of Mr. Vallas's past record in other school districts when he brought him on board. (Yu Dep. 180:10-20.)

226.    Yu was also aware that Vallas had been terminated when he was superintendent at the Bridgeport Connecticut Public Schools because he hadn't complied with state law. (Yu Dep. 182:16-183:2.)

227.    Don Yu thought it was fair to summarize Paul Vallas's philosophy when he went into school systems was to take a wrecking ball to them, and that Paul was going to speak his

mind and he thought some school systems . . . needed dramatic reform and that . . . you had to pull them up by the roots and start over. (Yu Dep. 180:13-20.)

228.   Vallas was known to have an operating principal of "do things big, do them fast, and do them all at once." (Yu Dep. 181:8-12, <u>RST Exhibit 43</u>.)

229.   Don Yu denies the hiring of Paul Vallas was at Secretary Arnie Duncan's urging, but admitted Duncan told Yu if he needed someone to help and somebody to bounce ideas off of, Paul would be a person he could ask questions. (Yu Dep. 181:21-182:11.)

230.   Don Yu was aware that Paul Vallas had unsuccessfully ran for Lieutenant Governor of Indiana in 2014, but does not believe the hiring of him was connected to that, but this was clarified by Yu to state that Vallas was hired and funded out of the Kellogg grant, which was run through NCAI, rather than by the BIE directly, so he was like a contractor or subcontractor for NCAI. (Yu Dep. 183:9-184:12.)

231.   Among the conditions attached to its December 18, 2015 letter providing conditional approval of the reprogramming and restructuring, the House Appropriations Committee required that "[t]hat every effort be made not to proceed with components of the reorganization at the field office level that may be directly impacted by pending litigation." (Administrative Record 4116,  RST Exhibit 30 – attached to Affidavit of Deborah Bordeaux.)

232.   The ADDs only found out after the conditional reprogramming that it had happened, as there was no press release.  (Hamley Dep. 119:8-13.)

233.   Donald Yu was aware that the Congress had given the BIE permission to restructure and reprogram dollars but to make every effort not to reorganize the field office level in South Dakota. (Yu Dep. 163:1-164:3.)

234.    When Yu was asked when he considered the restructuring/Blueprint for Reform to have been completely and fully implemented, Yu replied "I don't think we ever achieved all of those things.  I mean, I wish we could have.  I don't think . . . we achieved all of those things. . . I don't think it was ever the goal for our team and the . . . Administration to complete all of those things anyway." (Yu Dep. 54:16-55:7.)

235.    Yu said turning around a failing school system is not something you do in one year, two years, three years, four years.  It takes a decade, maybe more.  And it was never my . . . I never thought . . . and I don't think any one of the political appointees thought we would be able to complete all of the goals in there." (Yu Dep. 55:8-14.)

**2.    School Enhancement Funds Were Used to Fund Tribal Sovereignty Grants Before Reprogramming of Enhancement Funds Were Approved by Congress**

236.    School Enhancement Funds were used by the BIE and particularly Line Offices to assist Tribal Grant Schools funded by the BIE to supplement annual funds for things like school improvement and money for academic success, to improve reading scores, and to improve educational outcomes and are needed by tribal grant schools.  (Davis Dep. 40:8-41:2, Roessel Dep. 68:8-10.)

237.    During the restructuring, in October of 2014 [14 months before the House Appropriations Committee gave conditional approval to allow reprogramming of FY 2015 funds], in an effort to solicit tribes to apply for self-determination grants to run their schools, the BIE created a Sovereignty in Education program and gave out approximately $2 million in grants of about $200,000 each to Indian tribes.  (Hamley Dep. 86:3-87:7, Roessel Dep. 65:10-67:3.)

238.    At some point, the BIE under Director Roessel began using School Enhancement Funds, which were in the Greenbook each year and were specifically appropriated for assisting tribal schools with school improvement funds, using those to pay for the "sovereignty grants" to Indian tribes, rather than for the schools.  (Hamley Dep. 89:5-90:1, Roessel Dep. 67:4-6.)

239.    There was no Congressional reprogramming in the record for the reprogramming of school enhancement funds to be used for 'sovereignty grants" but Roessel was under the impression that Congressional approval was given, but knew no particulars, he just remembers being told by Interior that if they call them tribal sovereignty "enhancement" grants, by using the word "enhancement" they could use the enhancement funds.  (Roessel Dep. 68:4-69:4.)

240.    ADD Jeff Hamley suspected the BIE used school enhancement funds to pay for sovereignty grants which he suspected, but could not prove were used to reward tribes who supported the Blueprint for Reform, but Roessel denies this.  (Hamley Dep. 90:2-17, Roessel Dep. 69:5-9.)

