UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | |
|---|---|
| **CHEYENNE RIVER SIOUX TRIBE, ROSEBUD SIOUX TRIBE,**<br><br>　　　　**Plaintiffs,**<br><br>　　v.<br><br>**RYAN ZINKE, Secretary of Interior, et al.,**<br><br>　　　　**Defendants.** | )   Case No. 3:15-cv-3018-RAL<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFF CHEYENNE RIVER SIOUX TRIBE'S
MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND
MOTION TO JOIN PLAINTIFF ROSEBUD SIOUX TRIBE'S MOTION FOR
SUMMARY JUDGMENT / PARTIAL SUMMARY JUDGMENT**

**INTRODUCTION**

As Dr. Ian Malcolm said in the 1993 blockbuster Jurassic Park, "You were so busy thinking how you could, you forgot to ask whether you should." Like the scientists in that sci-fi adventure, the creators of the Department of Interior's "Blueprint for Reform" for Indian Education were so entranced with the idea of creating a utopia of bureaucratic efficiency - one that would help them realize their own personal and professional ambitions – that they did not stop to ponder or inquire about how their new structure would affect the thousands of Indian children whose educational futures were at stake. Now, Indian children are suffering with even lower academic performance, and there is no help for teachers or administrators in sight.

The Department of the Interior (hereinafter "DOI") is in the process of reorganizing the Bureau of Indian Education (hereinafter "BIE"). BIE is a subsidiary agency of DOI and is

1

responsible for providing education to American Indian children residing on or near Indian reservations. 25 U.S.C. § 2000. Among its many congressionally mandated duties, DOI is required to facilitate tribal control over matters involving the education of tribal members. 25 U.S.C. § 2011(a). To that end DOI is required to periodically engage in substantive and meaningful consultation with Indian tribes, including the Cheyenne River Sioux Tribe (hereinafter "CRST"). 25 U.S.C. § 2011(b). Unfortunately for thousands of Indian children in the Great Plains region, the federal government sloughed its treaty, trust, and statutory obligations in favor of pushing through a poorly designed centralized structure that will only increase DC bureaucracy and move critical technical assistance away from reservations.

## BACKGROUND AND PROCEDURAL HISTORY

In 2005 DOI, acting through the BIE, undertook a nationwide restructuring of Indian education, which ten Indian tribes and tribally-controlled schools opposed. *See* ECF Doc. 1 in case no. 4:06-cv-4091-KES. In addition CRST, tribes and schools located within the jurisdiction of the Federal District Court for the District of South Dakota – Southern Division were also parties to the suit, resulting in suit being filed in that court on December 22, 2005. *Id*. On July 14, 2006 Judge Karen Schreier issued a preliminary injunction enjoining Defendants from effectuating the proposed BIE restructuring. ECF Doc. 45 in case no. 4:06-cv-4091-KES. Parties to the suit entered into a Settlement Agreement on July 18, 2007. Ex. 1 to Compl.

The terms of the 2007 Settlement Agreement required BIE to maintain the six (6) existing Education Line Offices (hereinafter "ELOs") located in North and South Dakota. *Id*. at ¶ 2. Additionally, the 2007 Settlement Agreement also required BIE to hire and maintain a staff of at least three employees at each of the six ELOs during the remainder of 2007 and to attempt to

increase the total Dakota area staff to twenty-four (24). *Id*. at ¶ 4 - ¶ 5. After the Settlement Agreement was entered into by the parties Judge Schreier entered a Stipulated Final Judgment dismissing the action and retaining jurisdiction to enforce the terms of the Settlement Agreement. ECF Doc. 73 in case no. 4:06-cv-4091-KES.

Fast forward a few years to 2013, when DOI formed the American Indian Education Study Group (hereinafter "Study Group"). Ex. 18 to Compl. After a series of four (4) listening sessions the Study Group issued a final report regarding Indian education. Ex. 9 to Compl. at 1; Ex. 23 to Compl. at 5; Ex. 16 to Compl. Based on the final report proffered by the Study Committee BIE subsequently decided to restructure the twenty-two (22) existing ELOs into fifteen (15) Educational Resource Centers (hereinafter (ERCs"), including four (4) ERCs in North and South Dakota. Ex. 29 to Compl. at 2 and 8. Beyond merely changing the name of the six (6) current ELOs, BIE's renewed attempt at restructuring would reduce the number of offices in the Dakotas by two (2). More critically, it would move technical assistance expertise far away from local schools – in some cases more than 250 miles away.

On October 2, 2015 CRST filed suit to prevent such restructuring. In its Complaint CRST asserted four distinct legal claims, three of which survived the government's motion to dismiss: (1) that BIE failed to substantively and meaningfully consult with tribes regarding the proposed reorganization (Count I); (2) that BIE's restructuring plan is arbitrary and capricious and otherwise in violation of the Administrative Procedure Act ("APA") (Count II); and (3) that BIE is in breach of its trust responsibility and the Fort Laramie Treaty of 1868 (Count III).

