UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | |
|---|---|
| CHEYENNE RIVER SIOUX TRIBE, | Case: 3:15-cv-03018-KES |
| Plaintiff, | |
| ROSEBUD SIOUX TRIBE, | |
| Intervenor-Plaintiff, | |
| v. | |
| RYAN ZINKE, Secretary, United States Department of Interior, et al., | |
| Defendants. | |

## DEFENDANTS' COMBINED MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT

## INTRODUCTION

The Bureau of Indian Education ("BIE"), a component of the Department of Interior, is responsible for providing a school system, on or near Indian reservations, for the education of Indian children.  25 U.S.C. § 2000.  That system has struggled.  According to a 2011 study, BIE fourth graders scored on average 22 points lower in reading and 14 points lower in math than American Indian students attending public schools.  CRST-001905 (Final Findings and Recommendations Prepared by Study Group) (hereafter, "*Blueprint for Reform*").[1]  In 2012-2013, only one out of four BIE schools met state-defined proficiency standards.  *Id.*  And when compared to 18 urban school districts with high minority populations, the BIE underperformed all but one.  CRST-001906.

Facing such an urgent need for reform, and after several discussions with tribal leaders concerning systemic issues with BIE, the Secretaries of the Departments of Interior and Education appointed the American Indian Education Study Group ("Study Group") to diagnose, develop, and implement recommendations to transform BIE.  CRST-001903.  BIE's organizational structure had become outdated, as tribal nations and locally-controlled school boards came to operate approximately two-thirds of BIE schools, and BIE never evolved to recognize its new primary role of supporting those tribal programs rather than being the primary

---

[1] Defendants previously filed the certified administrative record for this action, *see* ECF Nos. 40-45, and cite to that where possible using the record's bates numbering.  When not apparent from the context of the sentence or from immediately preceding record citations, Defendants identify the specific document.

     Although Plaintiffs repeatedly refer to the general plan to restructure as the "Blueprint for Reform," the agency uses that term to refer to a specific report issued by the Study Group that is dated June 11, 2014.  *E.g.*, CRST-002567; CRST-002455:5:24-25, CRST-002456:6:1-14 (Rapid City Consultation Transcript) (explaining that the 2014 consultations were "about the Blueprint for [R]eform and the Secretarial Order that came later in June."); Yu Dep. 120:12-16 (explaining that "blueprint for reform" was revised as a result of April 2014 meetings).

provider of education.  CRST-000573 (Final Draft Study Group Proposal for Tribal Consultation (hereafter, "Draft *Blueprint*")).

Across Indian Country, the Study Group held extensive listening sessions in the fall of 2013—including several days in the Dakotas—with tribal leaders, educators, and community leaders, and in April 2014, released a draft set of findings and recommendations.  CRST-001830 (*Blueprint*); CRST-000571-CRST-000601 (Draft *Blueprint*).  The Study Group then held multiple consultation sessions with stakeholders that spring on the proposal, including one in the Dakotas that Cheyenne River Sioux Tribe ("CRST") and Rosebud Sioux Tribe ("RST") attended.  After that, the Study Group revised its draft and released a final proposal, which served as a basis for an order by the Secretary of the Department of Interior that called for various reforms within BIE.  Over the course of another year, BIE senior officials continued to consult with affected Indian tribes about implementing specific changes called for by the Study Group and the Secretary.  Again, BIE visited South Dakota on multiple occasions, including one-on-one meetings with CRST in February 2015 and RST in March 2015, as well as another consultation in April 2015 that both tribes attended.  Congress then approved the proposed reorganization in early 2016, but on the condition that BIE make every effort to not proceed with components of the reorganization at the field office level that may be directly impacted by pending litigation.

Notwithstanding the urgent need for reform and Defendants' extensive outreach to tribes and stakeholders, Plaintiffs—arguing that BIE "don't change anything," RST Mem. at 9, ECF No. 77—move this Court to set aside Defendants' efforts in the Dakotas, arguing that they were inadequately consulted.  Their opposition stems from the fact that BIE will no longer have education line offices on their reservations after the reorganization, but Plaintiffs' disagreement

with the substance of the reorganization does not mean that the agency ignored its legal obligation to consult. The Administrative Record (and evidence produced in discovery, should the Court decide that such evidence is appropriate to consider) reveal that Defendants consulted for approximately two years, repeatedly addressed Plaintiffs' concerns with the reorganization, and even made specific changes to the reorganization to address those concerns. Plaintiffs' charge that there was not "meaningful consultation" is therefore without merit.

Plaintiffs' remaining claims fare no better. They argue that Defendants violated the Administrative Procedure Act ("APA") by purposefully "closing" education line offices on their reservations to "make room" for the restructuring, RST Mem. at 27-28, but no evidence supports such a theory. In reality, individuals left line offices for reasons unrelated to the restructuring, such as retirement, and so the agency used interim personnel to continue to provide services. Such interim staffing decisions are not a reviewable "action" under the APA and, in any event, are committed to the agency's unreviewable discretion. Moreover, consistent with the Government's trust obligations, Defendants have continued to provide Plaintiffs ample technical assistance and educational support. Plaintiffs' arguments to the contrary do not concern the traditional subject matter of a breach-of-trust claim, and Plaintiffs cannot show any type of trust duties that would be actionable through such a claim. Similarly, Plaintiffs' argument concerning the Fort Laramie Treaty of 1868 finds no support in that treaty's text.

This Court should therefore enter judgment in favor of Defendants.

## BACKGROUND

BIE is a component of the Department of Interior under the supervision of the Assistant Secretary - Indian Affairs, and provides a school system for the education of Indian children. 25 U.S.C. § 2000. It is "the policy of the United States . . . to facilitate Indian control of Indian

affairs in all matters relat[ed] to education," *id.* § 2011(a), and that goal is effectuated by the requirement for regular and periodic "consultation," *id.* § 2011(b).  The BIE supports educational programs and residential facilities for American Indian students from federally recognized tribes at 183 elementary and secondary schools and dormitories located on 64 tribal reservations. CRST-003885 (Webinar).  Of these, the BIE operates 52 schools and dormitories, while the remaining 131 schools and dormitories are operated by tribes that are supported by grants or contracts with the Department of Interior.  Dearman Decl. ¶ 6, ECF No. 91.

In September 2013, the Secretaries of the Interior and Education appointed the Study Group to diagnose the educational challenges in BIE-funded schools, one of the lowest performing set of schools in the country, and recommend strategies for reform to ensure that all students attending BIE-funded schools receive a world-class education. CRST-000571 (Draft *Blueprint*); CRST-002441 (2015 Reorganization Tribal Consultation Booklet).  The Study Group obtained a firsthand perspective of the issues by visiting schools and conducting six listening sessions with tribal leaders, Indian educators, parents, school boards and others across the county. CRST-000540 (Federal Register Notice); CRST-002441 (2015 Reorganization Tribal Consultation Booklet).  Based on this input, the Study Group prepared a draft report that became the subject of four tribal consultation sessions in April and May 2014. CRST-000540-CRST-000541 (Federal Register Notice); CRST-000571 (draft *Blueprint*).

The Study Group incorporated feedback from these consultations into a final report: *Blueprint for Reform*.  CRST-001829 (*Blueprint*).  That report identified five areas for reform:

• <u>Effective Teachers and Principals</u>: Identifying, recruiting, retaining and empowering diverse, highly effective teachers and principals to maximize students' achievement.

• <u>Agile Organizational Environment</u>: Developing a responsive organization that provides resources, direction and services to tribes so they can help their students attain high levels of achievement.

4

• <u>Educational Self-Determination for Tribal Nations</u>: Building the capacity of tribes to operate high-performing schools and shape what students are learning about their tribes, language and culture in schools.

• <u>Comprehensive Supports through Partnerships</u>: Fostering parental, community and other organizational partnerships to provide the academic, emotional and social supports students need in order to be ready to learn.

• <u>Budget Aligned to Capacity Building</u>: Developing a budget that is aligned to and supports BIE's new mission of tribal capacity building and exchanging best practices.

CRST-001830-CRST-001831.

These often interconnecting goals reveal both the breadth of the BIE's study into issues affecting Indian education, as well its commitment to solving them.  While "agile organizational environment" may be "kind of [a] clunky term," the goal was straightforward—to "increase response time from BIE to resolve questions, concerns, [or] issues that were popping up at schools by reducing the bureaucracy," as tribal and school leaders were often uncertain of who to turn to resolve issues due to unclear lines of authority within the Department of Interior.  Yu Dep. 263:8-264:6.  For example, the BIE Director did not previously control the hiring of teaching or maintenance staff for BIE-operated schools, and so the agency moved human resources into BIE.  *Id.* 264:8-265:3.  With respect to the budget, the Study Group "heard so much in the consultations about the issues that tribes faced," took into account tribes' "unique circumstances," and sought to "increase the budget for those items," such as "funding for major repairs [in] school buildings" and "for new school construction," as well as increasing the funding to fully support the operating costs of Tribally-controlled schools, which had previously received only a fraction of the necessary funding.  *Id.* 256:21-258:22.

As for partnerships, the Study Group "look[ed] for additional resources that BIE didn't have" to "bring[] new partners to the table."  *Id.* 261:15-17.  For instance, the Study Group "heard a lot from tribal leaders" about high suicide rates at tribal schools, and so BIE, for the first

5

time, requested and received a Department of Education grant for the Pine Ridge reservation to develop a plan to provide emotional support for students. *Id.* 260:2-11, 261:1-3, 261:20-262:2. Also, a "number of tribal leaders said they lacked Internet access to broadband services for their schools," *id.* 139:9-11, and so BIE sought and received millions in dollars' worth in broadband from Verizon for BIE dormitories, *id.* 139:17-140:4.  And the goal of promoting self-determination for tribal nations, which was not included in the April 2014 draft *Blueprint*, was added after tribal leaders expressed a desire to take control of federally-operated schools, but did not know how to do so.  Thus, BIE would try to provide the resources and know-how for tribes that sought to make this voluntary decision.  *Id.* 268:21-269:10.

