**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH DAKOTA**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| CHEYENNE RIVER SIOUX TRIBE, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO.: 3:15-cv-03018-KES |
| | ) | |
| ROSEBUD SIOUX TRIBE, | ) | |
| | ) | **INTERVENOR-PLAINTIFF** |
| Intervenor-Plaintiff, | ) | **ROSEBUD SIOUX TRIBE'S** |
| | ) | **COMBINED BRIEF IN RESPONSE** |
| v. | ) | **TO DEFENDANTS'** |
| | ) | **MOTION FOR SUMMARY** |
| RYAN ZINKE, Secretary, United States | ) | **JUDGMENT, AND REPLY** |
| Department of Interior, et al., | ) | **TO DEFENDANTS' OPPOSITION TO** |
| | ) | **PLAINTIFF'S MOTION FOR** |
| Defendants. | ) | **SUMMARY JUDGMENT** |

COMES NOW the Intervenor-Plaintiff Rosebud Sioux Tribe, by and through its attorney Charles Abourezk, and hereby submits its Combined Brief in Response to Defendant Ryan Zinke, Secretary, *et al.*'s Motion for Summary Judgment and Reply to Defendants' Opposition to Plaintiffs' Motion for Summary Judgment. Rosebud Sioux Tribe joins with Cheyenne River Sioux Tribe's Combined Brief in Response to Defendants' Motion for Summary Judgment and Reply to Defendants' Opposition to Plaintiff's Motion for Summary Judgment.

**INTRODUCTION**

One of Defendants' many subtexts in their memorandum is that the federal government is deserving of complete deference by the Court as to how it conducted itself in this restructuring, because it *is* the federal government, after all, and would not deceive, mislead, or have any bad intentions toward Indian tribes. It suggests that tribes and tribal schools should just sit back and keep quiet when the government has decided it knows what's best for tribes and tribal education

1

– that tribes should get out of the way of non-tribal "experts."

The problem with these assumptions is that federal law and policy considers Indian tribes and tribal educators to *be experts* in determining their own educational futures, pursuant to the federal policy of tribal self-determination. This recognition is woven into the very fabric of federal law and policy, in order to ensure Indian tribes are able to, as much as possible, determine what is best for themselves and tribal children, to prevent ill-advised programs and structural changes effected by the federal government, and to protect tribes from the fleeting and fanciful notions of politically ambitious officials with no roots in the history or complexities of federal Indian policy. (BIA Consultation Policy, VI.A., 25 U.S.C. § 2011.) Reform in America generally has a poor history, but it has a particular maliciousness in Indian country.

The Plaintiffs, along with many tribes in the Great Plains region, where approximately one third of the tribal schools in the United States are located, would stand up at such great material and political cost to themselves, again and again, in order to ensure that the Defendants comply with federal law and policy, does not denote anger but rather an unremitting belief in the very laws upon which their cultural and sociopolitical survival depends. That tribal officials and members would recite treaties over and over again in the context of education at the formal consultations, listening sessions, in e-mails and written comments, speaks to the realism of their history, where treaties and laws have been their only shield against a relentless political and historical machinery which, if allowed to operate without any check upon it, would leave them as completely powerless subjects with no separate political voice, no self-determination, no land, and certainly no identity.

Former Nebraska Governor Ben Nelson once said, in relation to Native American

stereotypes and mascots, that he believes Indian people should only have to say *once* that something offends them, inferring that forcing Indian people to say it over and over again constituted dehumanization and racial prejudice of the worst kind.

In the period of time leading to the restructuring, the Great Plains tribes repeated their opposition to the manner in which the consultation was occurring, and made a record of substantive opposition to the restructuring plan itself, and presented alternatives at every opportunity, but it all fell on deaf ears, because the American Indian Education Study Group and the departmental secretaries had already committed to their own plan - one that did not include in any meaningful way the affected Indian tribes or tribal schools.  In such circumstances, it is only the courts which can help Indian tribes and tribal people to be heard, and to enforce meaningful consultation and give real effect to the federal policy of Indian self-determination. There is adequate evidence in the Administrative Record regarding the consultation issue and the Administrative Procedures Act to grant summery judgment in favor of Plaintiff's and against Defendants.

**AUTHORITIES AND ARGUMENT**

As the Eighth Circuit has recently held,

> [t]he nonmoving party "may not rely on allegations or denials," however, but must substantiate his allegations with "sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation [or] conjecture." *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)). Even if some factual dispute exists, the movant is entitled to summary judgment if the evidence, taken as a whole, is so one-sided that a fair-minded trier of fact could not find for the nonmoving party.

*Ball v. City of Lincoln, Nebraska*, 870 F.3d 722, 727 (8th Cir. 2017); citing *Anderson v. Liberty*

*Lobby, Inc*., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

There is not adequate space within the twenty-five page (25) brief limitation to respond to each of the many statements in the Defendants' Introduction and Background that are inaccurate or wrongly summarized. This Brief has to be somewhat perfunctory, but under the law and the facts, taken as a whole, Rosebud Sioux Tribe is entitled to summary judgment.

All abbreviations shall remain the same as in the Rosebud Sioux Tribe's original Memorandum and Statement of Material Facts, except that the Rosebud Sioux Tribe may be referred to as "Rosebud" for purposes of space, and Rosebud's Statement of Material Facts shall be referred to as "Rosebud SMF, para. ___.")

