UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| CHEYENNE RIVER SIOUX TRIBE, ROSEBUD SIOUX TRIBE, </br></br>       Plaintiffs, </br></br>   v. </br></br> RYAN ZINKE, Secretary of Interior, et al., </br></br>       Defendants. | Case No. 3:15-cv-3018-KES |

**PLAINTIFF CHEYENNE RIVER SIOUX TRIBE'S
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**ARGUMENT**

**I.   JOINDER IN ROSEBUD SIOUX TRIBE'S OPPOSITION AND REPLY**

As it did with Intervenor-Plaintiff Rosebud Sioux Tribe's Motion for Summary Judgment, the Cheyenne River Sioux Tribe hereby joins Rosebud Sioux Tribe's Memorandum in Opposition to Defendants' Motion for Summary Judgment and its Reply in Support of its Motion for Summary Judgment ("Opposition and Reply").

Cheyenne River Sioux Tribe desires to increase judicial efficiency by eliminating redundant briefing wherever possible. The facts and the law undergirding Rosebud's Opposition and Reply are substantially similar to the facts and law supporting Cheyenne River Sioux Tribe's Opposition to Defendants' Motion for Summary Judgment and Reply in Support of its Motion for Summary Judgment. Therefore, Plaintiff Cheyenne River Sioux Tribe joins in the arguments and authorities set forth in Intervenor-Plaintiff Rosebud Sioux Tribe's Opposition and Reply.

1

## II. THE COURT MAY EXPAND ITS REVIEW BEYOND THE ADMINISTRATIVE RECORD BECAUSE THERE IS A STRONG SHOWING OF BAD FAITH OR IMPROPER BEHAVIOR AND BECAUSE THE AGENCY'S DISCRETION HAS BEEN STATUTORILY LIMITED

The Defendants incorrectly try to limit this Court's reach by arguing that it cannot look beyond the administrative record to determine whether the Defendants adequately and meaningfully consulted prior to approving and implementing its major restructuring of the BIE. Def. Mem. at 12.  They cite, *inter alia*, *Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759 (8th Cir. 2004), as authority for the argument that this Court must have myopic vision and may only see the administrative record.  Defendants assert that the administrative record in and of itself shows there was "scrupulous consultation efforts" over the course of two years.  Def. Mem. at 15.  They alternatively posit that even if the Court were allowed to look beyond the administrative record, discovery would show that the consultation process was adequate.  Def. Mem. at 19.

While it is true that judicial review under the APA is typically limited to the administrative record that was before the agency when the decision was made, certain exceptions have been carved from that general rule.  *Voyageurs*, 381 F.3d at 766.  A court cannot "blindly defer to an agency decision that is …. unexplained." *Sugule v. Frazier*, 639 F.3d 406, 412 (8th Cir. 2011).  If there is a "strong showing of bad faith or improper behavior" the reviewing court may permit discovery and evidentiary supplementation of the administrative record.  *Voyageurs*, 381 F.3d at 766**.**

Moreover, where Congress has placed statutory conditions or limitations on agency actions, a court may review the agency's compliance with those statutory conditions.

> Typically actions are committed to agency discretion where it is not possible to devise an adequate standard of review for an agency action. *Ngure v. Ashcroft,* 367 F.3d 975, 982 (8th Cir.2004). The judiciary may, however, in certain contexts review an agency's compliance with its

2

> own regulations when the regulations impose binding norms on the agency. *Vitarelli v. Seaton,* 359 U.S. 535, 539–40, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Ngure,* 367 F.3d at 982. "As a general rule, an agency pronouncement is transformed into a binding norm if so intended by the agency [,] and agency intent, in turn, is ascertained by an examination of the statement's language, the context, and any available extrinsic evidence." *Id.* (quoting *Padula v. Webster,* 822 F.2d 97, 100 (D.C.Cir.1987)). Judicial review is appropriate where agency rules were "intended primarily to confer important procedural benefits upon individuals in the face of otherwise unfettered discretion." *783 Am. Farm Lines v. Black Ball Freight Serv.,* 397 U.S. 532, 538–39, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970). When the procedural rule is designed primarily to benefit the agency in carrying out its functions, however, judicial review may be prohibited. *Id.* at 539, 90 S.Ct. 1288.

Yankton Sioux Tribe v. Kempthorne, 442 F. Supp. 2d 774, 782–83 (D.S.D. 2006).