241.    ADD for Tribally-controlled Grant Schools for the BIE Rosemarie Davis, knew there were sovereignty grants being awarded but was not ever told that school enhancement funds were being used for those grants to tribes.  (Davis Dep. 59:7-60:2.)

242.    Chief Implementation Officer Greyeyes was aware that the Bureau intended to use Education [or School] Enhancement Funds in [FY] 2016 to fund positions within the Education Resource Centers.  (Greyeyes Dep. 106:17-22.)

243.    Greyeyes remembers hearing questions from tribes about what was being used to fund the reorganization.  (Greyeyes Dep. 107:16-18.)

43

**C.      Defendants Breached Their Trust Responsibility Arising Under Federal Statutes and the 1868 Ft. Laramie Treaty**

244.    The BIE has an historical and legal obligation, and in some cases a treaty obligation, and a general trust responsibility, arising out of various statutes and treaties to educate Indian children, and the treaties still impact reservation schools served by the BIE.  (Stevens Dep. 16:1-7, 67:8-19, Herrin Dep. 12:14-21, Hamley Dep. 70:2-5, Roessel Dep. 42:23-43:2.)

245.    The BIE trust obligation is both a general trust responsibility, as well as one arising out of statutes and treaties, to provide high quality education services to Indian children. (Davis Dep. 7:4-14, Hamley Dep. 23:17-24:5,Yu Dep. 168:8-169:1, Exhibit 12 - BIE 402.)

246.    In the Dakotas, the vast majority of BIE-funded elementary and secondary schools are located on Indian reservations.  (Davis 7:23-8:1.)

247.    Along with the treaty and trust responsibility, former Director Roessel had a belief that tribes should run their own school systems, not the federal government, but with the "full support" from the Bureau of Indian Education.  (Roessel Dep. 42:11-19.)

248.    Roessel understood the Self-Determination Act and the Tribally-Controlled Schools Act allowed Tribes to learn how to govern and operate their own institutions, but the federal government still had an obligation to perform under their trust responsibilities and treaty obligations. (Roessel Dep. 71:9-15.)

249.    The federal government has to stand behind the tribes and provide support while they carried out efforts to learn how to run their own schools. (Roessel Dep. 71:16-22.)

250.    The BIE, [even under self-determination and tribal control] was supposed to help initially through the education line offices with technical assistance on budget, facilities, curriculum, special education, and so on. (Roessel Dep. 71:23-72:2.)

251.    Tribal schools still need that kind of assistance today. (Roessel Dep. 72:3-5.)

252.    The BIE previously had school improvement specialists that were at the Education Line Office level throughout the United States, but now they are located only in Seattle, Nashville, Albuquerque, Minneapolis, and Oklahoma.  (Davis Dep. 43:10-44:12.)

253.    There has been a reduction in school improvement specialists since the restructuring, but the BIE is attempting to fill those.  (Davis 44:13-23.)

254.    There are no current BIE plans to locate school improvement specialists at either the Cheyenne River Sioux Reservation or the Rosebud Sioux Reservation.  (Davis 45:7-13.)

### 1.    Defendants Violated Their Trust Responsibility Arising Under Various Federal Statutes

255.    The funding of BIE-funded schools is based upon the federal Indian trust responsibility.  (Hamley Dep. 69:19-70:5.)

256.    There are various pieces of legislation underlying the federal trust responsibility, going back to the Snyder Act that gave the BIE the authority to spend monies and impact Indian education directly, including Public Law 95-561, 25 U.S.C. § 2006, the Indian Self-Determination and Education Assistance Act, Public Law 100-297 (the Tribally-Controlled Schools Act), and No Child Left Behind Act. (Herrin Dep. 11:14-12:13.)

257.    There is still a trust responsibility of the Federal Government under the laws that the BIE works with to educate Indian children and provide educational support, and the Rosebud

Sioux Tribe believes that the services provided under the trust responsibility should be provided on the reservation.  (Herrin Dep. 20:8-18, Bordeaux Dep. - Vol. II 77:1-7.)

## 2. Defendants Violated the Rights of the Plaintiffs Under the 1868 Ft. Laramie Treaty

258.    The Plaintiff Cheyenne River Sioux Tribe and the Intervenor-Plaintiff Rosebud Sioux Tribe are federally-recognized Indian tribes and signatory tribes to the 1868 Ft. Laramie Treaty.  (Complaints of CRST and RST, Bordeaux Affidavit, para. 13, Bordeaux Exhibit 8 – Document No. 18 – the Treaty with the Sioux-Brule, Oglala Miniconjou, Yanktonai, Hunkpapa, Blackfeet, Cuthead, Two Kettle, Sans Arcs, and Santee – and Arapaho, 1868, SDCL Vol. 1.)