Now with discovery essentially complete, Plaintiff Cheyenne River Sioux Tribe requests that this Court grant its - as well as Intervenor-Plaintiff Rosebud Sioux Tribe's - motion for summary judgment. The facts that have been brought to light clearly support these motions. In

order to reduce redundancy between the two tribes' pleadings, and since the cause of action stems from the same actions by the government, CRST joins in the factual statements and legal arguments made by RST.

## UNDISPUTED MATERIAL FACTS

Attached hereto is the Tribe's Statement of Material Facts About Which There is No Genuine Dispute ("SMF") filed pursuant to Local Rule 56.1. All Sections of the SMF as well as the Rosebud Sioux Tribe's Statement of Material Facts are filed in relation to this Motion and in relation to the Tribe's Motion to Join in the Rosebud Sioux Tribe's Motion for Summary Judgment.

## STANDARD OF REVIEW

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "There is a genuine dispute when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Dick v. Dickinson State Univ.,* 826 F.3d 1054, 1061 (8th Cir. 2016) (internal quotation marks omitted). "A fact is material if it might affect the outcome of the suit. ... Thus, there must be more than the mere existence of *some* alleged factual dispute to overcome summary judgment." *Id.* (internal quotation marks omitted, emphasis in original). Unsupported factual assertions are insufficient to create a genuine dispute. *Id.* "A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial." *Dryer v. National Football*

*League,* 814 F.3d 938, 942 (8th Cir. 2016); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986). "[W]hen the only question is what legal conclusions are to be drawn from an established set of facts, the entry of a summary judgment usually should be directed." Wright, Miller & Kane, Federal Practice & Procedure: Civil § 2725, p. 412 (3d ed. 1998).

Challenges to agency compliance with the Tribally Controlled Schools Act, 25 U.S.C. §2501 et seq., are reviewed pursuant to the Administrative Procedure Act ("APA"). Under the APA, a reviewing court will set aside agency actions that it determines were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious where an agency has "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs'. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42 (1983). A decision can be upheld only where the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Natural Res. Def Council,* 462 U.S. 87, 105 (1983).

Violations of the 1868 Treaty and the federal government's fiduciary duties to provide quality education for Indian children are subject to "the most exacting fiduciary standards." *Cobell v. Babbitt*, 91 F. Supp.2d 1, 46 (D.D.C. 1999) (citing *Seminole Nation v. United States*, 316 U.S. 286, 296-97 (1942)); *Assiniboine & Sioux Tribes v. Oil & Gas Conservation*, 792 F.2d 782, 794 (9th Cir. 1986). "'Close scrutiny of administrative action is particularly appropriate when the interests at stake are not merely economic interests … but personal interests of life and health.'" *Id.* (citing *Wellford v. Ruckelshaus*, 439 F.2d 598, 601 (D.C. Cir. 1971)).

5

**ARGUMENT**

**I. JOINDER IN THE MOTION FOR SUMMARY JUDGMENT OF THE ROSEBUD SIOUX TRIBE IS APPROPRIATE.**

When the BIE unilaterally decided it was going to create and implement a plan to reorganize the entire nation-wide management of the BIE it affected not only CRST, but also RST and other tribes throughout the country.  Therefore, the Cheyenne River Sioux Tribe hereby joins the Rosebud Sioux Tribe's Motion for Summary Judgment on the basis that the facts and the law undergirding Rosebud's Motion for Summary Judgment are substantially similar to the facts and law supporting Cheyenne River Sioux Tribe's Motion for Summary Judgment.   In support, the Cheyenne River Sioux Tribe references facts set forth in Rosebud Sioux Tribe's Statement of Material Facts and joins in the arguments and authorities proffered in RST's Memorandum in Support of Motion of Summary Judgment.

**II. FAILURE TO ENGAGE IN PRE-DECISIONAL CONSULTATION WITH TRIBES AND FAILURE TO PROVIDE SUBSTANTIAL REASONS FOR NOT GIVING EFFECT TO TRIBAL VIEWS AND CONCERNS**

In addition to the arguments set forth in Intervenor-Plaintiff Rosebud Sioux Tribe's Memorandum, Plaintiff Cheyenne River Sioux Tribe offers the following information and arguments.