Based on the Study Group's recommendations, Secretary Jewell issued Secretarial Order 3334, directing changes in BIE organization to improve the agency's operational support to schools.  CRST-001896-CRST-001898.  Seeking to account for the fact that BIE's primary role was now supporting tribal programs rather than being a primary provider of education, the Secretary called for, among other things, a realignment of the Associate Deputy Directors ("ADDs") from regional organization—ADD East, ADD West and ADD Navajo—to a more functional organization composed of ADD – Tribally Controlled Schools (to oversee and support 95 tribally controlled schools), ADD – BIE-Operated Schools (to oversee 23 BIE-operated schools), and ADD – Navajo (to remain the same and oversee 65 BIE-operated and tribally-controlled schools in the Navajo area).  CRST-003809 (Interior Letter to Congress).  This realignment recognizes the differences in oversight and operational needs and increases responsiveness.  *Id.*

The Secretarial Order also called for the restructuring of the existing education line offices ("ELOs") into education resource centers ("ERCs"), each to be staffed by a mobile

school improvement solutions team.  CRST-001897 (Secretarial Order 3334).  "[F]rom the very beginning," an issue BIE discussed with "schools at the listening sessions, consultation and throughout, [was] how do we improve the services, technical assistance to the schools," because the way technical assistance was being delivered was not working.  Roessel Dep. 90:15-91:21. The ELOs were based on an old idea and no longer met the needs of Indian education, CRST-000917:39:7-11 (Loneman School Consultation Transcript), and were about compliance and monitoring, not capacity building, CRST-001312:136:19-25 (Riverside Indian School Consultation Transcript).  The agency's plan "move[d] away from the compliance and monitoring and the heavy handedness of BIE" and focused on what BIE heard from stakeholders—the need to provide specific technical assistance to help schools, such as "reading [and] math strategies."  CRST-001396 (Muckleshoot School Consultation Transcript).  By moving to ERCs, BIE took programs "spread out throughout the Bureau and even outside the Bureau" and put them under one umbrella, consolidating entirely similar functions and saving money. CRST-002502:192:1-13 (Rapid City Consultation Transcript).

The ERCs are geographically positioned close to schools, designed to be more specialized, and would serve either BIE-operated schools or tribally-controlled schools.  CRST-003809 (Interior Letter to Congress).  The design and establishment of ERCs is based on states' practices, such as Minnesota and Arizona, which deploy the same structure to address rural schools.  CRST-003523 (Tribal Consultation Report); CRST-002482:113:8-13 (Rapid City Consultation Transcript); *see also* CRST-002485:122:11-12 (explaining at Rapid City consultation that "[t]his is a concept that's been used in education a lot"); Roessel Dep. 90:21-24 (testifying that some commented at listening sessions, "why don't you do it more like a state," which brings in a team to assist troubled schools).  And in planning the ERCs, the agency

considered two major factors: proximity to the schools served and the needs of the schools. CRST-003809 (Interior Letter to Congress).

The ERCs will have mobile School Solutions Teams that are able to provide customized support to meet the unique needs of individual schools, and, rather than issuing mandates to schools, help ensure that principals and teachers have the resources and support needed to operate high achieving schools. CRST-002443 (2015 Reorganization Tribal Consultation Booklet). The ERCs will have expertise leveraged from other parts of BIE, including school operations, to make a variety of technical skills available in the field. CRST-003809 (Interior Letter to Congress). ERCs will also assist schools in such areas as curriculum and instruction, intervention strategies, professional development, and tribal capacity building. CRST-002443 (Tribal Consultation Booklet). The Division of Performance and Accountability ("DPA"), which was previously based in Albuquerque and has primary responsibility for academic programs under the U.S. Department of Education, would now be spread throughout the different ERCs, as tribes had informed BIE during the consultation process that they were not receiving DPA's services. Roessel Dep. 78:1-11, 90:16-21, 93:18-24; CRST-002444 (2015 Reorganization Tribal Consultation Booklet), CRST-002484:121:15-24 (Rapid City Consultation Transcript).

In exploring how to implement the transition from ELOs to ERCs, BIE once more set out to consult with tribes and stakeholders. From February to April 2015, BIE held twelve regional or individual consultation sessions with tribes, including individually meeting with CRST and RST, as well as six others in the Dakotas. CRST-003518-CRST-003519 (Tribal Consultation Report). Then, in April and May of that year, BIE held six more tribal consultations, including one in the Dakotas that CRST and RST attended. CRST-003518. Connected with those meetings, the agency also invited and received 19 submissions, CRST-003519, including

questions from CRST on May 15, 2015, CRST-003477-CRST-003480, to which the agency responded, CRST-003684-CRST-003687.

Outside of these formal meetings in spring 2014 on the *Blueprint* and the winter and spring 2015 meetings on its implementation, BIE engaged in extensive outreach with tribes and stakeholders regarding the reorganization.   It held monthly stakeholder calls, *e.g.*, CRST-002403, conducted webinars, *e.g.*, CRST-003881, met twice with the Great Plains Tribal Chairmen's Association ("GPTCA"), to which both CRST and RST belong, CRST-002132 (Dear Tribal Leader Letter), met with Tribal Interior Budget Council ("TIBC"), which included CRST's Chairman, CRST-003208-CRST-003209 (May 2015 Meeting Notes), and held countless other discussions with stakeholders, *see, e.g.*, Bordeaux II Dep. 56:25-57:17 (RST's 30(b)(6) deponent explaining that she spoke with Mr. Yu "once a month on . . . average," and that "he encouraged that if [she] had a question to not hesitate to contact him").

This extensive tribal input from the Dakotas played a large role in formulating the proposal.  The idea to realign the ADDs by function came from the Dakotas.  CRST-001133:255:15-19 (Loneman Consultation Transcript).  BIE also added a new position in the Dakotas in response to CRST's request for oversight closer to BIE-operated schools,[2] and it changed the location of an ERC from Rapid City to Kyle in response to concerns expressed.  *See* CRST-003517 (Tribal Consultation Report).

In order to reprogram funds to establish the ERCs, BIE needed to submit the proposal to the Appropriations Committees for the U.S. House of Representatives and Senate for approval.

---

[2] Although CRST insists it did not request that this administrator be stationed at Pine Ridge, it does not dispute that BIE accommodated its concern by placing this administrator closer to its reservation.  The record plainly shows that the Education Program Administrator position was in response to CRST's feedback, CRST-002460:24:11-13, CRST-002501:187:6-23, CRST-002502:192:24-193:11, and CRST points to no evidence to the contrary.

*See* 160 Cong. Rec. at H971; 160 Cong. Rec. at H9759; *see also* Roessel Dep. 239:10-13

(explaining that ERCs would be staffed only after the agency received Congress' approval).

Interior requested Congressional approval in September 2015, explaining that if the proposed

reorganization is adopted, there will be four ERCs in the Dakotas: one for the BIE-operated

schools and three for the tribally-controlled schools.  CRST-003815.  The Turtle Mountain ELO,

which is located in Belcourt, North Dakota, will be the ERC for the eight BIE-operated schools

in the Dakotas.  CRST-003814-CRST-003815.  The ERCs for the tribally-controlled schools will

be located in Kyle, South Dakota (serving 12 schools), Bismarck, North Dakota (serving 9

schools) and Flandreau, South Dakota (serving 12 schools).  CRST-003815.  RST will continue

to implement the technical assistance functions of the line office pursuant to an Indian Self-

Determination and Education Assistance Act ("ISDEAA") contract that it entered with the

agency, and thus the Rosebud ELO will become a Technical Assistance Center from which the

Tribe can manage those functions.  25 U.S.C. § 450g; CRST-003810, CRST-003814; Dearman

Decl. ¶ 14.g.  The Cheyenne River ELO will become a Facility Support Center serving the local

BIE-funded schools. CRST-003814-CRST-003815.[3]

Although Congressional approval came in early 2016, it carried a condition "[t]hat

every effort be made not to proceed with components of the reorganization at the field office

level that may be directly impacted by pending litigation."  CRST-004116 (House Committee

Approval).  Accordingly, Plaintiffs' lawsuit has precluded the BIE from installing the ERCs in

---

[3] Like Rosebud's ELO, the Standing Rock ELO and Crow Creek/Lower Brule ELO will become
Technical Assistance Centers from which tribes will manage their former ELOs under ISDEAA
contracts.  CRST-003810, CRST-003814 (Interior Letter to Congress). The Pine Ridge ELO
would become a Facility Support Center with School Administrator Support that will continue to
house maintenance and operational services for schools. CRST-003810, CRST-003814-CRST-
003815.

the Dakotas to date, even though they have been opened elsewhere and have made a difference in "getting more services to schools" and test scores reflect an "increase[] over the last two years." Roessel Dep. 240:13-18.

Now, RST and CRST each move for summary judgment and join one another's motions. RST Mem. at 1; CRST Mem. at 6, ECF No. 83. They principally argue that Defendants' approximately two-year long consultation process was legally inadequate, and further assert that Defendants "purposefully closed" ELOs in violation of the APA and violated their trust and treaty obligations. For the reasons set out below, those claims fail as a matter of law, and judgment should be entered in favor of Defendants.

## STANDARD OF REVIEW

Summary judgment is appropriate if the facts, viewed in the light most favorable to the nonmoving party, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50, 255 (1986).

"The term 'consultation,'" as this Court previously explained, "'means a process involving the open discussion and joint deliberation of all options with to respect to potential issues or changes.'" *Cheyenne River Sioux Tribe v. Jewell*, 205 F. Supp. 3d 1052, 1057 (D.S.D. 2016) (quoting 25 U.S.C. § 2011(b)(2)(A)). During this process, interested parties like Plaintiffs are to be given the opportunity

> (i) to present issues . . . that will be considered for future action by the Secretary; and
> (ii) to participate and discuss the options presented, or to present alternatives, with the views and concerns of the interested parties given effect unless the Secretary determines, from information available from or presented by the interested parties during one or more of the discussions and deliberations, that there is a substantial reason for another course of action.

25 U.S.C. § 2011(b)(2)(B).  The Bureau of Indian Affairs' ("BIA") consultation policy similarly defines consultation to mean a "process of government-to-government dialogue . . . regarding proposed Federal actions," BIA Consultation Policy 3; ECF No. 1-30, with the goal "to secure meaningful and timely tribal input," *Cheyenne River Sioux*, 205 F. Supp. 3d at 1057.  Although consultation requires a process for open dialogue, Courts have repeatedly recognized that "[c]onsultation is not the same as obeying those who are consulted."  *Hoopa Valley Tribe v. Christie*, 812 F.2d 1097, 1103 (9th Cir. 1986); *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 721 (8th Cir. 1979) ("By holding that the Bureau failed to comply with its own procedures, we are not . . . holding that the Oglala Sioux Tribe is entitled to a superintendent of its choice."); *Lower Brule Sioux Tribe v. Deer*, 911 F. Supp. 395, 401 (D.S.D. 1995) ("That is not to say the [OIEP] must obey those who are consulted or that the [OIEP] must accept their advice.").