## FACTUAL RESPONSES

This is not intended to be responsive to all facts in Defendants' Responses to Plaintiff's Statement of Material Facts or to the Background Facts, but only a few salient points, not necessarily in any order.

In Defendants' SMF 152, they take issue with the fact that the Chief of Staff of the Defendant of Interior, Sarah Harris, cautioned staff not to use the word "realignment." Defendants' suggest this was only comments of counsel, but a true and correct copy of actual e-mail is attached to Second Affidavit of Charles Abourezk, at Exhibit 12.

In Defendants' SMF 187, they dispute that the Rosebud Line Offices was closed. In Defendants' SMF 188, they admit the office was closed physically, but Charmaine Weston was sent back out to open offices at the BIA building. However, this is misleading because Westonis only at Rosebud part time, by Defendants' admission, as she is also assigned to other reservations. (Davis Dep. 11:1-16, Plaintiff's SMF, paras. 210-211.) This was not a responsive

disputing of the facts in Defendants' SMF 188.

1.    **Defendant's Consultation Argument – Statute, Policies and the APA**

Rosebud assumes, for the sake of this Combined Brief, that the Administrative

Procedures Act is the device by which the law and policy on consultation is enforced, pursuant to

this Court's prior rulings, in *Cheyenne River Sioux Tribe v. Jewell*, 205 F. Supp. 3d 1052 (D.S.D.

2016); and  *Yankton Sioux Tribe v. Kempthorne*, 442 F. Supp. 2d 774, 783–84 (D.S.D. 2006).

Generally,

> [e]ven though the trust relationship does not restrict federal
> agencies' traditional discretion to proceed by rulemaking or
> otherwise, the trust doctrine has been pivotal in delineating the
> agencies' duties and limiting the broad discretion they usually
> enjoy pursuant to broad congressional delegations.  The trust
> doctrine may enlarge obligations of the BIA beyond what would be
> required by an administrative law analysis.  Actions that might well
> be considered within an agency's discretion because not 'arbitrary
> and capricious,' as stated in the APA, may nevertheless be held to
> violate the Secretary of the Interior's trust responsibility to tribes.

*Cohen's Handbook of Federal Indian Law* § 5.05[3][c] (Nell Jessup Newton, et al. eds. 2012 ed.)

The Eighth Circuit Court of Appeals has held as follows:

> One aspect of the arbitrary and capricious review is an inquiry into
> whether the agency "offered an explanation for its decision that
> runs counter to the evidence before the agency, or is so implausible
> that it could not be ascribed to a difference in view or the product
> of agency expertise." *Watkins v. Nat'l Transp. Safety Bd.*, 178 F.3d
> 959, 961 (8th Cir.1999) (internal quotation marks and citations
> omitted). By contrast to legal questions, we review the agency's
> findings of fact under a deferential substantial-evidence standard.
> *Sultani v. Gonzales*, 455 F.3d 878, 881–82 (8th Cir.2006) (stating
> that the agency's findings of fact are not supported by substantial
> evidence only where the evidence "not only supports a contrary
> conclusion but compels it").

*Sugule v. Frazier*, 639 F.3d 406, 411 (8th Cir. 2011), emphasis added.

The Eighth Circuit went on to hold that "[w]e cannot "blindly defer to an agency decision that is . . . unexplained," *Sugule*, at 412; citing *Qwest Corp. v. Boyle*, 589 F.3d 985, 998 (8th Cir. 2009)("we will not blindly defer to an agency decision that is uninformed or unexplained. The agency must "<u>examine the relevant data</u> and <u>articulate a satisfactory explanation for its action</u> <u>including a rational connection between the facts found and the choice made</u>.")

The Eighth Circuit has also held that

> We acknowledge that as a general rule an agency's interpretation of its own regulation is entitled to great deference. *Lile v. University of Iowa Hosp. & Clinics*, 886 F.2d 157, 160 (8th Cir.1989). However, courts are not obligated to give such deference to "an agency's interpretation ... which is not based on expertise in its particular field but is rather based on general common law principles," *Edwards v. Califano*, 619 F.2d at 869, or if the agency's interpretation is inconsistent with the regulation. *Creighton Omaha Regional Health Care Corp. v. Bowen*, 822 F.2d 785, 789 (8th Cir.1987). In addition, <u>courts do not defer to an agency's litigating position</u>. *McKee v. Sullivan*, 903 F.2d 1436, 1438–39 n. 3 (11th Cir.1990).

*Brewster on Behalf of Keller v. Sullivan*, 972 F.2d 898, 901 (8th Cir. 1992), emphasis added.

The heart of the consultation issue subject to review by this Court is whether the Defendants followed 25 U.S.C. § 2011 and their own Interior and BIA Government-to-Government Consultation Policies in their final decision to restructure the BIE, and whether, after required tribal consultation, there was a "rational connection between the facts found and the choice made." *Qwest Corp.*, at 998.   The Defendants fail on both issues.