As in *Yankton Sioux Tribe*, this case involves more than a challenge to a routine administrative decision. Here, federal statutes and BIA policies require the BIA to consult with Tribes before making changes in Indian school programs. *See* 25 U.S.C. § 2011(b)(1) & (2); 25 C.F.R. § 32.2(g); 25 C.F.R. § 32.4(a)(1) & (2); and *BIA Consultation Policy.* As in *Yankton Sioux Tribe*, the explicit language of these statutes, regulations, and policies "indicates an intent to confer important procedural benefits upon the tribes in the face of agency discretion and thus the agency action is subject to judicial review." *Id*. at 783. *See also, Yankton Sioux Tribe v. U.S. Dep't of Health Human Services,* 869 F. Supp 760, 765 (D.S.D. 1994) (distinguishing *Lincoln v. Vigil*, 508 U.S. 182 (1993) and stating that where Congress statutorily limits the discretion of an agency, as with compulsory consultation requirements, its actions are judicially reviewable). Therefore, the BIE's decision to restructure is subject to judicial review.

Here, the administrative record is admittedly large. However, quantity does not equal quality. A deeper look at the administrative record reveals that the government's efforts were merely a façade of consultation.

As described in Rosebud Sioux Tribe's brief, critical administrative documents were

3

omitted from the administrative record. Those documents showed the mental processes and intentions of federal officials in devising and implementing the reorganization of BIE. Plaintiffs believe those omissions were intentional and were designed to "hide the ball" from tribes so that tribes would be left in the dark until the restructuring was a fait accompli. .

Failure to adequately and meaningfully consult *is* improper under federal law and policy. As more fully described by Intervenor-Plaintiff Rosebud Sioux Tribe, Plaintiffs have shown that the meetings with tribes in this region were not true consultations as that term is defined by law and by the BIA's own policy. Defendants were simply going thru the motions because they knew their actions would be scrutinized by the tribes in the Dakotas based on the 2006 lawsuit to stop similar illegal restructuring. The discovery process proved the Plaintiffs' hunch that this was a plan that was concocted, explained to tribes, and then implemented without true government-to-government consultation with those who were most affected.

When, as here, there is a strong showing of bad faith or improper behavior in the process of consulting with an Indian tribe as required by federal law, regulations, and agency policy, the Court is free to look at more than what is in the administrative record. Defendants' assertion that the Court should limit its review to the administrative record is misplaced in this case.

### III. PLAINTIFFS WERE NOT MEANINGFULLY AND TIMELY CONSULTED AS REQUIRED BY 25 USC §2011

The Defendants would have this Court believe that the listening sessions, webinars, monthly stakeholder calls, and presentations at national tribal organization conventions where federal officials provided updates to attendees about the design - and later the status - of the restructuring was consultation. Attempts to shoehorn those presentations into the definition of consultation shows how little the federal government actually acknowledges and respects tribal

4

sovereignty and the principles that undergird true, meaningful, adequate government-to-government consultation.

This Court concisely laid out the requirements of meaningful and timely consultation in *Yankton Sioux Tribe*:

> [25 U.S.C.] §2011(b)(1) provides that all actions under the Education Amendments of 1978 shall be done with active consultation with the tribes, in a government-to-government relationship. "Consultation" is defined as "a process involving the open discussion and joint deliberation of all options with respect to potential issues or changes between the Bureau and all interested parties." 25 U.S.C. § 2011(b)(2)(A). Interested parties (including tribes and school officials) shall be given an opportunity:
>> (i) to present issues (including proposals regarding changes in current practices or programs) that will be considered for future action by the Secretary; and
>> (ii) to participate and discuss the options presented, or to present alternatives, with the views and concerns of the interested parties given effect unless the Secretary determines, from information available from or presented by the interested parties during one or more of the discussions and deliberations, that there is a substantial reason for another course of action. 25 U.S.C. § 2011(b)(2)(B).
>
> …
>
> Consultation does not mean merely the right of tribal officials, as members of the general public, to be consulted, or to provide comments, under the Administrative Procedures Act or other Federal law of general applicability. *BIA Consulting Policy.*

*Yankton Sioux Tribe v. Kempthorne*, 442 F. Supp. 2d 774, 783–84 (D.S.D. 2006); *see also, e.g., State of Wyoming, et al., v. United States Department of Interior, et al.,* 136 F.Supp.3d 1317 (D. Wyo. Sept. 30, 2015), *vacated and remanded on other grounds by Wyoming v. Sierra Club*, 2016 WL 3853806 (10th Cir. July 13, 2016) (Order granting preliminary injunction to tribal petitioners because federal government failed to meaningfully consult when "consultation" sessions were more informational and focused more on "discussion" rather than tribal concerns.)