259.    The 1868 Ft. Laramie Treaty is an important source of educational rights for Indian children from the [geographic] areas covered by the Treaty, [which includes the Rosebud and Cheyenne River Sioux Tribes]. (Roessel Dep. 44:23-45:2.)

260.    Roessel admits during the time he was BIE Director, he had previously read the 1868 Ft. Laramie Treaty, and agrees Article V guarantees that the federal government maintains offices on the reservation, and that Article VII guarantees a school house and teacher for every 30 school children.  (Roessel Dep. 44:3-22, RST Exhibit 15.)

261.    ADD Davis understands the 1868 Ft. Laramie Treaty to be an additional source of the obligations of the U.S. Government to provide education to Indian children, and that the Education Line Offices were placed on the reservations because of treaty obligations to those tribes.  (Davis Dep. 45:1-6, 46:12-47:12.)

262.    ADD Davis has heard tribal leaders talk about education due to them under the 1868 Ft. Laramie Treaty, for educators and the agent to live on the reservation.  (Davis 47:20-48:6.)

263.    Roessel admits that at the Loneman School Listening Session in April of 2014 and the consultation at the Ramkota Hotel in Rapid City, South Dakota on April 22, 2015, the right to education in compliance with the 1868 Ft. Laramie Treaty was raised by tribal representatives from numerous tribes in the Dakotas, particularly treaty rights to education.  (Roessel Dep. 45:3-17, Davis Dep. 33:23-34:1.)

264.    A subsidiary education organization of the Rosebud Sioux Tribe, Sicangu Owayawa Oti, in a statement that was both read aloud at the April 22, 2015 consultation in Rapid City, South Dakota as well as placed in the record, substantively raised the issue of Rosebud's treaty rights in relation to the government obligation to provide education.  (Greyeyes Dep. 39:15-19, Roessel 47:5-20, RST Exhibit 28.)

265.    The 1868 Treaty was raised by tribal participants so that the government doesn't get out of the business of education and that these are rights that [the government] has to abide by.  (Roessel Dep. 45:22-25.)

266.    The Cheyenne River Sioux Tribe conveyed to the BIE and Roessel that they wanted compliance with the 1868 Ft. Laramie Treaty. (Roessel Dep. 192:9-12.)

267.    The Cheyenne River Sioux Tribe also communicated they wanted education management on the reservations, (Roessel 193:1-3.)

268.    The Study Group and BIE commented on those treaty rights, saying "we will abide by them."  (Roessel Dep. 46:7-14.)

47

269.    The trust responsibility is reflective of the [1868 Ft. Laramie] treaty, which says that the federal government will provide services on the reservation specifically such as the location of agency superintendent for the Bureau of Indian Affairs[/Education] as well as an agency person, a superintendent or an education line officer to provide services on the reservation for the educational entities that receive Bureau funds, so that they would be on the reservation to be able to provide services locally for the Native people. (Bordeaux Dep. Vol. I- 11:16-12:4.)

270.    Chief Implementation Officer Wendy Greyeyes was asked by various people in the Study Group and BIE to pull data in support of the restructuring, but no one from the Study Group ever asked her to pull data or information on what treaties applied to the tribes in the Dakotas or what the Great Plains tribes meant when they referred to "treaty obligations" during the consultations.  (Greyeyes Dep. 105:7-16.)

Dated this 12th day of February, 2018.


 /s/ Charles Abourezk
Charles Abourezk
Abourezk, Zephier & LaFleur, P.C.
Attorney for Rosebud Sioux Tribe
P.O. Box 9460
Rapid City, South Dakota 57709
(605) 342-0097
Fax (605) 342-5170

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing *Intervenor-Plaintiff Rosebud Sioux Tribe's Statement of Undisputed Material Facts to Defendant Ryan Zinke, Secretary, United States Department of Interior, et al.* was served via e-filing, upon the following person(s):

Tracey Zephier
Fredericks, Peebles & Morgan, LLP
520 Kansas City Street, Ste 101
Rapid City, SD 57701

Attorney for Plaintiff Cheyenne River Sioux Tribe

Kevin Snell, Trial Attorney
Daniel Bensing, Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW, Room 6108
Washington, SD 20530

Attorneys for Defendants

this 12th day of February, 2018.

 /s/ Charles Abourezk