The Defendants have incorrectly put words in Plaintiff's mouth in an apparent effort to show that the Cheyenne River Sioux Tribe was (1) meaningfully consulted and (2) in agreement with the restructuring so long as an ERC would be located at Pine Ridge.  Both of these insinuations distort the truth.  While Defendant Roessel did travel to the Cheyenne River Sioux Reservation in February 2015 in an attempt to meet with Tribal leaders, he was specifically told that any time spent with Tribal leaders was not "consultation."  The meeting consisted of

Defendant Roessel showing to several Tribal representatives the same set of handouts similar to those attached to the Complaint as Exhibit 20.  Any effort by Defendants to state that this brief meeting was "consultation" is untrue because it in no way met the mandates of 25 U.S.C. §2011 or the BIA Government to Government Consultation Policy.  *See State of Wyoming, et al., v. United States Department of Interior, et al.,* Case No. 2:15-CV-043-SWS, 36-39 (D. Wyo. Sept. 30, 2015) (Order granting preliminary injunction to tribal petitioners because federal government failed to meaningfully consult when "consultation" sessions were more informational and focused more on "discussion" rather than tribal concerns.)

Nor does the fact that the Plaintiff submitted written requests for additional information about the proposed restructuring constitute meaningful consultation.  To draw the conclusion that the Tribe was meaningfully consulted because it asked for additional information is completely baseless.

Plaintiff has never agreed to or requested that an ERC be located on the Pine Ridge Reservation, so it is disingenuous for Defendants to argue that they did so in response to consultation with CRST.  ("For example, BIE specifically took into account and incorporated CRST's request that an administrator position remain at the Pine Ridge ELO." Defendant's Motion to Dismiss, ECF 15, at 25).  Any statement or insinuation to that effect is simply untrue.  (CRST SMF 15)  In support of this erroneous contention, Defendants cite to their own letter dated July 16, 2015, and addressed to Plaintiff's attorney (Complaint Ex. 28).  A careful reading of that letter does *not* support Defendants' claim that, as proof of Plaintiff's participation in a meaningful consultation process, the Plaintiff asked for (and was granted) an ERC to be located at Pine Ridge.  The Cheyenne River Sioux Tribe has *never* requested or asked, as part of a consultation or otherwise, that an education office be located on the Pine Ridge Reservation.

(CRST SMF 15)  Such a claim is completely irrational and without support anywhere in the record.

What the record does show, however, is the execution of a plan that was developed without adequate consideration of Tribal concerns and without extra, meaningful efforts to involve the Plaintiff or any other Tribe that expressed a desire to keep their Education Line Office open.  (Rosebud Sioux Tribe's SMF 58, 73, 80, 84, 100, 102, 106, 109, 126, 131)  If a tribe's input into the plan did not fit nicely into the grand scheme, it was summarily ignored.  The decision makers within the federal government created their own vision for the BIE and began marching on it without meaningfully heeding serious and legitimate concerns raised by the Plaintiff about the plan's effects on Indian education at the local level.  The brazen execution of this plan - without Congressional approval – has harmed and will continue to harm the youngest members of the Cheyenne River Sioux Tribe until it is halted and the Defendants are made to acknowledge and account for Plaintiff's concerns in their plan.

### III. DEFENDANTS VIOLATED THE ADMINISTRATIVE PROCEDURES ACT BY CARRYING OUT THEIR "PLAN" WITHOUT CONGRESSIONAL APPROVAL AND WITHOUT MEANINGFUL TRIBAL CONSULTATION

In addition to the arguments set forth in Intervenor-Plaintiff Rosebud Sioux Tribe's Memorandum, Plaintiff Cheyenne River Sioux Tribe offers the following information and arguments.

As Plaintiffs have shown, Defendants began implementing their restructuring plan without Congressional approval.  (Rosebud Sioux Tribe SMF 90-91)  Although Defendants claim there has been no final agency action, the facts show otherwise.  *Id.*  On its face and as applied, Defendant Jewell's Secretarial Order #3334 constituted final agency action as the Supreme Court

contemplated in *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004). Defendants' attempts to portray their own self-described "major management restructuring" as akin to the manner in which an agency implements its programs misses the mark. In the process of "merely alter[ing]" the way in which it will carry out its responsibilities to provide educational services to Indian children, Plaintiffs have shown that Defendants in fact created a clear and binding negative effect on the very constituents whose educational futures it is responsible for serving.

A significant basis for this case is because the federal government once again has failed to meaningfully consult with the Plaintiff before undertaking major federal action that resulted in hardship to the Plaintiff and its youngest citizens. Contrary to Defendants' assertions,

> The case at bar involves more than a challenge to a reallocation of funds from a lump sum appropriation. Here, federal statutes and BIA policies require the BIA to consult with Tribes before making changes in Indian school programs. … The explicit language of these statutes, regulations, and policies indicates an intent to confer important procedural benefits upon the tribes in the face of agency discretion and thus the agency action is subject to judicial review.

*Yankton Sioux Tribe v. Jewell*, 442 F. Supp. 2d 774, 783; *see also, e.g., Yankton Sioux Tribe v. U.S. Dep't of Health Human Services,* 869 F. Supp 760, 765 (D.S.D. 1994).