## ARGUMENT

### I.    Defendants' Consultation Efforts Created An Open Government-to-Government Dialogue and Secured Meaningful and Timely Tribal Input

Plaintiffs note that these consultation provisions are "remarkable for their stated obligation to be open and transparent, and include tribes in all steps of tribal consultation, and to proceed slowly and carefully."  RST Mem. at 8.  The administrative record (and evidence borne out by discovery) make clear that is exactly how BIE approached the consultation process in the present case.

#### A.  Plaintiff's Consultation Claim is an APA Claim

As an initial matter, Plaintiffs' consultation claim is an APA claim and should be reviewed as such.  Although Plaintiffs try to assert a separate APA claim that "overlaps with and incorporates the facts and discussion" of their consultation claim, RST Mem. at 21, they lack any basis for styling these as two distinct claims.  Plaintiffs must identify a "private right[] of action

to enforce federal law [that is] created by Congress," *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001), and they have not identified such a right of action in Title 25 of the United States Code, the BIA consultation manual, or anything else other than the APA.  Thus, the consultation claim should be reviewed as an APA claim, just as this Court did before in *Yankton Sioux Tribe v. Kempthorne*, 442 F. Supp. 2d 774, 783 (D.S.D. 2006) (reviewing consultation argument as APA claim);[4] *see also, e.g.*, *Sisseton-Wahpeton Oyate v. U.S. Dep't of State*, 659 F. Supp. 2d 1071, 1079 (D.S.D. 2009).  Indeed, a contrary holding would mean that Plaintiffs' allegedly separate APA claim must be dismissed, as the APA requires that a plaintiff lack any other adequate remedy to pursue such a claim.  5 U.S.C. § 704

In reviewing Plaintiffs' consultation arguments, "[i]t is well-established that judicial review under the APA is limited to the administrative record that was before the agency when it made its decision."  *Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 766 (8th Cir. 2004).  While there are exceptions to this general rule, they apply "only under extraordinary circumstances, and are not to be casually invoked unless the party seeking to depart from the record can make a strong showing that the specific extra-record material falls within one of the limited exceptions."  *Id.*; *Maxey v. Kadrovach*, 890 F.2d 73, 77 (8th Cir. 1989).  Plaintiffs have never tried to explain—and this Court has never specifically held—that this case presents an "extraordinary circumstance" where a "limited exception" applies, and thus Plaintiffs' consultation arguments should be reviewed on the already-filed certified administrative record. *See* ECF Nos. 40-45.

---

[4] In *Yankton Sioux*, this Court received evidence at a preliminary injunction hearing, but that does not mean the consultation claim was not an APA claim.

As this Court has explained, the "general standard set forth in Rule 56 does not apply where, as here, the parties are seeking this court's review of an administrative decision." *Bettor Racing, Inc. v. Nat'l Indian Gaming Comm'n*, 47 F. Supp. 3d 912, 918 (D.S.D. 2014), *aff'd*, 812 F.3d 648 (8th Cir. 2016).  That is because agency action "is reviewed, not tried," and "the issue is not whether the material facts are disputed, but whether the agency properly dealt with the facts."  *Id.*  "Consequently, a motion for summary judgment at this stage requires this court to determine whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review as a matter of law."  *Id.* (internal quotation marks omitted).  An agency decision fails the "arbitrary and capricious" standard if

> [T]he agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* at 919 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  This standard of review is "narrow" and the "[C]ourt is not empowered to substitute its judgment for that of the agency."  *Id.* (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).  "If the agency's decision 'is supportable on any rational basis,' it must be upheld."  *Id.* (quoting *Voyageurs*, 381 F.3d at 763).[5]

### B.  The Administrative Record Shows An Open Dialogue Between BIE and Tribes that Secured Meaningful and Timely Tribal Input

---

[5] For the reasons explained herein, Plaintiffs' consultation arguments are baseless.  But "[i]f the record before the agency does not support the agency action[ or] if the agency has not considered all relevant factors . . . the proper course, except in rare circumstances, is to remand to the agency for additional investigation."  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).  *See also I.N.S. v. Orlando Ventura,* 537 U.S. 12, 16 (2002) ("Generally speaking, a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands.").  Thus, if this Court finds that the agency inadequately consulted with Plaintiffs (which it should not), the remedy should be limited to a remand to the agency to allow for renewed consultation with CRST and RST.

Here, the administrative record reveals Defendants' scrupulous consultation efforts over the course of approximately two years.  This consultation occurred at each stage of the reorganization's development and well in advance of implementing the challenged restructuring, and confirms that the agency's efforts were open, transparent, proceeded carefully, included tribes at all steps along the way, and addressed tribal concerns.

Before Defendants developed any proposed reorganization, the Study Group "visit[ed] schools and classrooms, Tribal Governments, and Indian Affairs employees to gather information, listen to . . . concerns and, most importantly, try to find ways to improve American Indian education."  CRST-000001 (Establishment of Study Group).  In addition to these visits, the Study Group set up a dedicated email account for interested parties to submit comments. CRST-000002 (Establishment of Study Group).  It took into account this input in order to develop recommendations as to how to improve schools, with the goal to submit actionable recommendations.  CRST-000002; CRST-000544 (March 2014 Dear Tribal Leader Letter); CRST-002441 (2015 Reorganization Tribal Consultation Booklet).  Over the course of seven months, the Study Group reached out to tribal leaders and their representatives to identify issues and possible solutions, CRST-000544, held six listening sessions, CRST-000540 (Federal Register Notice), spent several days in South Dakota, and met with CRST and RST, CRST-000057-CRST-000071 (Notes from South Dakota listening Sessions), as well as more than 300 stakeholders, and received nearly 150 email comments, CRST-000577 (draft *Blueprint*).

In response to the comments received, the Study Group developed a draft framework for reform that focused on four pillars of educational reform:  effective teachers and principals; agile organizational environment; budget aligned to capacity; and compressive support through partnerships.  CRST-000542.  On April 17, 2014, the Study Group released a draft proposal for

15

purposes of tribal consultation to redesign the BIE that contained preliminary findings and recommendations.  CRST-000571.

That draft report was then the subject of four tribal consultations sessions in April and May of 2014, including a session at Loneman Day School in Oglala, South Dakota attended by CRST and RST.  CRST-000542-CRST-000543 (March 2014 Dear Tribal Leader Letter); CRST Compl. ¶ 41, ECF No. 1; RST Compl. ¶ 34, ECF No. 48-1.  The BIE provided notice of the tribal consultations by sending letters to tribal leaders, issuing a Federal Register notice and providing information on its website.  CRST-000542-CRST-000543; CRST-000540-CRST-000541.  BIE also solicited written comments, and allowed those comments to be submitted more than a month after the consultation session at Loneman.  CRST-000542-CRST-000543; CRST-000540-CRST-000541.

In June 2014, the Study Group incorporated feedback it received from tribal leaders and others into the final *Blueprint*.  CRST-001829.  The revised *Blueprint* incorporated changes since the April draft, including adding a fifth pillar of reform: promoting educational self-determination for tribal nationals, CRST-001831, and included illustrative comments from tribal members during the Study Group listening sessions for each area of reform, *see* CRST-001865-CRST-001880.  Based on the Study Group's recommendations, the Secretary of the Department of Interior issued Secretarial Order 3334 proposing a restructuring of the BIE to improve schools. *See* CRST-001896-CRST-001898.

BIE then drafted a proposal to implement the changes requested by the Secretarial Order.  CRST-003517 (Tribal Consultation Report).  Before releasing that draft proposal for national tribal consultation sessions, BIE held twelve regional or individual tribal consultations to gather input for the reorganization proposal.  CRST-003517-CRST-003518.  At these meetings, BIE

16

presented organizational charts and answered specific questions with tribal leadership, tribal

education departments, tribal staff, and different school representatives.  CRST-003518.  Of

these 12 meetings, 8 were with Dakota tribes, CRST-003518-CRST-003519, including a one-on-

one consultation with CRST on February 19, 2015, CRST-002190 (Sign-in Sheet), and another

one-on-one consultation with RST on March 26, 2015, CRST-002394-CRST-002396 (Sign-in

Sheet); CRST-003518-CRST-003519 (Tribal Consultation Report), where BIE explained

proposed organizational charts and answered the tribes' questions, CRST-002168-CRST-

002189, CRST002352-CRST-002374 (PowerPoint Presentations for Individual Consultations).

Then, as "a continuation of tribal consultations conducted," Defendants held six

additional formal consultations, including one in Rapid City, South Dakota that CRST and RST

attended. CRST-002349 (Federal Register Notice); CRST-002581-CRST-002584 (Sign-in

Sheet); CRST-003518 (Tribal Consultation Report).  Prior to those consultations, Defendants

made the proposed reorganization publicly available on the BIE website, explained the rationale

behind it, and invited tribes, tribal members, and schools to submit written comments.  CRST-

002437-CRST-002450; CRST Compl. ¶ 60; RST Compl. ¶ 53; CRST-002435.  At each of these

sessions, the BIE presented information regarding the reorganization, listened to comments and

engaged in discussions with tribal leaders and educators.  CRST-002440.  And BIE extended the

deadline by which comments needed to be submitted.  CRST-003519 (Tribal Consultation

Report).  The BIE received 19 submissions, *id.*, including questions from CRST on May 15,

2015, CRST-003477-CRST-003480, to which the agency responded, CRST-003684-CRST-

003687.

Aside from these consultations, BIE actively worked to keep tribes engaged in the

proposed reorganization.  It held monthly stakeholder calls "to improve communication and

create an ongoing dialog among staff, school administrations, tribal leaders, school boards, parents, tribal organizations and other interested parties about the restructuring of BIE." CRST-002403 (Notice of Stakeholder Call).  BIE hosted multiple webinars that were open to the public to help explain the proposed reorganization to tribes and tribal members and answer any questions.  CRST-003855-CRST-003870, CRST-003881-CRST-003908.  It made presentations to Indian education organizations such as the National Congress of American Indians ("NCAI"), CRST-002223, and discussed the reorganization at TIBC, where CRST participated.  CRST-003208-CRST-003209 (May 2015 Meeting Notes).  And, BIE authored and made publicly available a Tribal Consultation Report, which summarized comments received and the BIE's responses, CRST-003808, CRST-003515-CRST-003636, including summarizing the changes it made to the plan in response to concerns from tribal leaders and other stakeholders, CRST-003517.