As discussed further below, there was no rational connection between the alleged facts developed by the Study Group and the BIE, and the restructuring of the BIE.  By the admission of several senior level BIE officials, there was no empirical research or data which showed that

the alleged problems in Indian education, primarily low academic proficiency for American Indian students, would be addressed by *this* restructuring plan.  (Rosebud's SMF, at paras. 167, 176.)

The other purported target, which Defendants allege was added during the consultations, was "[p]romoting tribal self-determination for tribal nations . . . to address the *unique* concerns from tribal leaders." (Defendants' Memorandum, at 23, emphasis added.)

There were at the time and still are two statutory schemes by Congress, the Indian Self-Determination and Education Assistance Act, and the Tribally Controlled Schools Act (neither of which were modified or amended in the restructuring) which already provide detailed, extensive ways  for tribes to assume operation and govern their own educational institutions.  All but three tribal schools in the nation are grant schools under the Tribally Controlled Schools Act, and the other three are contract schools under the Indian Self-Determination and Education Assistance Act.  A restructuring was not required to make self-determination a reality for tribal schools, as it already existed, in much better form from the branch of government given constitutional, plenary power over Indian affairs – the Congress – than from the Defendants.

Tribes, where the 58 BIE-operated schools still exist, could have utilized those statutory schemes to contract or to operate by grant those BIE-operated schools if they wished, but chose not to.  Cheyenne River Sioux Tribe, for example, has both tribal grant schools and one BIE-operated school.  "The Secretary recognizes that tribal decisions to contract or not to contract are *equal expressions of self-determination*." 25 C.F.R. § 900.3, emphasis added. As a result, this articulated reason for the restructuring makes no rational sense.

The evidence suggests instead that "self-determination" was used by the Defendants,

7

and particularly by BIE Director Charles Roessel, to reframe the restructuring plan in order to sell it to skeptical Indian tribes and Congress, and that this target was taken on mid-course as Roessel realized the growing reluctance of both tribes and Congress.  This superficial use of "self-determination" as a marketing phrase is far different from the *actual* self-determination which the Defendants were required by law and policy to recognize and practice in the consultation process.

The purported "diagnoses" by the Study Group and resulting prescription, were not rationally anchored at all to the problems they purported to be addressing.  There was simply no rational, scientific (or empirical) connection between the decision of the Defendants and the actual problems in Indian education.  (Rosebud SMF 167, 176.)  Nor were the Defendants actually hearing what consulted tribes were saying or the alternatives they were proposing, and the ensuing decision ran contrary to the express views of many of the tribes during consultation, particularly tribes in the Great Plains (including Plaintiffs).   The Defendants state "the Study Group was plainly qualified to diagnose and develop recommendations for the BIE." (Defendants' Memorandum, at 21.)

That is questioned here, given the makeup of the Study Group and their lack of tribal experience, and the complex nuance of Indian education, but *arguendo*, even if true, they neglected the far greater expertise of tribal leaders and educators – expertise which federal law and policy recognizes, such as the requirement of "joint deliberation" and the Interior and BIA Consultation Policy's requirements to involve tribes as early as possible, in pre-consultation focusing and in authorship of the plan from the earliest stages.

The Defendants seem somewhat confused by the phrase "give effect." (Defendants' Memorandum, at 25.)  Its response was to pick out only *one* area where it alleges the Defendants

8

*did* give effect to tribal input, which was to purportedly to increase funding for tribal schools and grant support costs.[1]  (Defendants' Memorandum, at 25.)  Even if true, *arguendo*, granting more money to build schools and bringing grant support costs up to the full amount already appropriated by Congress, but never distributed, is *not* giving effect to the views of the tribes where they mattered most in the consultation process, those views opposing the restructuring, and the design and execution of the consultation process itself.

It is a part of the baseline requirements of federal law that

> during discussions and joint deliberations, interested parties (including tribes and school officials) shall be given an opportunity to (i) to present issues (including proposals regarding changes in current practices or programs) that will be considered for future action by the Secretary; and (ii) to participate and discuss the options presented, or to present alternatives, with the views and concerns of the interested parties given effect unless the Secretary determines, from information available from or presented by the interested parties during one or more of the discussions and deliberations, that there is a substantial reason for another course of action.

25 U.S.C. § 2011 (b)(2)(B), emphasis added.  The emphases are exactly what the Defendants failed to do - give effect to the clear and oft-repeated views and concerns of a number of tribes, tribal school officials, and tribal educators.  The views of Plaintiffs and their officials or representative tribal organizations such as GPTCA were specifically *not given effect* by the BIE during the consultation, nor did the Secretary of Interior make a determination from the

---

[1] Alleged increased funding for new schools never reached the Great Plains.  Donald Yu admitted in his deposition that 8 of 10 projects funded in the past year, a list he and Roessel were involved in compiling before their departure from the BIE, were given to schools in the Southwest of the United States, and no school construction projects were granted in the Great Plains. (Yu Dep. 272:7-275:3.) Grant support costs were always underfunded at around 62% of what Congress appropriated, but have in the past year reached 100%, according to the Green Book.  Dearman Declaration ¶ 3, website citation.

information available or presented during the discussions and deliberations "that there is a substantial reason for another course of action." (*Id.*)

This issue is not any more complex than that. Either consultation, as it exists in federal law and policy, and the underlying policy of self-determination that gave it statutory life means something in the federal administrative decision-making processes or it doesn't. This is the primary problem of the Defendants and one to which they go to great lengths to obscure and avoid in their Memorandum. (The weaknesses of their case are best demonstrated by tracking their footnotes.)  Even without the Interior and BIA consultation policies, which are more rigorous, the Defendants did not even follow the controlling baseline federal statute controlling their conduct in this case.  25 U.S.C. § 2011.