Despite Defendants' contention that the decision to place an Education Program Administrator at Pine Ridge was in response to Plaintiff CRST's consultation-originated request to have more oversight closer to its BIE-operated school, CRST has never made or agreed to such a request. Any statement or insinuation to that effect is simply untrue. (CRST SMF 15) Defendants' citation to their own letter dated July 16, 2015, CRST-003684, as proof that CRST requested and received an Education Program Administrator closer to their reservation is misplaced. A careful reading of that evidentiary submissions does *not* support Defendants' claim that, as proof of Plaintiff's participation in a meaningful consultation process, the Plaintiff asked for (and was granted) an Education Program Administrator to be located at Pine Ridge. The Cheyenne River Sioux Tribe has *never* requested or asked, as part of a consultation or otherwise, that an education office be located on the Pine Ridge Reservation. (CRST SMF 15) Such a claim is completely irrational and without support anywhere in the record.

Nor does the fact that the Plaintiff CRST submitted written requests for additional information about the proposed restructuring constitute meaningful consultation. 25 U.S.C. §2011, BIA Government-to-Government Consultation Policy. To draw the conclusion that the Tribe was meaningfully consulted because it asked for additional information is completely baseless.

> "Consultation" means a process of government-to-government dialogue between the Bureau of Indian Affairs and Indian tribes regarding proposed Federal actions in a manner intended to secure meaningful and timely tribal input. Consultation includes that Indian tribes are:
> 1. to receive timely notification of the formulated or proposed Federal action;
> 2. to be informed of the potential impact on Indian tribes of the formulated or proposed Federal action;
> 3. to be informed of those Federal officials who may make the final decisions with respect to the Federal action;
> 4. to have the input and recommendations of Indian tribes on such proposed action be fully considered by those officials responsible for the final decision; and

> 5. to be advised of the rejection of tribal recommendations on such action from those Federal officials making such decisions and the basis for such rejections.
> *BIA Consultation Policy.*

*Yankton Sioux Tribe*, 442 F. Supp. 2d at 784.

When the administrative record and supplemental evidentiary discovery is culled through it becomes clear that a government-to-government dialogue was not undertaken in a manner intended to secure meaningful and timely tribal input. CRST was not given timely notice of the planned restructuring. Despite numerous requests, to this day the Tribe has not been fully informed of the impact of the restructuring. Any input offered by CRST has either not been acknowledged or has been dismissed by BIE. Never has the BIE notified CRST that its suggestions were rejected, or the basis for such rejection.

Despite stuffing the administrative record with thousands of pages of documents, the fact remains that Defendants did not meaningfully and timely consult CRST about the restructuring of its educational system, a system that is responsible for the lives and futures of hundreds of young members of the Tribe. CRST's substantive concerns were not given effect by the Defendants.

## IV. DEFENDANTS HAVE NOT FULFILLED THEIR TRUST OR TREATY OBLIGATION TO PLAINTIFFS TO PROVIDE EDUCATIONAL SERVICES

Defendants claim that there is no specific trust-mandating statute (and that there is no specific trust-mandate in the 1868 Fort Laramie Treaty), therefore, the federal government owes no trust duty to Plaintiff CRST to provide educational services. At best this response ignores and misconstrues CRST's claim in this case; at worst it shows the government's intention to "get out of the business of running schools" with impunity. Roessel Dep. 40:12-41:1, 41:25-42:4.

Defendants conveniently overlook, however, that both Plaintiffs raised several statutory

provisions, as well as the 1868 Fort Laramie Treaty, in their claim of breach of trust and treaty obligations, from which statutory trust obligations arise.  Plaintiffs claim that Defendants breached their trust duty as mandated, inter alia, by each of these statutes:

- 25 U.S.C. §2006(d) – Defendants must provide all services and support functions for education programs with respect to personnel matters involving staffing actions and functions; and provide technical and coordinating assistance in areas such as procurement, contracting, budgeting, personnel, curriculum, and operation and maintenance of school facilities
- 25 U.S.C. §2009(c) – Defendants have an obligation to consult with tribal governing bodies and tribal school boards to conduct studies, surveys, or other activities to gather demographic information on Bureau-funded schools and project the amount necessary to provide Indian students with educational services, and to provide tribes with a report that contains projections of amounts necessary to provide Indian students in Bureau-funded schools with education services. The Defendants must also describe the methods and formulas used to calculate such numbers.
- 25 U.S.C. §2010 – Defendants must consult with the local school board in developing a financial plan for the school.
- 25 U.S.C. §2015 – Defendants must submit an annual report to tribal governing bodies of schools that details the state of education and suggestions for improvements.