**IV. DEFENDANTS HAVE BREACHED THEIR TREATY AND TRUST OBLIGATION TO PLAINTIFFS BY CREATING AND IMPLEMENTING A PLAN THAT ATTEMPTS TO SHIRK THE FEDERAL GOVERNMENT'S RESPONSIBILITY TO PROVIDE EDUCATION, INCLUDING THE CONTINUED OPERATION OF A LOCAL OFFICE THAT IS RESPONSIBLE FOR THE FAITHFUL DISCHARGE AND OVERSIGHT OF EDUCATIONAL SERVICES TO THE CHILDREN OF THE CHEYENNE RIVER SIOUX TRIBE.**

As Intervenor-Plaintiff Rosebud Sioux Tribe reasoned in their Memorandum in Support of Motion for Summary Judgment, Article VII of the 1868 Treaty of Fort Laramie has been interpreted to mean that the education of children of the Great Sioux Nation is a treaty right. *See, Quick Bear v. Leupp*, 210 U.S. 50 (1908). Under the reorganization, the federal government has

unilaterally abrogated that treaty right by closing the Education Line Office on the Cheyenne River Sioux Reservation. CRST SMF 7. The only BIE employees left at Cheyenne River are maintenance and facility workers for the BIE-operated school. They cannot and do not perform any of the duties formerly provided by the Education Line Office. CRST SMF 8. 12. If one of the schools on Cheyenne River Reservation needs assistance, they now must contact Rosemarie Davis in Minneapolis, MN, for tribally-controlled schools, or Casey Sovo in Albuquerque for the Bureau-operated school. (CRST SMF 10, 12)

The lack of an Education Line Office and a Line Officer at Cheyenne River has harmed the educational services provided to the children of the Tribe. Specifically:

   a. There has been almost no technical assistance (TA) provided to the schools on Cheyenne River for over four years. The BIE says they are providing TA but none is being given to the Cheyenne River Schools. The only person that was providing some limited TA to the Cheyenne River schools was a person from the Rosebud ELO, but she retired and that office was also moved to Minneapolis.

   b. Fund distribution documents (FDD) and grant amendments are not being sent to the Tribe by the ADD East (now apparently called ADD Tribally Controlled Schools) from Minneapolis in a timely manner as they had prior to the reorganization. This is causing a great financial hardship on our schools. For example, Takini School's Emergency Funds were never put into a grant amendment, which caused the school to run completely out of money. This was an error on the part of the office in Minneapolis.

   c. The Indian Student Equalization Program (ISEP) certification, which is critical in determining each school's funding level each year, has been delayed two times for the schools on Cheyenne River because the Education Program Specialist who oversees this process is now located in Minneapolis and cannot come out to complete the review because her travel was not approved. (CRST SMF 13)

None of the above-described situations described would have happened if the BIE had not closed the ELO at Cheyenne River and moved the office to Minneapolis. (CRST SMF 13) The BIE is not considering that the ELO offices on each reservation were sensitive to each school's unique situation and could respond quickly and effectively. The restructuring that is happening is only making services at the local level worse, not better, and that is ultimately

harming our students (CRST SMF 16), and abrogating the Defendants' treaty and trust responsibilities.

## CONCLUSION

For the reasons set forth herein, the Tribe respectfully asks this Court to grant the Motions for Summary Judgment, and the relief requested therein.  Let today be the day that the Court upholds the treaty and trust rights of Lakota Sioux Indian children to a quality education that is based on a desire to see them succeed, rather than on a desire to pad bureaucratic resumes. Let today be the day that the United States ends centuries of broken promises and broken treaties, and requires the BIE to honor its duty to consult with the Tribe in a meaningful way. For all these reasons Plaintiff Cheyenne River Sioux Tribe and Plaintiff Rosebud Sioux Tribe's Motions for Summary Judgment should granted.


Dated: February 12, 2018

                                              Respectfully submitted,

                                                /s/ Tracey A. Zephier_____
                                            TRACEY A. ZEPHIER
                                            FREDERICKS, PEEBLES, & MORGAN, LLP
                                            520 Kansas City Street, Suite 101
                                            Rapid City, SD 57701
                                            Ph:  (605) 791-1515
                                            Fax: (605) 791-1915
                                            Email: tzephier@ndnlaw.com
                                            Attorney for Plaintiff CRST

## WORD COUNT CERTIFICATE

I certify that the foregoing memorandum, Cheyenne River Sioux Tribe's Memorandum in Support of its Motion for Summary Judgment, complies with the type volume limitation of Local Rule 7.l (B)(l ).

According to the word count of the word processing system used to prepare the brief, the brief contains 3,360 words, excluding the cover page, tables, signature block and this certificate.

    /s/ Tracey A. Zephier_____