Tribal input from the Dakotas played a large role in formulating the proposal.  The idea to have ADDs assigned by function (i.e., tribally controlled and BIE-operated) came from the Dakotas.  CRST-001133:255:15-19 (Loneman Consultation Transcript).  Although RST indicated that the Great Sioux Nation wanted its own ADD and BIE informed the tribes that it would welcome such a plan, but the agency had not received one.  CRST-003524 (Tribal Consultation Report).  Moreover, the BIE specifically took into account and incorporated CRST's request for oversight closer to BIE-operated schools, and accommodated that request by locating an Education Program Administrator at Pine Ridge to oversee Flandreau, Cheyenne Eagle Butte, and Pine Ridge.  *See* CRST-003684 (Interior Letter to CRST).  Also in response to

concerns expressed during the consultation process, BIE modified its proposal to locate an ERC in Rapid City by shifting the location to Kyle. *See* CRST-003517 (Tribal Consultation Report).[6]

Contrary to the motion-to-dismiss stage, where the Court needed to "constru[e] the facts in a light most favorable to the Tribe" to find plausible allegations of an already-executed plan without tribal input and no ongoing consultation after June 2014 such that there was not an "open, government-to-government discussion," *Cheyenne River Sioux*, 205 F. Supp. 3d at 1058-59, the administrative record here plainly establishes that the BIE acted rationally in its consultation efforts, and Plaintiffs' consultation arguments should accordingly be rejected. *See Bettor Racing, Inc.*, 47 F. Supp. 3d at 919 ("If the agency's decision is supportable on any rational basis, it must be upheld.") (internal quotation marks omitted).

### C.  Discovery Reinforces the Adequacy of Consultation

Largely ignoring the administrative record, and making no attempt to explain how this case presents an "extraordinary circumstance[]" such that "one of the limited exceptions" to record review applies here, *Voyageurs,* 381 F.3d at 766, Plaintiffs turn to the discovery taken in this action to try to prove the merits of their case.  As an initial matter, Plaintiffs accuse Defendants of "trying to hide the ball" with respect to their reform efforts because of *Yankton*

---

[6] RST's assertion that Defendants decided to move an ERC "from Rapid City, to Eagle Butte, and finally to Kyle, South Dakota" before the April 22, 2015 consultation, RST Mem. 18, lacks any factual support.  RST does not cite the transcript of that consultation, but in the portion of that transcript it appears to reference, Director Roessel and a BIE employee never mention an ERC; read in context, the two are discussing the placement of the Education Program Administrator at Pine Ridge, as the BIE employee was discussing the proposed structure for BIE-operated schools, CRST-002501:186:23-25, 187:18-18-23 (Rapid City Consultation Transcript), which is where that position would exist.  By contrast, the ERC at Rapid City and ultimately Kyle is for tribally-controlled schools.  Moreover, Director Roessel explained in his deposition that he did not recall placing an ERC in Cheyenne River.  Roessel Dep. 147:2-4; *see also* CRST-002446; CRST-002571 (Consultation presentation showing ERC at that time in Rapid City).

*Sioux Tribe v. Kempthorne*, 442 F. Supp. 2d 774 (D.S.D. 2006), which preliminarily enjoined

prior restructuring efforts in the Dakotas.  RST Mem. at 19.  But the evidence reveals precisely

the opposite.  Mr. Yu explained that he "remember[s] the solicitors telling me that . . . because of

that [lawsuit] and the result of that case, that we needed to be sure we did the consultations by

the book."  Yu Dep. 187:16-19.  Indeed, *eight* of the twelve one-on-one consultations BIE held

in winter of 2015 were with Dakota tribes, CRST-003518-CRST-003519 (Tribal Consultation

Report), and Director Roessel explained to the Dakota tribes at the April 2015 consultation that

the *Yankton Sioux* settlement agreement is "the reason why I've gone out and met individually

with many of the tribes around this table," as the agency tried to have "deeper level and a deeper

consultation than what is actually recommended in the consultation policy of Interior" by having

individual meetings "[a]s opposed to having one big meeting."  CRST-002464:39:6-15.

Plaintiffs' remaining arguments, although difficult to discern at times, boil down to four

general criticisms:  first, Defendants appointed the wrong people to the Study Group, RST Mem.

at 9, 19; second, the consultation process was rushed because Defendants had a predetermined

plan, *id.* at 10-15, 24-25; third, Plaintiffs lacked necessary information to consult, *id.* at 9, 14-15,

24; and fourth, agency officials acted with impure motives, *id.* at 15, 20, 32.  Each point lacks

merit, and even though Plaintiffs fail to explain what standard of proof (or cause of action)

would apply in the absence of an APA claim, discovery nonetheless reinforces the adequacy of

the consultation process.

### 1.   The Study Group Was Highly Qualified and Responsive to the Needs of Tribal Education

Apparently trying to cast doubt on the Study Group's credentials, RST argues that that

*Blueprint* was the "work of the non-tribal federal officials and consultants" who lacked "prior

experience with tribal education or Indian education."  RST Mem. at 9, 19.  But the members of

the Study Group "combine[d] management, legal, education, and tribal expertise" to ensure its recommendations were grounded in a correct understanding of American Indian affairs, school operations, teaching, and learning.  CRST-001830 (*Blueprint*).  Kevin Washburn, Interior's Assistant Secretary for Indian Affairs, chaired the group, *id.*, and brought to the group an expertise in American Indian affairs, as did BIE Director Roessel and Bill Mendoza, the Director of the White House initiative to American Indian and Alaska Native education, Yu Dep. 151:4-10.  Dr. Roessel also brought experience in administering Indian education—he ran a tribally-controlled school, was a superintendent, and an ADD within the BIE.  Roessel Dep. 8:20-9:5.  The remaining members had similar expertise to employ for school reform.  Yu was a Special Advisor to the Secretary of Education, and had three-and-a-half years of working "pretty extensively" on Native American education issues at the federal level, CRST-001830; Yu Dep. 23:15-18; Ken Wong was "the expert in the country" on "school system fragmentation and how it can be corrected based upon years of research," Yu Dep. 40:15-18; *see also infra* footnote 10 (explaining fragmentation issues affecting BIE); Marilee Fitzgerald ran DoDEA,[7] "the only other school system that was somewhat comparable" to the BIE, *id.* 42:1-2; and Charlie Rose was the former General Counsel of the Department of Education, CRST-001830.[8]  Thus, the Study Group was plainly qualified to diagnose and develop recommendations for the BIE.

## 2.  The Consultation Process Was Deliberate and Thorough

---

[7] Department of Defense Education Activity ("DoDEA") is the other Federally-operated school system that is global and "responsible for planning, directing, coordinating, and managing prekindergarten through 12th grade educational programs on behalf of the Department of Defense."  https://www.dodea.edu/aboutDoDEA/ (last visited March 7, 2018).

[8] Plaintiffs argue that Mr. Yu "did not ever read the consultation policies or statutes."  RST Mem. at 14.  Such a charge is irrelevant, as Mr. Yu was not the final decision maker.  And in any event, Mr. Yu clarified that he did not recall if he did, Yu Dep. 116:5, and he explained that he "deferred to the solicitor about appropriate process for that and where we should be going and who we should be talking to," *id.* 115:12-15.

Faulting Defendants for their sense of "urgency," Plaintiffs suggest that the consultation process was done in such an expeditious manner as to render consultation inadequate. Of course the agency acted with urgency—the system in place was plainly inadequate, *see supra* Introduction, and "kids only get one chance in education." Yu Dep. 111:1-2. Indeed, Director Roessel explained that "[t]here was pressure from schools," "[t]he schools wanted something done," and "[t]he tribes wanted something done." Roessel Dep. 29:9-11.

But such urgency did not prevent adequate consultation, Yu Dep. 111:10-11, as evidenced by the approximately two year consultation process, *see supra* Part I.B. Defendants clearly moved at a deliberate and methodical pace with a willingness to consider comments and make changes in response. The Study Group first spent months listening to the issues facing Indian education, drafting a proposal, and then consulting and refining that proposal. *See supra* Background, Part I.B. At that point, the Study Group released the final *Blueprint* and Defendants then consulted about how to implement the proposal over the course of approximately one more year.[9] *Id.*

Plaintiffs also claim that they were told that the reorganization was "happening" as of July 2014, thus effectively marking the end of Defendants' consultation efforts. *See* RST Mem. at 12. But this charge is misleading and irrelevant to the consultation issues here. Mr. Yu explained that the reprogramming that Plaintiffs challenge "was a small piece of the overall transformation plan" and had *not* started by July 2014. Yu Dep. 56:16-17; Yu Dep. 241:14-20. It was *other* initiatives from the *Blueprint* that had started by that time, such as "budget

---

[9] Plaintiffs mistakenly state that the Study Group's proposal was released on June 6, 2014, RST Mem. at 8, but that proposal was not the final version, Yu Dep. 159:12-13. The administrative record shows that the final version is dated June 11, 2014. CRST-001829; *see also* CRST-001902 (revised for typographical and formatting inconsistences on July 9, 2014).

increases" and "[g]etting Verizon to start implementing [its] commitment . . . for millions of dollars for broadband."  Yu Dep. 241:14-242:4.