In their background facts and arguments, Defendants cite to cases that posit Defendants "must not *obey* those who are consulted."  (Defendant's Memorandum, at 12, emphasis added.) This focus, and later along the same line, the focus on a tribal "veto," is Defendants' attempt to polarize the issue of meaningful consultation by reframing it as the Plaintiffs wanting the government to "obey" them and that they are seeking a "veto" over the administrative decision making process (this came from testimony by Deb Bordeaux, an educator not a lawyer, in a one word response to a specific question by Defendants' attorneys at her deposition, which is not the legal position generally taken in this case.)  (Bordeaux Dep. Vol I 16:11-18:7)

Implicit in the Defendants' repeated references to these two loaded words is clear irritation with the very idea that tribes are perceived as being equal to and important actors in the federal government's decisions which affect and determine their children and their future.  By this, they seek to invite the Court into the same kind of patriarchal and outdated thinking which

informed the Defendants' approach to the entire restructuring, hoping to cause the Court to become fed up and overlook the duties raised by consultation requirements. However, the statute itself requires that "the views and concerns of the interested parties [be] *given effect* unless the Secretary determines . . . that there is a substantial reason for another course of action." 25 U.S.C. § 2011 (b)(2)(B), emphasis added. Plaintiffs are not asking that Defendants obey *them*, but rather *the law*.

Plaintiffs repeatedly submitted alternatives, opposed essential elements of the plan, questioned the adequacy of the consultation process, and criticized or raised questions about the semi-secrecy and haste within which consultation was occurring, saying repeatedly on the record they did not want their ELO's moved from their reservations or field staff reduced while growing upper level BIE management, but their views were given *no* effect and the Secretary made *no* determination of a substantial reason for another course of action.

The 2015 Tribal Consultation Report (essentially a selective summary) was cherry-picked to appear to show a cross-section of tribal sentiment, but the BIE essentially ignored and/or provided no response to the most substantive points, as set forth more fully in Plaintiffs' summary judgment pleadings. The BIE chose to put in and then respond to critical comments it *did* want to deal with, but *not* to those it did not want to give effect to.

What was the use of summarizing some comments in the Consultation Report when the major, substantive opposition to the restructuring by tribes, and presentation of alternatives in the Great Plains, including Plaintiff tribes, was entirely ignored? That is the important question the Defendants do not answer in their responsive pleadings. The mere act of including summaries of *some* of those comments (several without any response at all by the BIE), without giving them

11

any effect, does not minimally comply with federal law or policy.

The consultation record is telling, with regard to Plaintiffs and their allies in the Great Plains who shared Plaintiffs' views.  For example, Oglala Sioux Tribal Councilman C.J. Clifford testified that the Settlement Agreement with tribes in the Dakotas should be followed, and that "[t]ribes are asking the Education Line Offices (ELOs) remain open with staffing for schools in the Dakotas."  Consultation Report, at 7. (CRST- 3515)  The specific BIE Response to that was "BIE is following the policy for tribal consultation described in the Settlement and that a reorganization is permissible under the terms of the Settlement."  *Id.*  There was *no* substantive response to the above-quoted testimony at all, nor to expressions of the same position by the Rosebud and Cheyenne River Sioux Tribes.

There was no response in the 2015 Consultation Report to the written summary of Sicangu Owayawa Oti's written submission (and no mention at all of Patti Bush's *oral* testimony at the Rapid City consultation), which was summarized as follows:

> Letter from Sicangu Owayawa Oti of Mission, South Dakota from Sicangu Owayawa Oti Board of Directors dated April 22, 2015: The Board sought to remind the DOI that tribal entities are entitled to educational opportunities for Native children, per the tribe's treaty rights. The treaties relevant to the Lakota Tribes are the 1851 Treaty and the 1868 Treaty. The Treaty obligations and public laws should supersede any acts or amendments that the DOI wishes to place on tribal schools. Tribes should have absolute authority over any and all policy in reference to education of our people. *The Board recommended that line offices, which are mostly located on reservations, remain open and be fully staffed*. The Board also expressed continued support for Sicangu Owayawa Oti Resolution No. 04-03, which opposed the closing of a line office in 2004.

*Id.*, at 14, emphasis added.  (See, RST SMF 109, and attached exhibits.)  The Consultation Report also did not include Sicangu Owayawa Oti's statement that it wanted Rosebud's

12

education support services to stay local on the reservation *because the BIE had become too top heavy and not wanting the BIE to grow its upper level management*.  (*Id.,* emphasis added.)

The summary did not include, as further example, the June 26, 2015 email comment by Rosebud Representative Richard Lunderman: "We in Great Sioux Nation still oppose the reorganization and disagree that Monty Roessel has properly consulted with Tribes and kept us current with updates as promised, and that he is telling Congress another story."  (Rosebud SMF para. 106.)