Additionally, as described in previous pleadings in this case, as understood by CRST, the federal government promised in the 1868 Treaty of Fort Laramie that in exchange for allowing the undisturbed passage of non-Indians through Lakota Territory, Defendants would maintain an

office at Cheyenne River Agency that would be responsible for the provision of education services for members of the Tribe.  Although Defendants attempt to parse out the Treaty into separate and independent provisions cut off from any sense of history or context, caselaw is clear that the Indian law canons of construction require that the treaty "be construed liberally in favor of the Indians with ambiguous provision interpreted for their benefit," *County of Oneida v. Oneida* Indian Nation, 470 U.S. 226, 247 (1985), and that a reviewing court is to "look beyond the written words to the larger context that frames the Treaty, including 'the history of the treaty, the negotiations, and the practical construction adopted by the parties.'" *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 196 (1999).

Article VII of the 1868 Treaty of Fort Laramie has been interpreted to mean that the education of children of the Great Sioux Nation is a treaty right.  *See, Quick Bear v. Leupp*, 210 U.S. 50 (1908).  Under the reorganization, the federal government has unilaterally abrogated that treaty right by closing the Education Line Office on the Cheyenne River Sioux Reservation. CRST SMF 7.  The only BIE employees left at Cheyenne River are maintenance and facility workers for the BIE-operated school.  They cannot and do not perform any of the duties formerly provided by the Education Line Office. CRST SMF 8.

Taken together, since both articles arise out of the same treaty, the record shows that there is clear statutory and treaty authority establishing Defendants' obligation to (1) meaningfully consult with Plaintiffs, (2) provide budgetary and staffing information prior to undertaking any sort of agency action that would affect Plaintiffs, and (3) maintain a local office on the reservations with sufficient funding and authority to oversee the provision of educational services to children of the Tribe.  Despite their best efforts to "get out of the education business", Defendants must be held to honor and discharge their trust and treaty obligations.

## CONCLUSION

For the reasons set forth herein, the Tribe respectfully asks this Court to grant the Plaintiffs' Motions for Summary Judgment and deny the Defendants' motion for the same relief.

Dated: April 2, 2018

                Respectfully submitted,

                  /s/ Tracey A. Zephier_____
                TRACEY A. ZEPHIER
                FREDERICKS, PEEBLES, & MORGAN, LLP
                520 Kansas City Street, Suite 101
                Rapid City, SD 57701
                Ph:  (605) 791-1515
                Fax: (605) 791-1915
                Email: tzephier@ndnlaw.com
                Attorney for Plaintiff CRST

## WORD COUNT CERTIFICATE

I certify that the foregoing memorandum, Cheyenne River Sioux Tribe's Memorandum in Opposition to Defendants' Motion for Summary Judgment and Reply in Support of its Motion for Summary Judgment complies with the type volume limitation of Local Rule 7.l (B)(l ).

According to the word count of the word processing system used to prepare the brief, the brief contains 2,685 words, excluding the cover page, tables, signature block and this certificate.

                                                                            /s/ Tracey A. Zephier_____

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing Plaintiff Cheyenne River Sioux Tribe's Opposition to Defendants' Motion for Summary Judgment and Reply in Support of Its Motion for Summary Judgment was served via e-filing, upon the following person(s):

Charles Abourezk
PO Box 9460
2020 W. Omaha Street
Rapid City, SD 57709-9460
cabourezk@azlaw.pro

Attorney for Rosebud Sioux Tribe


Kevin Snell, Trial Attorney
Daniel Bensing, Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW, Room 6108
Washington, SD 20530
Kevin.Snell@usdoj.gov

Attorneys for Defendants


This 2nd day of April, 2018.


          /s/ Tracey A. Zephier
TRACEY A. ZEPHIER
FREDERICKS, PEEBLES, & MORGAN, LLP
520 Kansas City Street, Suite 101
Rapid City, SD 57701
Ph: (605) 791-1515
Fax: (605) 791-1915
Email: tzephier@ndnlaw.com
Attorney for Plaintiff CRST