Plaintiffs focus on the charge that the reform was predetermined, such that "no substantive changes were made . . .  in response to the tribal views."  RST Mem. at 15.  But that is flatly contradicted by both the administrative record and discovery.  The *Blueprint* itself explains that it is "[b]ased on extensive listening sessions in fall 2013 with tribal leaders, educators, and community members across Indian Country, and analysis of a wide range of primary and secondary data."  CRST-001830.  The Study Group listed tribal participants from the listening sessions in that document, CRST-001855-CRST-001864, along with illustrative comments they heard, CRST-001865-CRST-001880.  As Mr. Yu explained and confirmed, he "was always willing to make changes to" the *Blueprint* and it "chang[ed] a lot because of the consultations that were being done."  Yu Dep. 118:1-2, 239:9-13.  Indeed, "significant revisions" were made, *id.* 118:13, such as the addition of a new goal for reform:  promoting self-determination for tribal nations, which was added to the *Blueprint* after the initial April 2014 draft in order to address the "unique concerns from tribal leaders," *id.* 268:21-269:10.[10]

---

[10] Rather than producing any evidence to doubt these conclusions, Plaintiffs assert in conclusory fashion that the *Blueprint* "extrapolated" "theories regarding fragmentation and centralization in urban education" to tribal education.  RST Mem. at 9.  Citing an affidavit statement opining that fragmentation "is an asset and a positive value, because of the unique needs of tribes and tribal communities," Plaintiffs apparently interpret "fragmentation" to mean that the agency ignored the unique needs of each individual tribe.  *Id.* at 9 (citing, *inter alia*, RST SMF 21).  But that is plainly *not* what the *Blueprint* addressed.  *See* CRST-001834-CRST-001837 (listing issues with fragmentation); Yu Dep. 38:15-19 (explaining fragmentation issues, such as "you couldn't even get a teacher or a principal to hire them to be on time for the first day of class because we were working on a one-size-fits-all federal hiring system and they wouldn't tailor to the hiring to accommodate a school's calendar").  The Study Group sought to address the concerns voiced by stakeholders, such as the existing need to field "duplicative data calls from different offices within the BIE."  CRST-001836.

Aside from the *Blueprint*, the agency's willingness to consider tribal input is also readily apparent from the agency's redesign of BIE's administrative structure.  The concept of reassigning ADDs came from the Dakotas, CRST-001133:255:15-19 (Loneman Consultation Transcript), and at CRST's request for closer supervisory staff, BIE added an Education Program Administrator position in South Dakota to have direct oversight of the BIE-operated school at Cheyenne Eagle Butte (as well as those at Flandreau and Pine Ridge).  *See* CRST-002460:24:11-13, CRST-002501:187:6-23, CRST-002502:192:24-193:11 (Rapid City Consultation Transcript); Roessel Dep. 151:11-12; *compare* CRST-002186 (February 2015 presentation to CRST did not include position in organization chart), *with* CRST-002575 (April 2015 presentation that did include position).  And, in response to concerns expressed, BIE modified its initial proposal to relocate an ERC in Rapid City (where it was slated to be as of the April 22, 2015 consultation) to Kyle.  *See* CRST-002571, CRST-003517.  As Director Roessel explained, Rapid City was initially selected "based on some of the comments from schools" because it offered available housing (a lack of which had caused vacancies in the ELOs) but BIE moved it to Pine Ridge because it heard at consultation a desire to have it there, which would be close enough for staff to commute.  Roessel Dep. 147:9-21.  But BIE ultimately decided that keeping the ERC at Pine Ridge would be too political and, after further discussions with stakeholders, decided to move it to Kyle.  Roessel Dep. 147:9-148:20.[11]

---

[11] These changes prove that the agency was not done consulting and was willing to continue to make changes to the reorganization, notwithstanding a March 2015 email highlighted by Plaintiffs signaling Director Roessel's desire for "moving forward"—an ambiguous and undefined phrase—with a reprogramming letter.  *See* RST Mem. at 13.  Indeed, that email could not reflect a final agency decision:  Mr. Yu explained that the decision as to when to initiate a reprogramming request with Congress was not Director Roessel's decision to make.  Yu Dep. 69:13-18.
    RST claims that it questioned Mr. Yu about this ERC's move but never heard back from him.  RST Mem. at 18.  RST is mistaken; Mr. Yu subsequently sent Mr. Lunderman an email

Ignoring the agency's response to this tribal input, Plaintiffs accuse BIE of refusing to "giv[e] effect to the[ir] opposition or proposed alternatives," such as increasing the amount of funding for schools, RST Mem. at 16-17, and including ELOs in the reorganization, RST Mem. at 10-11, 15, 18.  Plaintiffs are mistaken on both counts.  BIE *did* give effect to the request to increase funding for schools, and increased funding for things like grant support costs.  Dearman Decl. ¶ 16 (approximately $14 million FY 2015, approximately $11 million for FY 2016, and approximately $7 million for FY 2017); 2016 Greenbook, IA-BIE-1 (showing increase of tens of millions of dollars for BIE), *available at* https://www.bia.gov/sites/bia.gov/files/assets/as-ia/ocfo/ocfo/pdf/idc1-029426.pdf (last visited March 19, 2018).  *See also* Yu Dep. 256:21-258:22; Bordeaux II Dep. 59:22-61:4 & Ex. 25.  As Mr. Yu explained, BIE "was making the pie bigger" with respect to funding, Yu. Dep. 197:12, and the restructuring proposals (designed to improve delivery of technical assistance) did not stop the agency from increasing funding for schools.

The agency also gave extensive consideration to the question of where to locate ERCs. "[F]rom the very beginning," BIE heard and discussed with stakeholders how to improve the delivery of technical assistance to schools, as the existing method (*i.e.*, ELOs) was inadequate. Roessel Dep. 90:15-24, 91:15-19.  Director Roessel explained how the "[l]ine [o]ffice" was "based on some old idea" that "doesn't fit" the needs of Indian education, CRST-000917:39:7-8 (Loneman Consultation Transcript), and BIE held one-on-one consultations with CRST and RST

---

dated July 14, 2015, that he had "an update about your question regarding Pine Ridge" and asking Mr. Lunderman if he would like to talk on the phone.  ECF No. 81-6 at 43.  And although RST argues that it was not included in discussions to move the ERC from Rapid City to Kyle, it does not argue that it would have preferred the initial location.  Given that it argues that ERCs are too far away, RST would be hard pressed to quarrel with the decision to move the ERC to Kyle, which is significantly closer to the tribe's reservation than Rapid City.

(and other Dakota tribes) "to discuss in specifics the line office" and to provide them an "opportunity to be able to speak specifically about [their] tribe and [their] concerns concerning the Blueprint for Reform."  CRST-002464:38:14-21 (Rapid City Consultation Transcript); *see also* CRST-002364-CRST-002365, CRST-002369, CRST-002371 (presentation to RST including ERC issue); CRST-002180-002181, CRST-002186, CRST-002188 (same, for CRST presentation); CRST-002191- CRST-002192 (February 2015 meeting minutes with CRST reflecting that Dr. Roessel explained that ELOs were initially set up as command centers that did not focus solely on education, and that converting to ERCs will allow the BIE to provide personnel to focus on education in BIE-operated and tribally-controlled schools).

Plaintiffs cannot credibly claim that the transition from ELOs to ERCs was not adequately explained to them.  RST acknowledges that "[e]verybody had an opportunity to ask a question or make comments" at its one-on-one meeting with BIE in March 2015, and the agency "answered any questions that people had about the different issues with" the presentation. Bordeaux Dep. II at 21:6-8, 11-12.  CRST similarly acknowledges that at its one-on-one meeting in February 2015, Director Roessel answered the tribe's questions "[t]o the best of his abilities," and that the tribe had enough information to understand the proposal.  Frazier Dep. 46:10, 48:3. And even if there was any lingering misunderstanding as to the agency's view of the need for ERCs, subsequent consultations would have provided an opportunity, as the BIE explained at the April 2015 Rapid City consultation that ERCs are "research-based;" they are "what states are utilizing;" and they have "shown to be effective." CRST-002482:113:8-12, CRST-002485:122:1-16.  It further explained how the school improvement teams stationed at ERCs would be able to help ensure schools have adequate resources and support, and focus on several areas of school needs such as professional development, data analysis, and special education,

rather than issuing mandates.  CRST-002443 (Tribal Consultation Booklet).  And BIE explained

ELOs no longer fit the needs of the agency.  The reorganization was "based on the funding [BIE]

ha[d]," as Education Program Management funding had been slashed from $19 million at the

time of the last reprograming to $14 million.  CRST-002466:48:1-25.  Transitioning to ERCs

allowed BIE to save money by consolidating entirely similar functions that were previously

"spread out throughout the Bureau and even outside the Bureau."  CRST-002502:191-5-192:22.

Moreover, since the last reprogramming, four Plains tribes assumed some responsibilities of the

line offices through ISDEAA contracts, and the reorganization reflects how the government

should continue to perform inherent government functions when tribes have started to control

their own line offices.  CRST-002464:39:15-40:16.

        At bottom, Plaintiffs' quarrel is with the agency's ultimate substantive decision to staff its

employees in ERCs not located on their reservation, rather than with their ability to consult on

the issue.  CRST testified that at its February 2015 meeting with BIE, it "told them that they

disagreed with them closing our line office," that it understood the proposal, "[a]nd didn't like

it."  Frazier Dep. 47:18-19, 48:3.  RST similarly testified that its concerns were not heard

"[b]ecause the line office was closed."  Bordeaux Dep. Vol. II 23:11-15.  Indeed, RST's

designated 30(b)(6) deponent deliberately declined to read the BIE's Tribal Consultation Report

because the ELO at Rosebud "closed," Bordeaux Dep. Vol. II. 47:24-48:4, and both CRST and

RST believe that the Government's duty to consult confers upon them an ability to veto any

proposal that they find unsatisfactory.  *See* Frazier Dep. 19:17-20 (agreeing that "one Indian tribe

out of 64 can veto a change that the other 63 tribes believe is beneficial"); Bordeaux Dep. Vol. I

18:1-7 (similar).

But that is plainly not what 25 U.S.C. § 2011 or any other substantive source of law provides.  Plaintiffs do not hold veto power over where an agency staffs its employees or any other substantive decision based solely on the agency's obligation to consult in those decisions.  The consultation process lasted approximately two years, and Plaintiffs' continued opposition to the consultation process and the reorganization—which Defendants repeatedly sought to address—does not erase the extensive consultation that occurred.  *Hoopa Valley Tribe*, 812 F.2d at 1103 ("The Hupas were heard, even though their advice was not accepted.  No violation of the Administrative Procedure Act has been shown."); *Lower Brule Sioux Tribe*, 911 F. Supp. at 401.