It also did not include this prescient email comment on July 9, 2015 by Rosebud representative Richard Lunderman, which was sent to Don Yu stating: "Don-We are just looking for some answers, we know the reorganization is well on its way like a snowball rolling down hill . . . *I don't think [Roessel] gets it or wants to get it until this whole reorganization is done*."  (Rosebud SMF, para. 71, emphasis added.)

All throughout their Background and Argument, Defendants attempt to confuse the legal term "consultation" with various contacts or visits they had with tribes, and attempt to confuse the BIE term of art "Listening Sessions" with a few visits by some members of the Study Group to a handful of reservations and tribal or BIE-operated schools.  They are not the same thing. Consultations are defined in 25 U.S.C. § 2011 and in the BIA Government-to-Government Consultation Policy and the Department of Interior's consultation policy and are preceded by a Notice in the Federal Register.  To be clear, there were only *four* formal Listening Sessions (CRST 000541, attached to Second Affidavit of Charles Abourezk.)  The Federal Register and Dear Tribal Leader letter from Assistant Secretary Washburn only showed four.(CRST- 540-543, Greyeyes Dep. 17:15-18:5, 57:8-20, Yu Dep. 74:14-75:11).

Defendants make broad, sweeping statements throughout their Memorandum attempting to establish adequate and meaningful consultation by reference to the *quantity* of contacts, rather than discussing the quality and meaningfulness of their "consultations."  For example, they state "Defendants consulted for *approximately two years*."  Memorandum, at 3, emphasis added. However, after the Defendants issued the final Blueprint for Reform in June of 2014, they only held *four* formal consultations within two months, by their own admission, in April and May of 2015.  (Defendants' Memorandum, at 4; citing CRST-000540-CRST-000541, CRST-571.)

The Defendants had some visits and contacts with tribes and organizations, as well as conducting "webinars" but these were *not* consultations by admission of both Roessel and Greyeyes, and others.  (Rosebud SMF, paras. 53, 54 and 55.)

Real, meaningful consultation that allows tribes a true voice in determining the future of their own educational system is not difficult to parse out from the kind of minimalist lip service paid to tribes throughout this process.  The Defendants simply wagered that *quantity* of contacts, not *quality* of *meaningful consultation* would pass muster under the Administrative Procedures Act.

The one damning fact that still rises above the numbers game is the fact that before one single tribal consultation on the restructuring plan (the plan was called the Blueprint for Reform and its final version released in June 2014 – never revised again after that date) was held in April-May 2015, Roessel instructed Wendy Greyeyes to contact the Interior Department and have them submit the request to Congress for reprogramming because Roessel "does not see any drastic changes based on comments from tribes heavily impacted by BIE's realignment" and that "therefore we want to continue moving forward with the reprogramming letter formally."

(Rosebud SMF 90-91.)

The BIE could have made hundreds of tribal contacts but they were already committed to advancing their plan, for political and other reasons, and by March of 2015, they were no longer feeling compelled to give effect to tribal views.   In fact, most of their Statement of Undisputed Material Facts is largely a reiteration of such contacts.  The Court may consider the whole of the evidence in granting summary judgment for Plaintiffs.  *Ball v. City of Lincoln, Nebraska*, *supra.*

Although this section overlaps with the APA section, the *Sisseton-Wahpeton Oyate* decision by this Court is cited for the proposition that "'[c]ourts generally accord Government records and official conduct a presumption of legitimacy' absent 'clear evidence to the contrary.'" (Defendants Memorandum, at 33, citing the *Sisseton-Wahpeton Oyate* case.) However, there *is* clear direct and circumstantial evidence to the contrary, as cited above and throughout Rosebud's SMF and Memorandum. Even without this evidence, the conduct of the BIE under Roessel (the third of three BIE Directors in a row to be removed from the Director position on ethics charges) and the conduct of the Study Group and Don Yu, who admits he had political goals in this "restructuring," do not warrant a "presumption of legitimacy."  This is not personal to them, but rather to their conduct when they wielded power as government officials – conduct which has harmed tribal education and tribal children, as well as the policy of self-determination for Indian tribes.  Upon the record, judicial review under the Administrative Procedures Act is a necessary check against such executive branch excesses.

### 2.    The APA Claim Arguments of Defendants

Generally, "[i]n order for an agency interpretation to be granted deference, it must be consistent with the congressional purpose."  *Morton v. Ruiz*, 415 U.S. 199, 237, 94 S. Ct. 1055,

1075, 39 L. Ed. 2d 270 (1974); citing *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 94 S.Ct. 334, 38

L.Ed.2d 287 (1973); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794,

1801, 23 L.Ed.2d 371 (1969).

The Bureau of Indian Education is required by federal statute to do the following:

> Education personnel who are under the direction and supervision
> of the Director of the Office of Indian Education Programs in
> accordance with subsection (b)(1) shall–
> (1) monitor and evaluate Bureau education programs;
> (2) provide all services and support functions for education
> programs with respect to personnel matters involving staffing
> actions and functions; and
> (3) provide technical and coordinating assistance in areas such as
> procurement, contracting, budgeting, personnel, curriculum, and
> operation and maintenance of school facilities.