### 3.  Defendants Provided the Plaintiffs the Necessary Information to Consult

Plaintiffs also seek to undermine the consultation process by singling out a couple of meetings they attended that that they argue lacked sufficient information on the proposal.  In doing so in a vacuum, they ignore the numerous other interactions that they had with BIE.  For example, their argument does not address the individual consultation session that BIE had with CRST in February 2015 and RST the next month, where both tribes acknowledge having their questions answered by the agency, *see supra* Part I.C.2; and it ignores two meetings that BIE had with the Great Plains Tribal Chairman's Association, an organization of the Great Plains tribal chairmen, Bordeaux Dep. II at 19:18-19, CRST-002132 (Dear Tribal Leader Letter), including one at Watertown, South Dakota in June 2014 where Director Roessel spoke to the group about the reorganization, Farlee Dep. 25:17-19.  Plaintiffs further disregard the TIBC meeting in May 2015 with CRST's Chairman that covered the reorganization, CRST-003208-CRST-003209 (May 2015 Meeting Notes), as well as an October 9, 2015 BIE webinar that covered, among other things, the cost of the reorganization and the number of FTEs supported by specific funding sources, CRST-003893-CRST-003901, which CRST acknowledged having reviewed, Farlee Dep. 59:8-10.  Their

argument further ignores the constant dialogue between BIE and tribes that occurred outside of formal meetings.  For example, RST's 30(b)(6) deponent explained how Mr. Yu "tried really hard to help," that they spoke "once a month on . . . average," and that "he encouraged that if [she] had a question to not hesitate to contact him."  Bordeaux II Dep. 56:25-57:17; *see also id.* at 59:2-24 (discussing email Mr. Yu wrote to RST's Education Committee in which Mr. Yu offers "to talk on the phone so I can address any concerns you may have or respond to questions.").  And BIE had made publicly available the Greenbook, which contains BIE's budget justification, as well as explanatory changes for that fiscal year's funding, Dearman Decl. ¶ 3; *see also* Bordeaux II Dep. 33:5-10, 44:10-12 (explaining that she accessed the Greenbook prior to the April 2015 consultation and referenced it "maybe once a month").

Notwithstanding the constant interaction between BIE and tribes, Plaintiffs argue that the spring 2014 consultations on the draft *Blueprint for Reform* "were ill-defined" and provided "little detailed information."  RST Mem. at 9.  But the record shows that the purpose of those consultations was clear:  In a "Dear Tribal" leader letter inviting stakeholders to the consultations, BIE "encourage[d] [tribes] to ask questions and provide comments on the Study Group's draft reform framework," CRST-000542; *see also* CRST-000541 (announcing in Federal Register that that "[t]he Study Group will hear input from tribal representatives on these pillars of reform and the actionable recommendations at consultation sessions and by written comment.").  And at the meeting, participants had a draft *Blueprint* and the Study Group went through a PowerPoint presentation on that document.  CRST-000561-CRST-000601; CRST-000894:16:22-25 (Mr. Yu explaining at Loneman consultation that "All of the feedback that we received during those listening sessions came together in the presentation that you're about to see and also this draft report.  Almost all of these ideas are your ideas.").

Plaintiffs do not identify what "detailed information" this meeting allegedly lacked, but apparently they do not think there was enough information regarding how the reorganization would alter staffing or the budget.  *See* RST Mem. at 9 (citing, *inter alia*, RST SMF 61).  But they do not allege, let alone show, that they requested that information at this meeting, or that such information even existed at this point.  And the record reveals no such information at this time.  Although the *Blueprint* called for the creation of ERCs geographically positioned close to schools, CRST-001845, it never addressed where those centers should be located, the personnel for each center, or other corresponding details, *see* CRST-001829-CRST001895; *see* Roessel Dep. 63:9-10 (explaining that "[w]e wouldn't have known" what future budgets might look like).  Indeed it was after this meeting—and over the course of more than a year and several more consultations, including the individual tribal consultations in February and March 2015 with CRST and RST respectively that were held to "discuss in specifics the line office," CRST-002464:38:18—that BIE sought to develop the specifics as to how to restructure its field offices.

Plaintiffs similarly argue that the April 2015 consultation in Rapid City was not meaningful because "[t]here was a marked lack of information from the BIE and Study Group about budgets or personnel in the restructuring."  RST Mem. at 14-15.  Though RST asserts that it "clearly asked for budget information" at the April 22, 2015 consultation session, RST Mem. at 15, that meeting's transcript reveals no such request, CRST-002454-CRST-002521, and Plaintiffs do not cite any request by RST at that meeting for personnel information.  Thus, as with the spring 2014 meeting, it is far from clear what information Plaintiffs allege was not provided.

In any event, the record reveals that personnel and budget issues were addressed in detail at that consultation.  The consultation booklet provided information on how ELOs would change

and the functions of ERCs, including a description of the mobile teams that staff ERCs and service each school, CRST-002433-CRST-002448, and the agency's presentation provided the position title and level of pay for each proposed position in each ERC, CRST-002575, CRST-002577.  Moreover, the transcript shows that BIE explained at that consultation that the presentation was color-coded, such that positions written in black ink reflected education program management positions, while those in blue reflected operations and green reflected DPA positions.  *Id.*; CRST-002515:243:3-7.  At a minimum, Plaintiffs must identify what specific information they requested, and how any response received was allegedly inadequate.

Plaintiffs cannot now claim that they lacked opportunity to receive information on the reprogramming by ignoring the extensive BIE outreach outlined above, as well as the April 2014 and April 2015 meetings.  Indeed, even if Plaintiffs still somehow had outstanding questions after April 2015, they enjoyed significant opportunities to have their questions resolved.  RST had "prolific" communications with Mr. Yu, RST Mem. at 30, *see* Bordeaux II Dep. 56:25-57:17; ECF No. 86-1 (emails between Mr. Yu and various members of RST), and although BIE extended the deadline to submit comments after the April 2015 meeting, CRST-003519 (Tribal Consultation Report), RST declined to submit any.  CRST submitted a letter, CRST-003477-CRST-003480, to which the agency responded, CRST-003684-CRST-003687.  And outside of these individual communications, BIE continued its dialogue with stakeholders regarding the restructuring.  For example, CRST's chairman attended the May 2015 TIBC meeting and discussed the reorganization with BIE, CRST-3208-CRST-003209, and CRST also reviewed the October 9 Webinar, Farlee Dep. 59:8-10.

Plaintiffs attempt to disqualify the agency's extensive outreach, stating that "[o]nly four actual consultations were held" on the reorganization—an apparent reference to the spring 2015

consultations,[12] *see* RST Mem. at 11—and CRST similarly argues that its one-on-one meeting with BIE in February 2015 cannot be evidence of consultation because Director Roessel "was specifically told that any time spent with Tribal leaders was not 'consultation'" and because that meeting "in no way met the mandates of 25 U.S.C. § 2011 or the BIA Government to Government Consultation Policy."  CRST Mem. at 6-7.  But consultation is "a *process* involving the open discussion" with stakeholders, *Cheyenne River Sioux Tribe*, 205 F. Supp. 3d 1057(emphasis added) (quoting 25 U.S.C. § 2011(b)(2)(A)); *see also* BIA Consultation Policy at 1 ("'Consultation' means *a process*") (emphasis added), not a single meeting.  Plaintiffs provide no authority for their position that only meetings that they deem "actual consultations" qualify as evidence of BIE's good-faith efforts during this process,[13] and that is simply not what the consultation process requires.  Were it otherwise, a single tribe could negate agency decisions and meaningful reform by simply refusing to participate in the process, even when others support that reform.  Indeed, NCAI (among others) supports BIE's reform.  *See* CRST-004021 (Resolution of Support).

BIE plainly sought to inform tribes of the particulars of the proposed reorganization, and Plaintiffs cannot now rely on their objections to isolated parts of this process to show otherwise.[14]

_____

[12] Defendants note that there were six consultation sessions that spring.  CRST-003518 (Tribal Consultation Report).

[13] Plaintiffs also highlight Interior's consultation policy, *see* RST Mem. at 6-7, but that too explains that consultation is a "process."  Plaintiffs assert that Defendants "disregarded their obligations" under this policy too, *id.* at 7, but fail to explain how such a charge differs in any way from the alleged violations of § 2011 and BIA's policy.  Thus, Defendants do not separately address it here.

[14] Plaintiffs state that Defendants "appear[]" to have violated 25 U.S.C. § 2011 by not including school officials and educators at consultations.  RST Mem. at 21.  But Plaintiffs' do not allege that *their* schools were shut out.  And the record reveals that they were not.  *E.g.*, CRST-000885:7:20-24 (explaining at April 2014 consultation that BIE "allowed elected tribal leaders to

**4. Plaintiffs' Unsupported Attacks on Federal Officials' Motives Provide No Reason to Doubt the Agency's Consultation Efforts**

Plaintiffs' remaining attempts to undermine the agency's consultation efforts rely on various unsupported theories apparently designed to cast doubt on the agency's motives for the restructuring. Each argument lacks factual support, as well as legal support, as "[c]ourts generally accord Government records and official conduct a presumption of legitimacy" absent "clear evidence to the contrary." *Sisseton-Wahpeton Oyate of Lake Traverse Reservation v. U.S. Corps of Eng'rs*, 124 F. Supp. 3d 958, 964 (D.S.D. 2015) (internal quotation marks omitted).

Plaintiffs argue that a "strong inference" can be made that Dr. Roessel sought to "use the restructuring to enhance the benefits for his own Navajo tribe." RST Mem. at 20. But inferences are drawn *against* the party moving for summary judgment, *Anderson*, 477 U.S. at 255, and in any event, the reorganization was not designed to favor the Navajo. That concern was voiced during consultations, and the agency explained how the ratio of ERCs to BIE-funded schools in the Navajo region was either equal to or worse than those in the Dakotas, and the ratio of ERC staff to BIE-funded schools was worse for the Navajo than the other regions. CRST-003524 (Tribal Consultation Report).

Similarly, Plaintiffs posit that they were "somewhat punished" in the reorganization. But as explained above, the administrative record and evidence shows that BIE repeatedly and thoroughly addressed the need to transition to ERCs, as well as Plaintiffs' resulting concerns.

---

speak first, and then after that others can speak"); CRST-002455:4:1-15 (explaining at April 2015 consultation that "we've asked the tribal leaders . . . to speak first, sometimes they have other places to go, and then after that, then others can talk," and "that "in no way diminishes what we're hearing form the different areas and the different levels, but it's just a way to try to keep things moving"); Bordeaux Dep. Vol. II 20:19-24 (stating that RST school representatives were at March 2015 one-on-one consultation). Plaintiffs' reliance on a vague statement from a non-party to this lawsuit is irrelevant and does not show any violation of Defendants' consultation obligations.