25 U.S.C. § 2006. Obligations to tribal children and tribal education also exist under Public

Laws 93-638, 100-297, and 95-561. (See, also, SMF 255-257, Hamley 115:21-116:20.) The

Plaintiffs are statutory beneficiaries of these statutes and of the trust responsibility arising from

these statutes. *Blue Legs v. U.S. Bureau of Indian Affairs*, 867 F.2d 1094, 1100 (8th Cir.

1989)("The existence of a trust duty between the United States and an Indian or Indian tribe can

be inferred from the provisions of a statute, treaty or other agreement, 'reinforced by the

undisputed existence of a general trust relationship between the United States and the Indian

people;'") and *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 131 S.Ct. 2313180

L.Ed.2d 187 (2011); *United States v. Mitchell*, 463 U.S. 206, 224, 103 S. Ct. 2961, 2972, 77 L.

Ed. 2d 580 (1983). These cannot be circumvented or abandoned by the BIE, particularly

arbitrarily and capriciously.

First, then BIE Director Roessel understood that the BIE had a statutory obligation to

provide educational support and technical assistance *until* Congress allowed reprogramming. (Roessel Dep. 128:19-129:6.) The Defendants' own conduct demonstrates that Congressional approval was required *before* such acts, as evidenced by the intense efforts by the Defendants to do all within their power to obtain the approval of a skeptical Congress – approval of both the reprogramming of funds and the restructuring itself – which did not finally happen until February of 2016.   In other words, why obtain Congressional approval if it was not *required* in relation to their budget and their restructuring effort?  As stated in Rosebud's Memorandum, there was a reduction in services at the field level – at the Education Line Offices. (SMF 169-170, 172-174, 176, 182, 185-217.)  This process began as early as December of 2014 at Cheyenne River, and continued until reprogramming was finally approved in 2016.

The Defendants try to suggest that the attrition of Education Line Office personnel somehow occurred naturally, like an act of God, rather than a consequence of deliberate acts by the Defendants.  However, a *thirty-eight (38) percent reduction* in Line Office personnel does not occur naturally, and there is direct and circumstantial evidence to the contrary, which this Court may consider as a whole. First, the direct and circumstantial evidence points to the use of this reduction to prepare budgetary space for the increases from the restructuring, while remaining budget neutral apparently in an attempt to overcome the reluctance of Congress.  (SMF 189, Herrin Dep. 9:21-10:8, Stevens Dep. 64:18-65:4.)

This attrition, and forcing fewer staff to do more, was creating tremendous problems for the ADD of tribally-controlled schools RoseMarie Davis, who oversaw the tribal schools in the Great Plains, and her field staff, and even greater problems for the tribal schools themselves, as shown in Rosebud's Memorandum and SMF.   As nice as Ms. Davis is, and in spite of her

loyalty to the BIE, she openly warned Roessel at the April 22, 2015 consultation about what had

been occurring already:

> I do want to say one thing, though, Monty [Roessel], if I might.
> Right now in tribally-controlled schools, we have eight staff, eight.
> And we serve 58 schools.[2]  We cannot – because of [Education
> Program Management] EPM funds, we have a situation where I am
> the only AOTI for the . . . plains area.  Just the 29 schools.  I finally
> reached the point where I'm sending Mr. Parisien for training so I
> can appoint him as an AOTI.  *We need to have services.  We need
> to have these resources.  Because right now, with this limited
> number – and I have to give the people credit for the amount of
> work they are doing.  Its phenomenal.*  So when this goes into
> effect, if it goes into effect, however it does, when I'm looking at
> it, is that these personnel will be able to provide services to the
> field.

(Document 43, CRST-002515, at 245, emphasis added.)  This transcript is in the Administrative

Record.[3]  This, in and of itself, is evidence that Roessel knew the damaging effects to tribes of

letting the ELOs die on the vine, contrary to the BIE's statutory obligations to tribes and contrary

to the statutory trust responsibility.  Roessel also testified he knew Davis was struggling to keep

up with the additional workload after the ELO's were effectively closed. (Roessel Dep. 109:5-15,

123:17-19, 129:7-19.)  It was concerning to ADD Bart Stevens the fewer people were going to be

asked to do more functions after ELO personnel were reduced. (Stevens Dep. 66:11-67:5, 65:7-

---

[2] Davis now oversees approximately 90 schools with her staff.

[3] The Defendants were good at hiding the truth of what had been occurring in 2014 and
2015, but not perfect.  Thanks to discovery, more was ferreted out later.  Particularly, the
Defendants attack RST Exhibits 9 and 10 in Defendants' SMF, paras. 86-88, but it should be
noted these were attached to a document which was produced, but the attachments were not until
they were requested at depositions in Washington, D.C. at which time Defendants' lawyers
immediately went into the other room and then produced those documents at RST Exhibits 9 and
10.  It was and still is difficult, to get information out of the BIE as to how much the upper level
management grew, and how much field level positions were reduced – facts that should have
been public in the process, and certainly talked about it.

12.)

Defendants purposefully reframed the phrase "attrition and diminishment of Education Line Offices long before ostensible approval by the respective House and Senate Appropriations Committees," into the phrase "assigning agency personnel to temporary assignments," because it apparently fits with the case law cited.  (Defendants' Memorandum, at 37.) This Court has previously examined *Heckler v. Chaney*, 470 U.S. 821 (1985); and *Yankton Sioux Tribe v. U.S. Dep't of Health & Human Services*, 869 F.Supp. 760, 765 (D.S.D.1994).  *Yankton Sioux Tribe v. Kempthorne*, 442 F. Supp. 2d 774, 783 (D.S.D. 2006).