*See supra* Parts I.B & I.C.2-3.  And most fundamentally, the BIE would continue to provide—and improve upon—the technical assistance delivered in the Dakotas with ERCs for tribally-controlled schools in Kyle, Flandreau, and Bismarck, and an ERC in Belcourt for BIE-operated schools, while RST's ELO would become a Technical Assistance center from which the tribe would manage its former ELO under ISDEAA contracts, and CRST's ELO would become Facility Support Center serving the local BIE-funded schools.  CRST-003810, CRST-003815.[15]  And as for Plaintiffs' characterization that BIE "actively campaign[ed] behind the scenes" at NCAI, RST Mem. at 15, the evidence simply shows that BIE "explained what [it was] looking at to anybody that would listen," Roessel Dep. 144:6-9, and Congress had asked BIE to get NCAI's support, *id.* 144:10-21.  And of course BIE would try to do so—NCAI represented the concerns from tribal and education leaders.  *See id.* 85:13-21.[16]

## II.    Plaintiffs' Remaining APA Claim is Without Merit

Plaintiffs appear to argue two bases for their APA claim.  The first claim is coextensive with their consultation claim and should therefore be dismissed as discussed above.  *See* RST Mem. at 21 ("This section overlaps with and incorporates the facts and discussion" from consultation section.).  The second alleges that Defendants violated the APA by acting arbitrarily or capriciously and in excess of statutory authority in taking "final agency actions . . . which

---

[15] Without any evidentiary support, Plaintiffs state that BIE created the Office of Sovereignty and Indian Education to "win support of tribes."  RST Mem. at 32.  This office was created because BIE learned that some tribes did not know how to exercise sovereignty in education and this office would thus provide a resource to those tribes to help provide them the know-how. Roessel Dep. 63:20-65:9.

[16] Plaintiffs also point to one official's email indicating that the Study Group or its recommendations should not be referred to as a "realignment," but they present no evidence connecting that choice of wording to a legally impermissible motive.  Plaintiffs do not offer this email as evidence, instead referring only to RST's counsel's inadmissible statement at a deposition.  *See* Yu Dep. 186:2-7.  Similarly, Plaintiffs do not offer any admissible evidence to establish an email sent between Mr. Rose and Mr. Yu that RST references in its memorandum.

began to diminish and in some cases terminate educational support services and technical assistance for tribal schools – by closing or allowing to be diminished by attrition the Education Line Offices."  RST Mem. at 25-26 (citing 5 U.S.C. § 706(2)(A), (C)).[17]  As an initial matter, Plaintiffs rely solely on evidence derived from discovery, but fail to explain why such evidence could be considered in support for this claim.  *See Voyageurs*, 381 F.3d at 766 ("It is well-established that judicial review under the APA is limited to the administrative record that was before the agency when it made its decision.").   In any event, even if Plaintiffs allege a cognizable APA claim (and as outlined below, they do not), they fail to point to any evidence showing that BIE closed ELOs in order to "make room" for restructuring, RST Mem. at 27, and are in fact simply challenging the agency's reliance on personnel outside of the ELO when that ELO lacked staffing.

### 1.  Agency Staff Assignment Decisions Do Not Constitute Agency Action

The APA only authorizes judicial review of "agency action," 5 U.S.C. § 702, and the personnel assignment decisions that BIE takes to provide technical assistance to tribes do not constitute such action.  The APA defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent. . ." *Id.* § 551(13).  As the Supreme Court explained, the five specific actions listed all "involve circumscribed, discrete agency actions," and consequently, "agency action" would not include a broad challenge on the manner in which an agency implements its programs.  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62, 64 (2004) ("*SUWA*"); *see also Vill. of Bald Head Island v. U.S. Army Corps of Engineers*, 714 F.3d

---

[17] Although not entirely clear, CRST apparently agrees with RST's argument, alleging that "Defendants began implementing their restructuring plan without Congressional approval," arguing that the June Secretarial Order reflects "final agency action."  CRST Mem. at 8.

186, 193 (4th Cir. 2013); *see also* S*ierra Club v. U.S. Corps of Eng'rs*, 446 F.3d 808, 813 (8th Cir. 2006).

Although Plaintiffs argue that BIE has failed to hire the proper personnel to deliver technical assistance, such claims of "[g]eneral deficiencies in [agency] compliance . . . lack the specificity requisite for agency action."  *SUWA*, 542 U.S. at 65-66; *Lujan v. National Wildlife Federation*, 497 U.S. 871, 890 (1990) (holding "land withdrawal review program," which was "the continuing (and thus constantly changing) operations of the BLM in reviewing" applications and classifications, was conduct far too vague and sweeping to be properly challenged as "agency action").  The agency's pre-existing responsibilities in the administration of its programs did not change, and simply assigning new personnel on a temporary basis to carry out those responsibilities does not affect existing rights and obligations and consequently is not "agency action."

Plaintiffs cite a collection of laws but offer no specific legal authority that would prohibit BIE's use of temporary assignments.  *See* RST Mem. at 27 (citing P.L. 93-638, 95-561, 100-297, and 25 U.S.C. § 2006).  The absence of any discrete legal obligation imposed on BIE in this area is not surprising, as the agency enjoys "a great deal of discretion" over staffing decisions.  *See SUWA*, 542 U.S. at 66.  Plaintiffs' claims would inject this Court into day-to-day agency management and force it to supervise interim personnel assignments, contrary to the Supreme Court's directive in *SUWA* "to avoid abstract policy disagreements" that would make it "the supervising court, rather than the agency to work out compliance with the broad statutory mandate."  542 U.S. at 66-67.  Indeed, Plaintiffs' theory would allow them to argue that any allegedly ineffective personnel should be replaced on the ground that they provide insufficient

services.  Such an argument is plainly foreclosed by Supreme Court precedent, as Plaintiffs do not challenge any discrete agency "action" under the APA.

### 2.   Assigning Agency Personnel To Temporary Assignments Is Committed to Agency Discretion

Plaintiffs' argument fails for another reason:  the assignment of agency personnel for certain tasks is committed to BIE's unreviewable discretion.  Although the APA embodies a "basic presumption of judicial review," *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967), Plaintiffs "must first clear the hurdle" of 5 U.S.C. § 701(a)(2), *see Heckler v. Chaney*, 470 U.S. 821, 828 (1985), which precludes judicial review when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2).  An agency action is committed to agency discretion by law and thus not subject to APA review if "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Chaney*, 470 U.S. at 830.  .

Plaintiffs' citation to several isolated statutory provisions fails to identify any applicable legal standard to guide this Court's review.  *Tamenut v. Mukasey*, 521 F.3d 1000, 1003-04 (8th Cir. 2008) ("The absence of any statutory factors to guide the agency's decision-making process, in combination with the open-ended nature of the inquiry, generally supports the conclusion that the 'agency action is committed to agency discretion by law.'") (quoting 5 U.S.C. § 701(a)(2)).  Rather, the challenged decisions here resemble that from *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993), where the Supreme Court found unreviewable an attempt to challenge the agency's decision to discontinue an Indian children's healthcare program, reasoning that the allocation of funds from a lump-sum appropriation is an "administrative decision traditionally regarded as committed to agency discretion," and that "as long as the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives," the APA gives the courts "no leave

to intrude." *Id.* at 192-93.  This Court similarly recognized that "[a]n agency has implied authority to manage its funds," *Yankton Sioux*, 442 F. Supp. 2d at 786, and Plaintiffs provide nothing here that limits where BIE locates its offices or who it assigns to provide technical assistance, let alone when that assistance is provided on a temporary basis.  *See Lincoln*, 508 U.S. at 193–94.  Indeed, this Court's past analysis of *Lincoln*—which allowed judicial review of a consultation claim because it found "explicit language" requiring consultation that limited the agency's discretion—reinforces the unavailability of review here where Plaintiffs fail to point to any such explicit language.  *Yankton Sioux*, 442 F. Supp. 2d at 783.

### 3. BIE Has Provided Technical Assistance In A Sensible and Thoughtful Manner in the Face of Adversity

Even if this Court were to reach the merits of this argument—and for the reasons described above, it should not—the evidence merely shows that BIE relied on agency personnel outside of a tribe's ELO when that ELO lacked staffing.  Director Roessel explained that vacancies occurred at ELOs naturally, such as retirements, and not as a result of restructuring. Roessel Dep. 117:17-24 (explaining that attrition "just happened" and that "it wasn't in terms of . . . the reforms"); *see also* Stevens Dep. 64:13-17 (testifying that there was no conscious effort to reduce line office personnel "around 2013 or 2014").  BIE "did not consider" the line offices "closed, just that we didn't have the personnel," and the agency was "in a position where [it] had to cover" by "distribut[ing] the oversight to other people."  Roessel Dep. 125:15-19.  And the agency faced difficulties in filling vacant ELO positions.  Specifically, in light of the forthcoming restructuring, BIE "didn't know whether the ELOs would continue or not continue," and "didn't know where the line office would may [sic] be moved as an ERC."  Roessel Dep. 117:1-19:25.  With such uncertainty surrounding what positions and locations to advertise, the agency was unable to fill those vacancies.  Roessel Dep. 117:17-119:11; Greyeyes Dep. 70:18-

38

71:25 (explaining that "no one really knew what the reprogramming or the reorganization was," and that "everything was just put on hold" so that BIE could go through tribes' "comments and … concerns" to allow the agency to "figure out what's going on with the restructuring" before hiring).

And in approving the reorganization, Congress directed the agency not to implement restructuring at the line office level to the extent it is impacted by pending litigation, and so BIE could not (and still cannot) staff the proposed Dakota ERCs. *See* Roessel Dep. 118:17-119:11. Notwithstanding these challenges, the agency made the reasonable decision to assign agency personnel to assist tribes so that ELO vacancies would not deprive tribes of technical assistance. That sensible approach is not arbitrary, capricious, or in excess of statutory authority. *See* 5 U.S.C. § 706(2)(A), (C).

### III. BIE Has Acted Consistent with its General Trust Relationship with Tribes by Continuing to Provide Technical Assistance

Consistent with the "general trust relationship between the United States and the Indian tribes," *Menominee Indian Tribe of Wis. v. United States*, 136 S. Ct. 750, 757 (2016), Defendants have provided ample technical assistance and support to RST and CRST during the times at issue in this action. Plaintiffs nevertheless assert that Defendants violated their trust responsibility by inadequately consulting with Plaintiffs over the reorganization; "not maintain[ing] adequate educational support [or] technical assistance on the[ir] reservations"; and awarding "sovereignty grants" "without obtaining any reprogramming permission, at least anywhere on the record to do so." RST Mem. at 31-32. These arguments fail because they do not concern the traditional subject matter of a breach-of-trust claim, and because Plaintiffs cannot show any type of trust duties that would be actionable through such a claim.