As this Court held, with regard to the consultation policies,  "[a]gency action taken without statutory authorization, or which frustrates the congressional policy which underlies a statute, is invalid."  *Yankton Sioux Tribe v. Kempthorne*, 442 F. Supp. 2d 774, 784 (D.S.D. 2006); citing *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 715 (8th Cir.1979).   The United States Supreme Court, in a 1974 case, is helpful in terms of this issue:

> In the area of Indian affairs, the Executive has long been empowered to promulgate rules and policies, and the power has been given explicitly to the Secretary and his delegates at the BIA. This agency power to make rules that affect substantial individual rights and obligations carries with it the responsibility not only to remain consistent with the governing legislation, *Federal Maritime Comm'n v. Seatrain Lines, Inc.*, 411 U.S. 726, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973); *Dixon v. United States*, 381 U.S. 68, 74, 85 S.Ct. 1301, 1305, 14 L.Ed.2d 223 (1965); *Brannan v. Stark*, 342 U.S. 451, 72 S.Ct. 433, 96 L.Ed. 497 (1952), but also to employ procedures that conform to the law. See *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 764, 89 S.Ct. 1426, 1428, 22 L.Ed.2d 709 (1969)(plurality opinion).

*Morton v. Ruiz*, 415 U.S. 199, 231–32, 94 S. Ct. 1055, 1072–73, 39 L. Ed. 2d 270 (1974), emphasis added.

To essentially diminish by more than one-third (38 percent) its field staff is *not* temporary personnel assignments but rather an abrogation of its statutory trust responsibilities to the Plaintiff tribes and other tribes in the Great Plains.   This reduction occurred long before the December 18, 2015 letter from the House Appropriations Committee telling the BIE to make every effort to avoid restructuring in areas where there is pending legislation (something Roessel blamed, in his deposition, for acts that mostly occurred *before* that letter request from the House Appropriations Committee.)

It is difficult in this instance, because although a regulatory scheme has been imposed upon the Bureau of Indian Education (formerly the Office of Education programs), published in the Code of Federal Regulations at 25 C.F.R. Parts 32 and 33, there are no procedures published in the Bureau of Indian Affairs Manual, pursuant to the requirement of 25 C.F.R. § 33.10..

Citing as statutory authority Pub.L. 95–561 and 25 U.S.C. 2006, the Code of Federal Regulations sets forth:

> The Director, Office of Indian Education Programs shall prepare and promulgate procedures *to govern the provision of support services by the Bureau of Indian Affairs for the education function*. These procedures shall be consistent with existing laws, regulations, Executive Orders, and Departmental policies governing administrative support services. These provisions shall be prepared in consultation with those personnel within the Bureau of Indian Affairs who are responsible to the Commissioner of Indian Affairs for providing support services.

25 C.F.R. § 33.9, emphasis added.   Citing the same statutory authority, the C.F.R. also sets forth

> A Bureau *Agency Superintendent for Education* shall perform those education functions related to elementary and secondary education, early childhood education, peripheral dormitories which have been supervised prior to Pub.L. 95–561, and exceptional education programs as defined in 25 CFR part 32. This section

20

> shall not be construed to remove higher education, adult education
> and/or Johnson–O'Malley programs currently administered at the
> Agency level. Further, the Director under the authority of § 33.4
> will periodically review Area programs such as higher education,
> adult education, and Johnson–O'Malley for consideration to assign
> to Agency level administration.

25 C.F.R. § 33.6, emphasis added. An Agency Superintendent of Education implies it is at the

Agency (reservation) level and not the Area level.

> The Assistant Secretary--Indian Affairs shall implement Bureau of
> Indian Affairs Area Office and Agency Office reorganizations
> required to structure these offices consistent with education
> program activities to be undertaken at those levels.

25 C.F.R. § 33.8.

### 3.    Defendant's Argument Regarding Going Beyond the Administrative Record

Rosebud partitioned the issues in its Memorandum in roughly the same way the Court did

in its Opinion and Order on the Defendants' motion to dismiss.  Although structured in that

manner, Plaintiffs are very aware that the issues of consultation, the Administrative Procedures

Act, the general and statutory trust responsibility, and treaty rights are very much entangled and

overlap with each other.  However the Court parses out its analysis, the Plaintiffs have covered

all of their arguments and connected them in their Memorandum, and regardless of whether

consultation is analyzed separately or under the Administrative Procedures Act, it was inadequate

under and out of compliance with federal law and policy.  Rosebud Sioux Tribe responds more

specifically as follows.

With regard to the issue raised by Defendants suggesting the Court should not look at

matters outside of the Administrative Record, there is case law to the contrary both from the

Supreme Court and the Eighth Circuit Court of Appeals.  The United States Supreme Court has

held that

> the Court has stressed the importance of not simply
> rubber-stamping agency factfinding. [*Universal Camera Corp. v.*
> *NLRB*, 340 U.S. 474,  71 S.Ct. 456, 95 L.Ed. 456 (1951)], at 490,
> 71 S.Ct. 456. The APA requires meaningful review; and its
> enactment meant stricter judicial review of agency fact finding than
> Congress believed some courts had previously conducted. *Id.*

*Dickinson v. Zurko*, 527 U.S. 150, 162, 119 S. Ct. 1816, 1823, 144 L. Ed. 2d 143 (1999).