The Supreme Court recently reiterated that "any specific obligations the Government may have under that [trust] relationship are 'governed by statute rather than the common law.'" *Menominee Indian Tribe*, 136 S. Ct. at 757 (quoting *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 165 (2011)).  To establish an enforceable trust duty, a statute must "clearly give the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians," "thereby establish[ing] a fiduciary relationship and defin[ing] the contours of the United States' fiduciary responsibilities."  *United States v. Mitchell*, 463 U.S. 206, 224 (1983) (*Mitchell II*).  These trust duties must apply to a "trust corpus" consisting of property—for example, "Indian timber, lands, [or] funds"—with beneficial title belonging to Indian tribes or their members.  *Mitchell II*, 463 U.S. at 225; *see also* Restatement (Third) of Trusts § 2 cmt. f (2003) (explaining that an element of a trust is trust property that the trustee manages for beneficiaries).

Here, Plaintiffs fail to "identif[y] any assets taken over by the government such as tribally owned land, timber, or funds which would give rise to a special trust duty."  *Yankton Sioux Tribe v. U.S. Dep't of Health & Human Servs.*, 533 F.3d 634, 644 (8th Cir. 2008).  The provision of education is not equivalent to managing such assets.  *See Allred v. United States*, 33 Fed. Cl. 349, 357 (1995) (rejecting claim that defendants violated trust responsibility to provide health services "because this court finds that the statutes in question only pertain to Indian health care generally and do not require that any tribal property be managed, plaintiffs have failed to establish the property element of a breach of trust claim."); *cf. Mitchell II*, 463 U.S. at  222-25 (holding enforceable trust duty where "virtually every stage of the process [wa]s under federal control," and "[a]ll of the necessary elements of a common-law trust [was] present: a trustee (the United States), a beneficiary (the Indian allottees), and a trust corpus (Indian timber, lands, and

funds")).  Plaintiff's trust arguments therefore fail at this preliminary step.  *See Yankton Sioux Tribe*, 533 F.3d at 644 (rejecting alleged violation of trust based on closure of healthcare facility emergency room); *Allred*, 33 Fed. Cl. at 357.[18]

Moreover, Plaintiffs fail to identify any statutory provision that creates actionable trust obligations that Defendants have allegedly violated.  The Supreme Court has emphasized that any legally enforceable trust obligation must reside in statute.  *Jicarilla Apache Nation*, 564 U.S. at 177 (explaining that to establish a cause of action, the tribe must identify "a specific, applicable, trust-creating statute or regulation that the Government violated. . . .") (internal quotation marks omitted).  "An agency has implied authority to manage its funds," *Yankton Sioux Tribe*, 442 F. Supp. 2d at 786, and Plaintiffs have not identified any appropriations specifically for ELOs on their reservations, or otherwise shown that they have a property interest in any government funds that were allegedly misspent.  *See Lincoln*, 508 U.S. at 195 ("Whatever the contours of that [trust] relationship, though, it could not limit the Service's discretion to reorder its priorities from serving a subgroup of beneficiaries to serving the broader class of all Indians nationwide.").

Instead, Plaintiffs cite a collection of "several statutes and/or Public Laws," as well as the 1868 Fort Laramie treaty, and assert that "taken together," those authorities establish a "specific fiduciary" duty that BIE allegedly violated.  RST Mem. at 29.  But aside from the treaty provisions (which are addressed below), they never identify what *specific* duty purportedly

---

[18] *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 721 (8th Cir. 1979), stated that an agency's failure "to make any real attempt to comply with its own policy of consultation" violates general principles of administrative decision making, and further remarked that such a failure "violates the distinctive obligation of trust incumbent upon the Government."  (Internal quotation marks omitted).  But that remark does not mean that inadequate consultation is cognizable as a trust claim; such a claim was not even before that Court.

resides in that collection of authorities that Defendants purportedly failed to perform.  "When the Tribe cannot identify a specific, applicable, trust-creating statute or regulation that the Government violated, . . .  neither the Government's 'control' over [Indian assets] nor common-law trust principles matter."  *Jicarilla Apache Nation*, 564 U.S. at 177 (2011) (internal quotation marks omitted), and thus Plaintiffs' trust arguments fail for that reason as well.

Even if Plaintiffs could surmount these hurdles—and they cannot—their trust arguments still fail.  As articulated *supra*, Defendants cannot show the consultation process to be legally inadequate.  Plaintiffs' claim that the BIE lacked authority to award sovereignty grants lacks *any* factual support, and is flatly contradicted by the evidence, as Director Roessel testified that BIE had authority from Congress for the sovereignty grants. Roessel Dep. 68:8-14.  And the BIE has continually provided ample educational support and technical assistance to CRST and RST. Specifically, the BIE has continued to allocate to Plaintiffs and their schools tens of millions of dollars in education funding, Dearman Decl. ¶ 9, continued to fund RST pursuant to a P.L. 93-638 contract in which the Tribe agreed to implement the technical assistance functions of the line office, and still offers technical assistance to Plaintiffs through acting education line officers and others, Dearman Decl. ¶¶ 14-15.[19]

## IV.    Defendants' Efforts to Strengthen the Quality of Education Delivered to Plaintiffs is Consistent with Treaty Obligations

Defendants have likewise acted consistently with the Fort Laramie Treaty of 1868, April 29, 1868, 15 Stat. 635 ("Treaty").  Article 7 of the Treaty provides that "for every thirty children . . . a house shall be provided and a teacher competent to teach the elementary branches of an English education shall be furnished."  RST conceded that "there is a school that provides

---

[19] RST's statement that Defendants' officials have "admitted that they have acted arbitrarily and capriciously, and/or exceeded their statutory obligations," RST Mem. at 28, is unfounded.

education for Indian children on the Rosebud Reservation that is funded by the Bureau of Indian Affairs that would comply with this" obligation, Bordeaux Dep. Vol. I at 12:19-22; CRST acknowledges that their two tribally-controlled schools are BIE-funded, and their third school is BIE-operated, CRST SMF 4, ECF No. 84; and BIE provides ample resources and technical assistance to the tribes in numerous other ways, *see* Dearman Decl ¶¶ 9, 14-15.  The reorganization is designed to *strengthen* the delivery of education, not diminish it, *see supra* Background, Part I.C.2.

Likewise, Article 5 of the Treaty has been complied with.  That article nowhere discusses education but states generally that the "United States agrees that the agent for said Indians shall in the future make his home at the agency-building" and will "keep an office open . . . for the purpose of prompt and diligent inquiry into such matters of complaint by and against the Indians as may be presented for investigation under the provisions of their treaty stipulations."  Treaty, April 29, 1868, 15 Stat. 635.  Both tribes acknowledge that a BIA representative is stationed on their reservation.  Bordeaux Dep. Vol. I at 13:14; Frazier Dep. 13:25-14:2; *see also* http://www.indianaffairs.gov/WhoWeAre/RegionalOffices/GreatPlains/index.htm (last visited March 19, 2018).

Unable to show a violation of either provision, Plaintiffs assert that Articles 5 and 7 "must be read together," and because the Treaty provides for education, "the agent" referred to in Article V must mean an ELO.  RST Mem. at 34-35.  The "starting point for any analysis" of Indian treaties "is the treaty language itself . . . interpreted in light of the parties' intentions," *Minnesota v. Mille Lacs Band of Chippewa Indians,* 526 U.S. 172, 206 (1999), and there is no plausible reading of the Treaty to support Plaintiffs' interpretation.  The Treaty calls for the United States to create "an agency-building for the residence of *the agent*," Article 4 (emphasis

43

added), and "*the* agent" should keep "*an* office open" for "prompt and diligent inquiry into such matters of complaint."  Article 5 (emphases added).  At most, the Treaty can therefore be read to require one individual and one office to generally be available to hear various types of complaints (*i.e.* BIA's office and its agent).  However, that requirement in no way indicates that the agency must install a dedicated education office on Plaintiffs' reservation and staff that dedicated office with assigned education specialists.  *See Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 466-67 (1995) (rejecting interpretation that signatories "likely gave no thought to").  Indeed, that agent's responsibilities span from receiving evidence of "bad men," Article 1, to having tribal members select tracts of land for farming "in the presence and with the assistance of the agent."  Article 6.  Such tasks are plainly not suited for an ELO, and Plaintiffs cannot expand the term "agent" to entitle them to a dedicated office and specialist for every issue addressed by the Treaty.  *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 432 (1943) ("[E]ven Indian treaties cannot be re-written or expanded beyond their clear terms to remedy a claimed injustice"); *Garreaux v. United States*, 77 Fed. Cl. 726, 737 (2007) (similar).

## CONCLUSION

For all the reasons stated above, this Court should enter judgment as a matter of law in Defendants' favor with respect to all of Plaintiffs' claims and should deny RST's and CRST's motions for summary judgment.

Dated: March 19, 2018   Respectfully submitted,

       CHAD. A. READLER
       Acting Assistant Attorney General

       RONALD A PARSONS, JR.
       United States Attorney

       CHERYL SCHREMPP DUPRIS
       Assistant United States Attorney

United States Attorney's Office
325 S. 1st Street, Suite 300
Sioux Falls, S.D. 57104
Telephone: (605) 357-2340

ERIC WOMACK
Assistant Branch Director

/s/Kevin M. Snell
DANIEL BENSING
Senior Trial Counsel
KEVIN M. SNELL
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 6108
Washington, D.C.  20530
Tel.: (202) 305-0924
Fax: (202) 616-8470
E-mail:  Kevin.Snell@usdoj.gov

Attorneys for Defendants

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned attorney for Defendants certifies that this memorandum complies with

this Court's January 25, 2018 Order that allows Defendants to file a 45-page brief.  ECF No. 75.

<u>/s/Kevin M. Snell</u>
KEVIN M. SNELL
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 6108
Washington, D.C.  20530
Tel.: (202) 305-0924
Fax: (202) 616-8460
E-mail:  Kevin.Snell@usdoj.gov