The Eighth Circuit Court of Appeals has held that "[t]he very narrow exceptions to this

rule 'apply only under extraordinary circumstances' in which a strong showing can be made that

the record is so incomplete as to preclude effective judicial review or that there is clear bad faith

or improper behavior."  *S. Dakota v. U.S. Dep't of Interior*, 423 F.3d 790, 803 (8th Cir. 2005);

citing *Newton Cty. Wildlife Ass'n v. Rogers*, 141 F.3d 803, 807 (8th Cir. 1998).  Plaintiffs believe

that the record was incomplete, as set forth in the summary judgment pleadings, and there is clear

bad faith, particularly by Roessel, who controlled the actual process of consultation quite closely,

even keeping it away from his ADDs.  Plaintiffs had to supplement the record in discovery to

ascertain the entire truth of the adequacy of consultation.

The Administrative Record was prepared in anticipation of litigation by admission of

Jacquelyn Cheek, the Assistant to the BIE Director, and omitted significant communications

from the Rosebud Sioux Tribe which should have been incorporated into the Administrative

Record, particularly the e-mails or other communications which were produced to Defendants

and made a part of the record through the Affidavit of Deborah Bordeaux, Exhibit 6.  (See, also,

Rosebud Sioux Tribe's SMF paras. 71, 74, 89, 106, and 113.)

Assistant to the Director of the Bureau of Indian Education, Jacquelyn Cheek, admitted that she compiled the Administrative Record, that it was for the purpose of this litigation (a fact amplified by the Defendants' attorney raising attorney work product privilege at Cheek's deposition when questions were asked about how the Administrative Record was compiled and what was contained within it.)  (Cheek Dep. 9:15-11:16.)  Cheek also testified that she had compiled everything Don Yu had received.  (Cheek Dep. 12:7-13:7.)  This was not true because her compilation *omitted* a great deal of Rosebud Representative Lunderman's correspondence with Yu, for example, including questions about why Rosebud was not consulted regarding the change of location of the ERC to Kyle on the Pine Ridge Reservation.   (See Bordeaux Affidavit, Exhibit 6.)  These communications contained substantive comments about restructuring and about their opposition and tribal concerns that they were not being properly consulted prior to the final Agency decision, and that Congress was being misled.  (*Id.*)

## CONCLUSION

In their Memorandum, the Defendants cite to a self-serving comment by Roessel at the Loneman Listening Session in April 2014, that "[t]he ELOs were based on an old idea and no longer meet the needs of Indian education and were about compliance and monitoring, not capacity building."  (Defendants' Memorandum, at 7.)  The Defendants then state "[t]he agency's plan move[d] away from compliance and monitoring and focused on . . . the need to provide specific technical assistance to help schools . . . such as reading and math strategies."  (*Id.*)

First, compliance and monitoring by the Division of Performance and Management Accountability ("DPMA"), carried out through Education Line Officers, is *required* by federal law because schools also receive Department of Education funds and must comply with those

granting laws.  Second, and more importantly, that was a relatively small aspect of the educational support and technical assistance provided by Education Line Offices to tribal schools.  (SMF 168, 211, Hamley 115:21-116:20.)  If the BIE wanted to provide technical assistance to help with reading and math strategies, that could have been done more efficiently and with greater face-to-face contact at the Education Line Offices located *on* reservations in the Great Plains.  The two concepts described above are not mutually exclusive, but the way in which it is presented helps to further demonstrate that Defendants had another agenda, were not seeking real solutions and were and still are wrapping justifications around their initiative to and consolidate, "saving money" by shrinking field level positions while growing upper level management, just as they sought to do previously in 2006.  (Defendants' Memorandum, at 7.)

In conclusion, Plaintiff Rosebud Sioux Tribe urges that summary judgment be granted in its favor and against Defendants, and that Defendants' motion for summary judgment be denied.

Dated this 2 day of April, 2018.

/s/Charles Abourezk

Charles Abourezk
Abourezk, Zephier & LaFleur, P.C.
Attorney for Rosebud Sioux Tribe
P.O. Box 9460
Rapid City, South Dakota 57709
(605) 342-0097
Fax (605) 342-5170

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing *Intervenor-Plaintiff Rosebud Sioux Tribe's Brief in Response to Defendant Ryan Zinke, Secretary, et al.'s Motion for Summary Judgment and Reply to Defendants' Opposition to Plaintiff's Motion for Summary Judgment* was served via e-filing, upon the following person(s):

Tracey Zephier
Fredericks, Peebles & Morgan, LLP
520 Kansas City Street, Ste 101
Rapid City, SD 57701

Attorney for Plaintiff Cheyenne River Sioux Tribe

Kevin Snell, Trial Attorney
Daniel Bensing, Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW, Room 6108
Washington, SD 20530

Attorneys for Defendants

this 2nd day of April, 2018.

/s/Charles Abourezk