UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | |
|---|---|
| CHEYENNE RIVER SIOUX TRIBE, | Case: 3:15-cv-03018-KES |
| Plaintiff, | |
| ROSEBUD SIOUX TRIBE, | |
| Intervenor-Plaintiff, | |
| v. | |
| RYAN ZINKE, Secretary, United States Department of Interior, et al., | |
| Defendants. | |

**DEFENDANTS' REPLY MEMORANDUM**
**IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

The Bureau of Indian Education's ("BIE") schools are some of the lowest performing schools in the country.  CRST-001903 (Final Findings and Recommendations Prepared by Study Group) (hereafter, "*Blueprint for Reform*").  Facing an urgent need for reform, and after consulting with tribes across Indian country over the course of approximately two years, Defendants submitted a restructuring proposal to Congress designed to strengthen the agency's ability to provide greater oversight of, and improve service delivery to, its schools.  CRST-003808.  But Plaintiffs Cheyenne River Sioux Tribe ("CRST") and Rosebud Sioux Tribe ("RST") opposed this proposal because they would not retain education line offices ("ELOs") on their reservations, and they subsequently brought this lawsuit.  Even though Congress approved the proposal more than two years ago, and even though the reorganization has made a difference in "getting more services to schools" and has produced an "increase[] over the last two years" in test scores, Roessel Dep. 240:13-18, Defendants have been unable to implement the reorganization in the Dakotas because Congress directed Defendants to make "every effort . . . not to proceed with components of the reorganization at the field office level that may be directly impacted by pending litigation."  CRST-004116 (House Committee Approval).

With discovery now closed and summary judgment fully briefed, it is clear that this Court should enter judgment in favor of Defendants.  Plaintiffs' consultation claim, which Plaintiffs now appear to concede is a claim under the Administrative Procedure Act ("APA"), is meritless; the administrative record establishes a thorough and open consultation process with tribes and Plaintiffs fail to identify a single specific aspect of the proposed restructuring that they raised with BIE that went unaddressed during that process.  They instead try to distract from Defendants' extensive outreach, first by raising a new legal theory not found in their initial briefs

that attacks the substance of the reorganization rather than the consultation that occurred.  That argument fails, as do their attempts to isolate individual aspects of the consultation process that they claim were inadequate.

Plaintiffs' remaining claims fare no better.  Their argument that Defendants violated APA by not fully staffing ELOs "to prepare budgetary space" for the restructuring, Comb. Resp. Defs.' Mot. Summ. J. & Reply RST's Mot. Summ. J., ECF No. 98 ("RST Reply") at 17, is not an actionable APA claim—a point that Plaintiffs do not meaningfully address in their replies—and is any event not supported by evidence.  As for their breach of trust claim, Plaintiffs entirely ignore that they have not identified a corpus upon which such a claim would be based, and they likewise continue to fail to show any actionable trust duty that Defendants purportedly failed to perform.  And although Defendants previously explained how Plaintiffs' argument concerning the Fort Laramie Treaty of 1868 enjoys no support in that treaty's text, Plaintiffs tellingly decline to recite *any* text from that treaty that supports their interpretation, or otherwise explain why the text is not as plain as it appears.

Plaintiffs have had every opportunity to prove their case, including taking extensive discovery on what they now apparently concede is an APA claim without first establishing an exception to record review.  But all of that evidence has failed to demonstrate a meritorious claim.  Accordingly, judgment should be entered in favor of Defendants.

## ARGUMENT

## I.      The Consultation Process Was Deliberate, Thorough and Led to Meaningful and Timely Tribal Input, Including From the Plaintiffs

Defendants previously explained that Plaintiffs' consultation arguments are in fact claims under the APA, Defs.' Comb. Mem. Supp. Defs.' Mot. Summ. J. & Opp. Pls.' Mot. Summ. J., ECF Nos. 90 & 94 ("Defs.' Mem.") at 12-14, a point that Plaintiffs decline to dispute in their

replies.  And Plaintiffs largely ignore Defendants' scrupulous consultation efforts that occurred at each stage of the reorganization's development and well in advance of implementing the challenged restructuring.  *See* Defs.' Mem. at 14-34.  Instead, they cherry-pick testimony and aspects of the reorganization to argue that BIE's proposal is substantively flawed, and once again argue that the agency ignored certain views in drafting that proposal.  RST Reply at 6-11. Indeed, Plaintiffs try to focus on just one consultation meeting that they attended and one consultation document that Defendants drafted.  *Id.* at 11-15.  Plaintiffs' arguments are misguided, and they cannot obscure Defendants' extensive outreach that made the reorganization process open, transparent, deliberate, inclusive, and responsive at each step along the way.

### A.  Plaintiffs Do Not Dispute that Their Consultation Claim is an APA Claim

Defendants previously explained how Plaintiffs' consultation claim is an APA claim and should be reviewed as such, Defs.' Mem at 12-14, and Plaintiffs do not dispute this point.  *See* RST Reply at 5; CRST Comb. Oppn. Defs.' Mot. Summ. J. & Reply Supp. CRST's Mot. Summ. J., ECF No. 102 ("CRST Reply") at 2-4.  Thus, there is no dispute that this claim should be "reviewed, not tried" and that the "general standard set forth in Rule 56 does not apply."  Defs.' Mem. at 14 (quoting *Bettor Racing, Inc. v. Nat'l Indian Gaming Comm'n*, 47 F. Supp. 3d 912, 918 (D.S.D. 2014)).  Instead, Plaintiffs focus on trying to escape the "well-established" rule for APA claims that limits judicial review to the administrative record, *Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 766 (8th Cir. 2004), arguing that this case meets two "limited exceptions" that would allow this Court to consider extra-record evidence: 1) bad faith and 2) an incomplete administrative record that precludes judicial review.  RST Reply at 22; CRST Reply at 2.  Both arguments fail.

First, Plaintiffs state that "there is clear bad faith, particularly by Roessel, who controlled the actual process of consultation quite closely, even keeping it away from his [Associate Deputy Directors]." RST Reply at 22. But Plaintiffs merely state a conclusion without any citations to the record, and thus cannot establish a "strong showing" of bad faith. *Maxey v. Kadrovach*, 890 F.2d 73, 77 (8th Cir. 1989). Assuming this assertion is in reference to the allegations of bias and secrecy that Plaintiffs previously leveled against Mr. Roessel, *see* CRST Reply at 4 (alleging without citations of efforts to "hide the ball"), Defendants already explained how such accusations lack merit, Defs.' Mem. at 19-20, 33-34—an explanation that Plaintiffs decline to address in their replies.

Indeed, the evidence shows that "because of [*Yankton Sioux Tribe v. Kempthorne*, 442 F. Supp. 2d 774 (D.S.D. 2006)] and the result of that case," the agency knew it "needed to be sure [to do] the consultations by the book." Yu Dep. 187:16-19. *Eight* of the twelve one-on-one consultations BIE held in the winter of 2015 were with Dakota tribes. CRST-003518-CRST-003519 (Tribal Consultation Report). And Director Roessel explained to those tribes at the April 2015 consultation that the *Yankton Sioux* settlement agreement is "the reason why I've gone out and met individually with many of the tribes around this table," as the agency tried to have "deeper level and a deeper consultation than what is actually recommended in the consultation policy of Interior" by having individual meetings "[a]s opposed to having one big meeting." CRST-002464:39:6-15. And Plaintiffs' criticism that the BIE Director did not adequately involve his Associate Deputy Directors ("ADDs") is evidence of nothing more than a personnel decision, rather than bad faith. *See* Defs.' Mem. at 20-21 (discussing qualifications of Study Group); *infra* Part I.B (discussing how BIE and Study Group worked with tribes and stakeholders).

4

Plaintiffs' remaining efforts to invoke this exception are likewise without merit.  Their vague assertion that Don Yu "admits he had political goals in this 'restructuring'" is once again unsupported by any cited evidence.  RST Reply at 15.  It is true that Mr. Yu testified that he understood an "urgency of reform," Yu Dep. 110:15-111:11, but that urgency was well-founded: "kids only get one chance in education," Yu Dep. 111:1-2.  As Director Roessel explained, "[t]here was pressure from schools," "[t]he schools wanted something done," and "[t]he tribes wanted something done."  Roessel Dep. 29:9-11.  Further, Mr. Yu made clear that any urgency did not displace the need for adequate consultation.  Yu Dep. 111:10-11.  And although Plaintiffs apparently think they can show bad faith by arguing that they should win on the merits of the consultation claim, *see* CRST Reply at 2-4, that is plainly incorrect and not the type of "extraordinary circumstance" needed to allow to discovery for an APA claim.  *See Tafas v. Dudas*, 530 F. Supp. 2d 786, 798 (E.D. Va. 2008) ("Importantly, disagreement with an agency's ultimate decision, or with its interpretation of the factual materials before it, is not bad faith.").  To hold otherwise would open up to discovery *any* APA claim that survives a motion to dismiss.

Second, Plaintiffs believe that "the record is so incomplete as to preclude effective judicial review," pointing to email exchanges between Mr. Yu and Mr. Lunderman of RST that are not included in the administrative record.  RST Reply at 22.  But the omission of those emails from an "admittedly large" record, CRST Reply at 3, that spans more than 4000 pages is no reason to ignore basic APA principles and consider the discovery taken in this matter.  *See Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 338 (D.C. Cir. 1989) (explaining that a record "allow[s] for meaningful judicial review" if it "delineates the path by which [the agency] reached its decision"); *Farley v. Perry*, No. Civ. A. No. 94-0794-LFO, 1994 WL 413316, at *4 n.1 (D.D.C. July 20, 1994) (finding other portions of record along with accounts in party's pleadings "adequately fill in the gaps of information left by the missing pages" in administrative record).

5

At most it would demonstrate a need to supplement the record with those emails, rather than demonstrating a need to consider any and all evidence produced in discovery.

Plaintiffs are unable to show an "extraordinary circumstance" warranting consideration of extra-record evidence, and this Court should therefore reject their request to evade the ordinary standards of the APA

### B. Defendants Created a Consultation Process That Led to an Open Dialogue with Tribes and Secured Their Meaningful and Timely Input

#### 1. The Administrative Record Shows Defendants' Scrupulous Consultation Efforts Over the Course of Approximately Two Years

Plaintiffs try to ignore the fact that the administrative record shows Defendants' thorough consultation efforts at each stage of the reorganization's development. *See* Defs.' Mem. at 14-19. The Study Group "combine[d] management, legal, education, and *tribal expertise*," that helped to ensure the group's recommendations were grounded in a correct understanding of American Indian affairs, school operations, teaching, and learning. CRST-00572 (draft *Blueprint*) (emphasis added); *see also* Defs.' Mem. at 20-21. Before developing any proposed reorganization, the Study Group held "extensive listening sessions in fall 2013 with tribal leaders, educators, and community members across Indian Country," and wrote a draft *Blueprint* based on those meetings and "analysis of a wide range of primary and secondary data." CRST-001830. That draft report became the subject of four tribal consultation sessions in April and May 2014, CRST-000540-CRST-000541 (Federal Register Notice); CRST-000571 (draft *Blueprint*); CRST-001132:254:14-CRST-001133:255:13 (explaining how draft report was released for April 2014 consultation); CRST-000894:16:22-25 (Mr. Yu explaining at Loneman consultation that "All of the feedback that we received during those listening sessions came together in the presentation that you're about to see and also this draft report. Almost all of these ideas are your ideas."); CRST Compl. ¶ 39, ECF No. 1 (acknowledging release of draft on April

17, 2014); RST Compl. ¶ 34, ECF No. 48-1 (same), and significant revisions were made as a result of consultation.  For example, the revised *Blueprint* included a new pillar of reform: promoting educational self-determination for tribal nationals.  CRST-001831; *see also* CRST-001855-CRST-001880 (*Blueprint* appendices A & B listing tribal participants from the listening sessions and consultations along with illustrative comments Study Group heard).  Secretarial Order 3334 was based on the Study Group's recommendations and directed changes to the BIE organization.  CRST-001896-CRST-001898

Then, over the course of approximately one more year, Defendants devised how to implement those changes in consultation with stakeholders.  This included visits to each Plaintiff's reservation in February and March 2015 (and six other visits to the Dakotas to meet with tribes), CRST-003517-CRST-003519 (Tribal Consultation Report), as well as six more formal consultations in spring 2015, including one in Rapid City that Plaintiffs attended. CRST-002349 (Federal Register Notice); CRST-002581-CRST-002584 (Sign-in Sheet); CRST-003518 (Tribal Consultation Report).  Aside from the formal consultations, BIE kept tribes engaged through activities such as monthly stakeholder calls, CRST-002403 (Notice of Stakeholder Call), and webinars, CRST-003855-CRST-003870.

And this process led to a number of changes in the agency's redesign of its administrative structure, and specific changes trace back to input from the Dakotas.  The idea to have ADDs assigned by function (i.e., tribally controlled and BIE-operated) came from the Dakotas, CRST-001133:255:15-19 (Loneman Consultation Transcript), and although RST indicated that the Great Sioux Nation wanted its own ADD and BIE informed the tribes that it would welcome such a plan, the agency did not receive one.  CRST-003524 (Tribal Consultation Report). Moreover, the BIE specifically took into account and incorporated CRST's request for oversight

closer to BIE-operated schools, and accommodated that request by locating an Education

Program Administrator at Pine Ridge to oversee Flandreau, Cheyenne Eagle Butte, and Pine

Ridge.  *See* CRST-003684 (Interior Letter to CRST).  Also in response to concerns expressed

during the consultation process, BIE modified its proposal to locate an education resource center

("ERC") in Rapid City by shifting the location to Kyle. *See* CRST-003517 (Tribal Consultation

Report).  *See* Defs.' Mem. at 24.

      The Court's review should be limited to the administrative record, *see supra* Part I.A.,

and that record reveals no doubt that BIE's consultation efforts were rational.  *See Bettor Racing,*

*Inc.*, 47 F. Supp. 3d at 919 ("If the agency's decision is supportable on any rational basis, it must

be upheld.") (internal quotation marks omitted); *see also* Defs.' Mem. at 14-19.  But even if this

Court's expanded its review to all evidence taken in this action, the discovery taken has

reinforced the adequacy of consultation here, Defs.' Mem. at 19-34, and, as discussed in detail

below, Plaintiffs' replies do not disturb that conclusion.

### 2.   This Court Should Reject Plaintiffs' Attempt to Introduce a New, Meritless APA Claim at This Juncture of the Litigation

      Faced with the overwhelming record evidence of Defendants' consultation efforts,

Plaintiffs try to transform their consultation claim into a substantive attack on the merits of the

reorganization, arguing that Defendants cannot show a "rational connection between the facts

found and the choice made" because "there was no empirical research or data" showing "the

alleged problems in Indian education . . . would be addressed by *this* restructuring plan," and

because "[p]romoting tribal self-determination" was unnecessary in light of existing authorities

already allowed tribes to take control of their educational institutions.  RST Reply at 6-7

(emphasis in  original).  That claim, however, was not developed in Plaintiffs' complaints, *see*

*Cheyenne River Sioux Tribe v. Jewell*, 205 F. Supp. 3d 1052, 1060 (D.S.D. 2016) (analyzing

CRST's APA claim as consultation claim), or in their initial summary judgment briefs. Thus, they cannot introduce this claim on summary judgment after the close of discovery and after their initial brief has been filed. *See S. Dakota Min. Ass'n, Inc. v. Lawrence Cty.*, 155 F.3d 1005, 1011 (8th Cir. 1998); *Black Hills Truck & Trailer, Inc. v. MAC Trailer Mfg., Inc.*, No. 13-CV-4113 (KES), 2017 WL 4236546, at *10 (D.S.D. Sept. 22, 2017).

In any event, even if the claim had been asserted in a timely fashion, the record shows that the reorganization is designed to strengthen Indian education and is research-based. Although Plaintiffs argue that no "empirical research or data" supports this plan, Plaintiffs point to no legal requirement mandating such data. Moreover, the Study Group—whose collective expertise was in school reform—sought to diagnose the educational challenges in BIE-funded schools and recommend strategies for reform to ensure that all students attending BIE-funded schools receive a world-class education. CRST-000571 (Draft *Blueprint*); CRST-002441 (2015 Reorganization Tribal Consultation Booklet). They did that by meeting with and hearing the concerns of hundreds of stakeholders, and BIE similarly developed the specifics to carry out those recommendations through consulting over the course of approximately one more year. *See supra* Part B.1.; *infra* Parts B.3-B.4; Defs.' Mem. at 14-34. Thus, the suggestion that the restructuring is not tethered to the needs of BIE schools is simply incorrect.

Plaintiffs apparently single out ERCs as allegedly being unsupported by empirical research or data. RST Reply at 7 (citing *inter alia* RST Stmt. Mat. Fact, ECF No. 78 ("SMF") ¶ 176).[1] But even if the agency were somehow prohibited by the law from exploring new or

---

[1] Plaintiffs' other citation in support of their argument is to RST SMF ¶ 167, which cites deposition testimony from Mr. Roessel, Mr. Hamley, and Ms. Davis. The citation to Mr. Roessel's testimony is misleading; he explains that the reform efforts were connected with research; just that "we did not have an opportunity" to compile "empirical research or data" "prov[ing] a direct link between their restructuring proposals . . . and the actual improvement of

innovative educational approaches, the record shows that ERCs are "research-based;" "what states are utilizing;" and have "shown to be effective," CRST-002482:113:8-12, CRST-002485:122:1-16 (Rapid City Consultation Transcript), and good reason existed to move away from ELOs, *see infra* Part I.B.3; CRST-000917:39:7-7-11 (Loneman School Consultation Transcript); CRST-001312:136:19-25 (Riverside Indian School Consultation Transcript); CRST-001396 (Muckleshoot School Consultation Transcript); CRST-002502:192:1-13 (Rapid City Consultation Transcript).  Indeed, ERCs have been opened outside of the Plains, and have made a difference in "getting more services to schools" and test scores reflect an "increase [] over the last two years."  Roessel Dep. 240:13-18; *see also* Yu Dep. 160:21-162:17 ("other school systems that were rapidly improving took steps like" utilizing "school support teams" and working with school districts as "partners" that the restructuring seeks to do).

Equally meritless is Plaintiffs' assertion that it "makes no rational sense" for the reorganization to "[p]romot[e] Indian self-determination" because tribes already had the authority to assume operation of their schools.  RST Reply at 7.  There is nothing irrational about the agency seeking to "[s]trengthen and support the efforts of tribal Nations to directly operate BIE-funded schools," such as by providing additional funding for grant support costs,  CRST-001846-CRST-001847 (*Blueprint*), or offering resources for "smaller tribes that have just one school" that may not know how to exercise sovereignty in education, Roessel Dep. 63:20-65:9.  Although Plaintiffs accuse Defendants of "superficial[ly]" using "self-determination" "to sell"

---

student scores."  Roessel Dep. 81:15-82:11.  And Plaintiffs have failed to establish that Mr. Hamley and Ms. Davis have personal knowledge to testify on this matter.  Those witnesses testified only that they had not "seen or been told about any empirical research or data showing" the effectiveness of the restructuring.  Hamley Dep. 129:2-9; Davis Dep. 36:17-22 (similar). Plaintiffs have not shown that such information would have been provided to them.  *See* RST Reply at 22.  *See also* Defs.' Resp. Stmt. Mat. Fact, ECF No. 89 ¶¶ 167, 176.

the restructuring plan to "skeptical Indian tribes and Congress," RST Reply at 7-8, they lack any evidence for this baseless contention. *See* Defs.' Mem. at 34 n.15 (highlighting lack of evidence for similar accusations by Plaintiffs).

Thus, a rational connection exists between Defendants' consultation efforts and the decision to restructure, as well as between the challenges facing Indian educations and the proposed reorganization. Consequently, even if Plaintiffs' new APA arguments were procedurally proper, they should nonetheless be rejected.

### 3. The BIE Understood and Addressed Plaintiffs' Concerns During the Consultation Process

Returning to their original consultation claim, Plaintiffs' central argument on the merits is that they are entitled to summary judgment because their views were not "given effect" and that the Secretary of Interior lacked a "substantial reason for another course of action," in violation of 25 U.S.C. § 2011(b)(2)(B). RST Reply at 9-10. Although Plaintiffs repeatedly state that they presented "alternatives," RST Reply at 3, 8, 11, or their "views" were ignored, *id.* at 8, 9, 11 15, the only specific instances identified in their replies are requests for increased funding, *id.* at 9, and the retention of fully-staffed ELOs on their reservations, RST Reply at 11, 12, 24. These were the same two specific "alternatives" that Plaintiffs described in their opening memoranda, which Defendants have already shown were addressed by BIE. Defs' Mem. at 24-27. These points continue to *reinforce*, rather than *undermine*, the adequacy of consultation.

Although Plaintiffs initially accused Defendants of ignoring calls to increase funding for schools, RST Mem. Supp. Summ. J. ECF No. 77 ("RST Mem.") at 16-17, Plaintiffs do not dispute that BIE increased funding by tens of millions of dollars in response to tribal concerns,

*see* RST Reply at 9 n.1; Dearman Decl. ¶ 16, ECF Nos. 91 & 96.[2]  But they dismiss these

increases as not giving effect to the "views of the tribes where they mattered most."  RST Reply

at 9.  Although such funding increases may not have "mattered most" to Plaintiffs, it certainly

mattered to others.  After all, it is "pretty hard to run a school if you're only get[ting]" a fraction

of the budget you need, and BIE heard from "tribal leaders many times" that operating costs for

grant schools were underfunded.  Yu Dep. 258:11-22.  And as Mr. Yu explained, BIE's efforts in

addressing these funding concerns by obtaining a substantial increase in appropriations was a

central component of the restructuring because BIE was "making the pie bigger."  Yu. Dep.

197:12; *see also, e.g.*, 2015 Greenbook, IA-BIE-1, *available at*

https://www.bia.gov/sites/bia.gov/files/assets/as-ia/ocfo/ocfo/pdf/idc1-025942.pdf (showing

request for an additional approximately $40 million from FY 2013 to FY 2015 for BIE); *accord*

Bordeaux II Dep. 59:22-61:4 & Ex. 25.[3]

Plaintiffs next argue that Defendants did not "give effect" to their concerns about losing

ELOs under the reorganization.  *See* RST Reply at 8-9.  However, after hearing concerns about

the proposal to "close or relocate several ERCs" and that tribes "would lose services," BIE

---

[2] Mr. Dearman's declaration indicates that tribally controlled schools are receiving 100% of their formula-based calculated need amount due to funding increases.  Dearman Decl. ¶ 16.  Defendants clarify that while they have increased funding by tens of millions of dollars in an attempt to fully fund grant support costs, different variables have prevented funding from reaching that level, such as tribes assuming control over more schools and increases in program funding requirements.  BIE has sought to increase funds for grant support costs on an annual basis in an attempt to keep pace with these variables.

[3] Plaintiffs also state that "Donald Yu admitted in his deposition that 8 of 10 projects funded in the past year . . . were given to schools in the Southwest of the United States, and no school construction projects were granted in the Great Plains."  RST Reply at 9 (citing Yu Dep. 272:7-275:3).  But Mr. Yu actually testified that he "think[s] [he] remember[s] most of that funding going to the Southwest," and that any suggestion of bias was unwarranted, as BIE employed a "numbers-based" process; "[i]t was insert these numbers, and this is the list that came out."  Yu Dep. 272:7-275:7.

amended its proposed field structure to move an ERC from Rapid City to Kyle and added an

Education Program Administrator Position stationed in South Dakota.  *See* CRST-003516-

CRST-003517 (Tribal Consultation Report); CRST-002460:24:11-13, CRST-002501:187:6-23,

CRST-002502:192:24-193:11 (Rapid City Consultation Transcript); CRST-003684 (Interior

Letter to CRST).  Of course the reorganization does not call for ELOs on Plaintiffs' reservation

for the very reason that the agency determined that the ERC structure was appropriate.  But

Plaintiffs conflate result and process in suggesting that this is proof that consultation was

inadequate.  Plaintiffs do not—and cannot—dispute that the agency adequately explained the

ELO to ERC transition to them.  Defs.' Mem. at 26-27.  Indeed, Plaintiffs ignore the one-on-one

meetings they had with BIE in February and March 2015 where the agency answered any

questions they had.  Bordeaux Dep. Vol. II at 21:6-8, 11-12, Frazier Dep. 46:10, 48:3.

Additionally, at the April 2015 consultation, BIE explained how ERCs are: "research-based;"

"what states are utilizing;" "shown to be effective;" "based on the funding [BIE] ha[d]" in light

of management funds being slashed by approximately $5 million; able to consolidate entirely

similar functions that were previously "spread out throughout the Bureau and even outside the

Bureau;" reflect how the government should continue to perform inherent government functions

in light of four Plains tribes taking control of their own line offices; and staffed with mobile

school improvement teams that are able to help ensure schools have adequate resources and

support.  CRST-002464:39:15-40:16; CRST-002482:113:8-12; CRST-002485:122:1-16; CRST-

002466:48:1-25; CRST-002502:191-5-192:22 (Rapid City Consultation Transcript); CRST-

002443 (Tribal Consultation Booklet).

     Plaintiffs' inability to dispute that that the agency explained the transition of ELOs to

ERCs as part of the consultation process underscores that Plaintiffs are, in fact, attempting to use

the consultation process and this litigation as a de facto veto of the BIE's proposal. Plaintiffs try to distance themselves from this position—claiming that they are not "generally" taking this position "in this case," RST Reply at 10—but the facts reveal the opposite. CRST's Chairman indisputably testified that consultation is the equivalent of a tribal veto, Frazier Dep. 19:17-20. RST Reply at 10. And RST's witness, who the Tribe designated pursuant to Federal Rule of Civil Procedure 30(b)(6) to testify on its behalf regarding its legal claims, testified the same. Bordeaux Dep. Vol. I 18:1-7. The inescapable conclusion is that Plaintiffs "were heard, even though their advice was not accepted. No violation of the Administrative Procedure Act has been shown." *Hoopa Valley Tribe v. Christie*, 812 F.2d 1097, 1103 (9th Cir. 1986).

### 4. Plaintiffs Cannot Unilaterally Dictate Which Aspects of the Consultation Process Matter for Purposes of this Lawsuit

Unable to show that they were ignored, Plaintiffs invite the Court to overlook the extensive, approximately two-year history of the consultation process and instead focus on only a couple of specific interactions between the agency and stakeholders. First, they assert that that Defendants "only held *four* formal consultations within two months," apparently insisting that the Court should only give weight to the April 2015 consultation that they attended, and accusing Defendants of "attempt[ing] to confuse" "consultation[s]" "[l]istening [s]ession[s]," and "a few visits." RST Reply at 13-14 (emphasis in original); *see also* CRST Reply at 4-5. And second, Plaintiffs ignore all other dialogue they had with BIE during the consultation process by focusing on the BIE's Tribal Consultation Report, CRST-003515, which they claim is inadequate. RST Reply at 11-13. Both arguments fail.

### a. Plaintiffs Ignore the Approximately Two Year Consultation Process by Focusing on One Consultation

Plaintiffs apparently believe that the only consultation they attended was the April 2015 meeting in Rapid City. RST Reply at 14, CRST Reply at 4-5. Even if it were proper to focus

solely on that meeting, Plaintiffs have not meaningfully responded to Defendants' arguments, which demonstrated that the meeting was legally adequate. Defs.' Mem. at 29-31. Although they vaguely reference a need for "budgetary and staffing information," *see* CRST Reply at 9, they fail to identify what specific requests went unaddressed at the meeting. *See* Defs.' Mem. at 28-32 (demonstrating that BIE sought to inform Plaintiffs of particulars of proposed reorganization and Plaintiffs had not shown otherwise). Plaintiffs "may not merely point to unsupported self-serving allegations, but must substantiate [their] allegations with sufficient probative evidence that would permit a finding in [their] favor." *Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 790-91 (8th Cir. 2009). Plaintiffs have failed to substantiate their claims that the April 2015 consultation was inadequate.

But in any event, this Court is not limited to just assessing that single meeting in deciding whether the consultation process constituted a violation of the APA. As this Court has already recognized—and Plaintiffs fail to confront—"'consultation' means a *process* involving the open discussion and joint deliberation" with stakeholders, *Cheyenne River Sioux Tribe v. Jewell*, 205 F. Supp. 3d 1052, 1057 (D.S.D. 2016) (emphasis added); Defs.' Mem. at 11-12. Indeed, Plaintiffs themselves acknowledge that "the heart of the consultation issue" is whether 25 U.S.C. § 2011 and the BIA's consultation policies were followed, RST Reply at 6,[4] and it is those very

---

[4] Plaintiffs mention Interior's consultation policy, RST Rely at 6, an apparent reference to Secretarial Order No. 3317, which they identified in their opening summary judgment brief, *see* RST Mem. at 6-7. That order was not identified in their Complaint as a basis for their claim, and they should not be able to allege violations of that order now. *N. States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1057 (8th Cir. 2004) ("[W]hile we recognize that the pleading requirements under the Federal Rules are relatively permissive, they do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment."); *see also Morgan Distrib. Co. v. Unidynamic Corp.*, 868 F.2d 992, 995 (8th Cir. 1989). But in any event, Defendants previously explained that the order likewise explains that "[c]onsultation is a process," and Plaintiffs' arguments with respect to that order do not differ in any way from their arguments regarding § 2011 and BIA's policy. *See* Defs.' Mem

15

sources that define consultation as a "process."  25 U.S.C. § 2011(b)(2)(A); BIA Consultation

Policy at 1.  And to focus on only a single meeting while ignoring the extent of agency's

outreach with tribes would contravene "[t]he goal of this policy:" to have "dialogue" in order to

"secure meaningful and timely tribal input."  *Cheyenne River Sioux Tribe*, 205 F. Supp. 3d at

1057 (internal quotation marks omitted).

Here, the record confirms that Defendants' extensive efforts sought to *enhance* that

dialogue beyond what just one meeting would offer.  For example, Director Roessel explained

that the "the reason why I've gone out and met individually with many of the tribes" was that the

agency tried to have "deeper level and a deeper consultation than what is actually recommended

in the consultation policy of Interior" by having individual meetings "[a]s opposed to having one

big meeting."  *See* CRST-002464:39:6-15 (Rapid City Consultation Transcript).

And the record further confirms that this dialogue led to meaningful and timely tribal

input, including well before the April 2015 consultation.  The *Blueprint* was "[b]ased on

extensive listening sessions in fall 2013 with tribal leaders, educators, and community members

across Indian Country, and analysis of a wide range of primary and secondary data," CRST-

001830 (*Blueprint*); *see also* Yu Dep. 118:13 ("significant revisions" made to *Blueprint* as a

result of consultation), and served as the basis for the reorganization in June 2014, CRST-

---

at 32 n.13.  Moreover, Defendants note that order apparently expired on December 31, 2014, and
clarify that the purpose of Secretarial Order 3317 was to "update, expand, and clarify the
Department's policy on consultation . . . and to acknowledge that the provisions for conducting
consultation . . . are expressed in the Department of the Interior Policy on Consultation with
Indian Tribes."  *See* Secretarial Order 3317 Sec. 1,
https://elips.doi.gov/elips/0/doc/3958/Page1.aspx (last visited April 12, 2018).  That policy—
which Plaintiffs have never cited—likewise explains that "[c]onsultation is a deliberative process
that aims to create effective collaboration and informed Federal decision-making."  *See* Exhibit 1
(emphasis added); *see also See Department of the Interior Policy on Consultation with Indian
Tribes*, *available at* https://www.doi.gov/sites/doi.gov/files/migrated/cobell/upload/FINAL-
Departmental-tribal-consultation-policy.pdf (last visited April 16, 2018).

001896-CRST-001898 (Secretarial Order 3334).  In addition, BIE made specific changes to the proposed field structure in response to input from the Dakotas; it assigned ADDs by function, an idea that came from the Dakotas, CRST-001133:255:15-19 (Loneman Consultation Transcript), and added an Education Program Administrator Position stationed in South Dakota to address CRST's request for closer supervisory staff, *compare* CRST-002186 (February 2015 presentation to CRST did not include position in organization chart), *with* CRST-002575 (April 2015 presentation that did include position).

Plaintiffs cannot ignore this meaningful and timely tribal input by highlighting a March 2015 email from Director Roessel signaling a desire for "moving forward" with a reprogramming letter, RST Reply at 14, an email that Defendants have already explained (and Plaintiffs have failed to address) is vague and could not signal the initiation of the reprogramming request.  Defs.' Mem. at 24 n.11.  Plaintiffs' reading is contrary to the actual process that continued to occur after the date of the email, as BIE continued to amend the proposal.  Indeed, it was *after* the April 2015 consultation that BIE relocated an ERC from Rapid City to Kyle.  *See* CRST-002571, CRST-003517.[5]  Moreover, although RST "request[ed] the Great Sioux Nation be treated equally and be given the same opportunity to have his own ADD and develop and propose a plan," CRST-002477:93:4-8, the BIE later explained that it

---

[5] Plaintiffs confusingly state that the "restructuring plan . . . was called the Blueprint for Reform" and assert that it was not revised after June 2014.  RST Reply at 14.  As Defendants already explained, the agency uses that term to refer to a specific report issued by the Study Group that is dated June 11, 2014.  *See* Defs.' Mem. at 1 n.1.  Defendants acknowledge that the only revisions to that document after June 2014 were made for typographical and formatting inconsistencies, CRST-001902-CRST-001967, but any suggestion that there were no changes to the proposed reorganization of BIE's field structure after that date is plainly incorrect.  As already explained, and not addressed by Plaintiffs, the *Blueprint* never addressed where ERCs should be located, the personnel for each center, or other similar details.  Defs.' Mem. at 30.  Those details were fleshed out over the course of several more meetings with stakeholders in 2014 and 2015.

"welcomes such a plan; however, to date, it has not received" one.  CRST-003524 (Tribal Consultation Report).[6]

Plaintiffs try to dispute these changes to the field structure but lack any supporting evidence to do so.  They have no evidence that contradicts the fact that the suggestion of realigning the ADDs by function came from the Dakotas.  *See* CRST Resp. SMF ¶ 26, ECF No. 101; RST Resp. SMF ¶ 26, ECF No. 99.[7]  As for the fact that BIE added the Education Program Administrator in response to CRST's concerns, CRST responds by insisting that they never requested such a position "at Pine Ridge," CRST Reply at 6, a statement Defendants did not make, Defs.' Mem at 9 n.2.  Once again, the uncontroverted record—including repeated statements by BIE's Director to CRST's Chairman at the April 2015 consultation—establish that the position was created in response to CRST's concerns.  CRST-002460:24:11-13, CRST-002501:187:6-23, CRST-002502:192:24-193:11 (Rapid City Consultation Transcript).  And RST has no evidence showing plans to station an ERC in Kyle before the April 2015 consultation.  RST Resp. SMF ¶ 28.  As Defendants' already explained—and Plaintiffs fail to acknowledge— the portion of the transcript relied upon makes no such showing, Defs.' Mem. at 19 n.6, and the

---

[6] Although RST suggests that there were "only" four consultations in the spring of 2015, the Tribal Consultation Report shows six.  CRST-003518. And the documents cited by plaintiffs plainly refer to meetings in the spring of 2014 as "consultation sessions," CRST-000541, CRST-000543, just as the Plaintiffs did earlier in this litigation, RST Compl. ¶ 36, ECF No. 48-1 (referring to April 28, 2014 meeting as "consultation"); CRST Compl. ¶ 36, ECF No. 1 (same).

[7] RST incorrectly claims that Defendants' provided an incorrect citation to support this fact, and also incorrectly suggest that the idea came from the Loneman consultation session in April 2014. RST Resp. SMF ¶ 26.  Defendants' citation, CRST-001133:255:15-19, shows Director Roessel explaining at the Loneman consultation that "[s]ome of these ideas came from you. The idea of an ADD for grant schools came when we were meeting in Rapid City in October.  I think it was October.  That came from you all."  And to the extent CRST suggests that there is no corroborating evidence in the record, Director Roessel testified at his deposition that the idea came from RST's 30(b)(6) deponent, Ms. Bordeaux.  Roessel Dep. 34:4-12.  Plaintiffs do clarify that Defendants inadvertently cited incorrect pages in paragraph 24 of Defendants' statement of material facts.  The citation in that paragraph should have been CRST-003708-CRST-003709.

difference between the organizational chart presented at the April 2015 and the one in the agency's reprogramming request confirm that the change was made after the consultation, *compare* CRST-002571 (ERC in Rapid City), *with* CRST-003517 (ERC in Kyle).

Plaintiffs cannot ignore that the record evidence showing that Defendants' outreach went well beyond a single meeting in April 2015, and that outreach played an integral role in formulating the proposal.

### b. Plaintiffs Cannot Ignore the Extensive Dialogue that They Had with BIE By Highlighting a Single Report

Aside from arguing about what meetings this Court may consider, Plaintiffs also zero in on the Tribal Consultation Report, ignoring all other dialogue that they had with BIE.  RST Reply at 11-13.  Even though RST's 30(b)(6) deponent refused to read this document, Bordeaux Dep. Vol. II. 47:24-48:4, Plaintiffs apparently argue that it nevertheless shows a violation of 25 U.S.C. § 2011(b)(2)(B) because it does not explain the agency's "substantial reason for another course of action."  RST Reply at 10-11.  But 25 U.S.C. § 2011 did not require the Secretary to draft this report.[8]  And nothing in that statute forbids the agency from conveying the rationale behind its decisions in another fashion.  Indeed, to conclude otherwise would be inconsistent with the goal of promoting an open dialogue with stakeholders, and is unrealistic given the countless interactions and discussions with stakeholders throughout the approximately two-year consultation process.

In any event, Plaintiffs have not identified anything wrong with this report.  No evidence supports their claim that Defendants "cherry-picked" what comments to include.  Although they

---

[8] After this consultation report was released, the Departmental Manual at 512 DM 5 directed bureaus to prepare a summary of consultation activities upon completion of those activities.  *See* Exhibit 2; *see also* https://elips.doi.gov/ELIPS/DocView.aspx?id=4218&dbid=0 (last visited April 16, 2018).

criticize the report for not including two emails from June and July 2015 between Mr. Yu and Mr. Lunderman of RST, the report makes plain that its purpose was to "summarize[] the comments BIE received" during the "the national tribal consultations" in April and May 2015, and "through the written comment process" that closed May 22, 2015, rather than responding to every individual comment received.  CRST-003519.  Nor can RST credibly claim that it lacked any opportunity to have the agency address these emails—Mr. Yu asked no fewer than two times to speak by phone with Mr. Lunderman in response to the June email, and did so again no fewer than two times in response to the July email.  ECF No. 81-6 at 43-44.

The comments that Plaintiffs highlight in the report were likewise adequately addressed. They claim that the report lacked a "substantive response" to a statement regarding the need to comply with the settlement agreement from *Yankton Sioux Tribe*, but that issue was addressed both at the consultation, CRST-002464:38:22-40:16, and in the report, CRST-003521.[9] Likewise, the transition from ELOs to ERCs, RST Reply at 12, was covered, among other places, at the individual consultations that the tribes had with the agency, *e.g.* CRST-002464:38:17-21 (Director Roessel explaining at April 2015 consultation that "[w]e met individually to discuss [the] specifics [in] the line office"), as well as at the April 2015 consultation, *see supra* Parts I.B.2-I.B.3, and in the report, which "identifies changes to the original proposal to address concerns in the Dakotas."  CRST-003521, CRST-003517 (referencing "Executive Summary" which explains how BIE "amended its original draft proposal" "[i]n response to concerns" expressed, including "establish[ing] an ERC in Kyle" and "creat[ing] an Education Program Administrator").  And though Plaintiffs disagree with how the agency summarized a letter

---

[9] Of course, this Court found that the settlement agreement did not prevent BIE from restructuring.  *Cheyenne River Sioux Tribe*, 205 F. Supp. 3d at 1063-64.

because it did not specifically recite the letter's concern about the size of BIE management, RST Reply at 12-13 (emphasis omitted), the report nevertheless addressed that concern too. *See* CRST-003522 (addressing concern that "BIE is [b]uilding a [b]igger [b]ureacy" by explaining that the funding level for BIE for administration staffing had in fact declined by about $5 million in the past six years).[10]

Plaintiffs' attempt to shift this Court's focus away from the two-year consultation process to a single meeting and document is contrary to the purpose of consultation and should be rejected. Defendants thoroughly consulted with stakeholders, including Plaintiffs, and Plaintiffs have not demonstrated otherwise.

## II.    Plaintiffs' Remaining APA Claim is Without Merit

Aside from their consultation arguments, Plaintiffs also continue to press a separate APA argument that Defendants acted arbitrarily or capriciously and in excess of statutory authority by "essentially diminish[ing] more than one-third (38 percent) its field staff" before Congressional approval to reprogram in order "to prepare budgetary space for the increases from the restructuring." RST Reply at 17, 20; *see also* RST Mem. at 25-26 (citing 5 U.S.C. § 706(2)(A), (C)). Defendants previously pointed out that Plaintiffs failed to offer any explanation as to why evidence derived from discovery is appropriate for this purported APA claim, Defs.' Mem. at 35, a fundamental flaw that Plaintiffs fail to adequately address in their replies, *cf.* RST Reply at 22 (arguing evidence necessary for consultation claim but not for purported APA claim regarding assistance received); CRST Reply at 2-4 (same).

---

[10] Plaintiffs' accusation that Defendants did "no[t] mention at all . . . Patti Bush's *oral* testimony at the Rapid City consultation," RST Reply at 12 (emphasis in original), is misleading. Ms. Bush's oral testimony consisted of her reading from the letter summarized in the consultation report. *Compare* CRST-002500:183:25-186:17 (Rapid City Consultation Transcript), *with* CRST-002451-CRST-002453.

In any event, Plaintiffs fail to meaningfully address the point that the actions they challenge here—the agency's reliance on personnel outside of the ELO when an ELO lacked staffing—is not an "agency action" under 5 U.S.C. § 702, as that term does not include a broad challenge on the manner in which an agency implements its programs. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62, 64 (2004) ("*SUWA*"). Nor can Plaintiffs escape the conclusion that interim personnel decisions are committed to the agency's unreviewable discretion under 5 U.S.C. § 701(a)(2). Defs.' Mem. at 35-38.

Rather than confront either point, Plaintiffs recycle the same statutes and argument from their opening memorandum, quote 25 U.S.C. § 2006 without any analysis or explanation as to whether it has allegedly been violated, and assert that "BIE had a statutory obligation to provide educational support and technical assistance *until* Congress allowed reprogramming." RST Reply at 16-17 (emphasis in original); RST Mem. at 27. But Defendants have continued to provide assistance. Dearman Decl. ¶¶ 14-15. And Plaintiffs' vague allegations of "[g]eneral deficiencies in [agency] compliance . . . lack the specificity requisite for agency action," *SUWA*, 542 U.S. at 65-66, and as explained before, none of the statutes they cite provide an applicable legal standard to guide this Court's review. Defs.' Mem. at 35-38. Plaintiffs fail to identify any authority that dictates BIE's use of temporary assignments, where BIE locates its offices or staff, or the manner in which that staff provides technical assistance. *Id.* That ends their APA argument.

For the first time in their reply, Plaintiffs quote 25 C.F.R. §§ 33.6, 33.8, and 33.9, apparently arguing that those regulations may provide this Court a standard to review their allegations because they discuss an "Agency Superintendent of Education," which "implies" that the position must be stationed "at the Agency (reservation) level." RST Reply at 20-21.

Plaintiffs failed to allege a violation of these regulations in their complaints and should not be permitted to do so at this late hour.  Nevertheless, the term "[a]gency" cannot bear the weight Plaintiffs try to place on it, as it is defined to "mean[] th[e] organizational unit of the Bureau which provides direct services to the governing body or bodies and members of *one or more specified Indian Tribes*."  25 C.F.R. § 33.1(a) (emphasis added).  Because the "agency" unit encompasses "one or more specified Indian Tribes," an "[a]gency [s]uperintendent," 25 C.F.R. § 33.6, or "[a]gency [o]ffice," 25 C.F.R. § 33.8, may serve "one or more specified Indian Tribes," and the regulations therefore do not imply that an ELO must be stationed on each tribe's reservation.

Even if this Court were to reach the merits of this claim, Plaintiffs lack evidence showing Defendants acted arbitrary, capricious, or in excess of statutory authority.  Though they accuse Defendants of "purposefully refram[ing]" their argument, RST Reply at 19, the *uncontroverted* evidence shows that attrition at ELOs "just happened" because of retirements and the like, and "it wasn't in terms of . . . the reforms."  Roessel Dep. 117:17-24; *see also* Stevens Dep. 64:13-17 (testifying that there was no conscious effort to reduce line office personnel "around 2013 or 2014").  And uncertainty about what the final reorganization would ultimately entail prevented the agency from filling vacant positions, as BIE did not know what any new positions would involve or where they would be located.  Roessel Dep. 117:17-119:11; Greyeyes Dep. 70:18-71:25 (explaining that "no one really knew what the reprogramming or the reorganization was," and that "everything was just put on hold" so that BIE could go through tribes' "comments and … concerns" to allow the agency to "figure out what's going on with the restructuring" before hiring).

Plaintiffs offer no evidence to contradict this, and instead argue that that there was "a *'thirty-eight (38) percent reduction* in Line Office personnel," which they believe "does not occur naturally."  RST Reply at 17 (emphasis in original).  But even if that number is correct,[11] Plaintiffs have not shown that whatever caused these alleged vacancies nationwide was at odds with the circumstances testified to in the depositions.  Indeed, Plaintiffs' own experiences reinforce the accuracy of those representations.  Plaintiffs argue that CRST's ELO "was closed in December of 2014," RST Mem. at 27, but that was when their acting education line officer retired, Dearman Decl. ¶ 14.a, and RST's allegation that their ELO was "effectively closed [on] June 30, 2015," RST Mem. at 27, once again coincidences with a retirement as well as a brief, temporary loss of office space for the line office, Dearman Decl. ¶ 14.f; *see also id.* ¶¶ 14-15 (explaining BIE's efforts to provide technical assistance to Plaintiffs through acting education line officers and others).  The personnel management decisions Plaintiffs challenge are not discrete reviewable final agency actions, *see SUWA*, 542 U.S. at 62, 64-66, and not precluded by any statutory provision Plaintiffs cite.

Plaintiffs argue that the "evidence points to the use of this reduction to prepare budgetary space for the increases from the restructuring," apparently thinking that the agency was able to

---

[11] Plaintiffs have failed to establish the accuracy of this number.  Plaintiffs cite deposition testimony for this figure where RST's counsel presented this percentage as part of a question (with different corresponding dates) and witnesses testified that the number was "within reason," Stevens Dep. 65:4, or "about right," Davis Dep. 12:7-9; Greyeyes 70:15-17.  It is not entirely clear where RST's counsel's found this alleged number.  Perhaps RST's counsel was referencing an alleged research report from an unnamed subcommittee on the House Appropriations Committee, *see* Herrin Dep. 7:20-10:5, which Plaintiffs neither offered as evidence here nor as an exhibit in depositions.  If so, even if such report exists, and even if RST's counsel accurately read from it, that number *undermines* Plaintiffs' argument here that the agency acted arbitrarily and capriciously, as it purportedly stated that "From FY 2011 to 2014 *funding* for management of BIE schools, including the Line Office staff, decreased by about 38 percent."  Herrin Dep. 10:3-5 (emphasis added).

hoard money that would have otherwise gone to ELO personnel to fund restructuring.  *See* RST Reply at 17.  But the evidence Plaintiffs cite for this proposition establishes no such thing.  *Id.* (citing RST SMF 189, Herrin Dep. 9:21-10:8, Stevens Dep. 64:18-65:4).  And the simple fact is that the agency lacked the ability to do that.  Education Program Management funds, which were used to fund ELO positions, are generally not allowed to be used for personnel salaries if not used within the year of appropriations.  Dearman Decl. ¶ 19; *see also id.* (explaining that Enhancement funds are available for only 15 months).[12]

### III.   BIE Demonstrated that It has Acted Consistently with Its Trust Relationship with Tribes, and Plaintiffs Have Not Shown Otherwise

Plaintiffs mistakenly assert that "Defendants claim that . . . the federal government owes no trust duty to Plaintiff CRST to provide educational services."  CRST Reply at 7.  Defendants explained how they have continued to provide ample technical assistance and support to RST and CRST, "consistent with the 'general trust relationship between the United States and the Indian tribes.'"  Defs.' Mem. at 39 (quoting *Menominee Indian Tribe of Wis. v. United States*, 136 S. Ct. 750, 757 (2016)).  But it is well-established that the "general trust relationship between the United States and the Indian People[,] . . . alone does not suffice to impose an actionable fiduciary duty on the United States."  *Ashley v. U.S. Dep't of Interior*, 408 F.3d 997,

---

[12] Plaintiffs incorrectly argue that "[i]t was and still is difficult[] to get information out of the BIE about" staffing levels.  RST Reply at 18 n.3.  Tellingly absent from this charge is any reference to a request by Plaintiffs for such information during the consultation process.  *See* Defs.' Mem. at 30-31 (explaining how personnel issues were addressed at April 2015 consultation); *see also* Bordeaux Dep. II at 21:6-8, 11-12 (acknowledging that "[e]verybody had an opportunity to ask a question or make comments" at RST's one-on-one meeting with BIE in March 2015, and the agency "answered any questions that people had about the different issues with" the presentation); Frazier Dep. 46:10, 48:3 (similar, and testifying that tribe had enough information to understand the proposal).  And Plaintiffs' suggestion that Defendants have not provided that information during the course of this litigation is likewise without merit.  *E.g.*, CRST-002575, CRST-002577 (April 22, 2015 presentation providing position title and level of pay for each proposed position in each ERC); CRST-003816-CRST-003817 (Interior Letter to Congress describing staffing levels).

1002 (8th Cir. 2005) (citation omitted).  Defendants explained that Plaintiffs could not show such an actionable duty for at least two reasons, Defs.' Mem. at 39-42 and Plaintiffs' replies offer nothing to doubt these conclusions.

First, Plaintiffs fail to "identif[y] any assets taken over by the government such as tribally owned land, timber, or funds which would give rise to a special trust duty."  *Yankton Sioux Tribe v. U.S. Dep't of Health & Human Servs.*, 533 F.3d 634, 644 (8th Cir. 2008).  Plaintiffs' replies entirely ignore the requirement that they identify a trust corpus to establish a trust claim, Defs.' Mem. at 40-41, and thus their argument should be rejected at this preliminary step, *see Ashley*, 408 F.3d at 1002 ("For a duty to exist, there must be something akin to elaborate provisions . . . [that] give the Federal government full responsibility to manage Indian resources for the benefit of the Indians.") (internal quotation marks omitted).

Second, Plaintiffs cannot establish a trust claim because they never identified a specific duty that Defendants purportedly violated.  Although Plaintiffs apparently continue to argue that Defendants violated their trust obligations by not maintaining enough ELO personnel on their reservations, *see* RST Reply at 18, 20; RST Mem. at 31-32, they still do not identify any statute, regulation, or appropriation specifically requiring ELOs on their reservations or disallow the use of temporary assignments when an ELO lacks staffing.  Nor have they shown that any government funds were misspent.  Defs.' Mem. at 41.

Plaintiffs also summarize "several statutory provisions" that they cited in their complaints but, with the exception of a cursory citation to 25 U.S.C. § 2006(d), not in their initial summary judgment brief.  CRST Reply at 7-8 (citing 25 U.S.C. §§ 2006(d), 2009(c), 2010, 2015); RST Reply at 16.  Even if the Court overlooked that procedural impropriety, none of these provisions require an ELO on Plaintiffs' reservations or disallow temporary personnel assignments.

26

Defendants have already shown that they continue to provide technical assistance and support to Plaintiffs and still fund RST pursuant to a P.L. 93-638 contract in which the Tribe agreed to implement technical assistance functions of the line office.  Dearman Decl. ¶¶ 14-15.  Plaintiffs fail to identify how any of these freshly cited provisions were allegedly violated, let alone cite any evidence in support of such an allegation.

Plaintiffs are no longer at the motion-to-dismiss stage where the Court must "constru[e] all the facts asserted in the complaint as true," *Cheyenne River Sioux Tribe*, 205 F. Supp. 3d at 1062, and "may not merely point to unsupported self-serving allegations, but must substantiate [their] allegations with sufficient probative evidence that would permit a finding in [their] favor," *Reed v. City of St. Charles*, 561 F.3d 788, 790-91 (8th Cir. 2009).  Thus, Plaintiffs cannot force Defendants to continue to guess at the concerns Plaintiffs may have with Defendants' actions by citing a handful of statutes.  *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record.").[13]  And this Court should similarly not be required to sift through the various statutes in an attempt to find a viable legal obligation that Defendants may have violated. *E.g.*, *Gilbert v. Des Moines Area Cmty. Coll.*, 495 F.3d 906, 915 (8th Cir. 2007) ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim."); *Rodgers v. City of Des Moines*, 435 F.3d 904, 908 (8th

---

[13] Plaintiffs' suggestion that BIE intends to "get out of the business of running schools," CRST Reply at 7, is misleading.  The deposition testimony relied upon makes clear that BIE would continue to provide educational services, Roessel Dep. 40:24-41:1, and a tribe's decision to control its own schools is voluntary, *id.* 42:6-7.

Cir. 2006) ("[W]e will not mine a summary judgment record searching for nuggets of factual disputes to gild a party's arguments.").

### IV.   Plaintiffs Ignore the Plain Language of the Fort Laramie Treaty in Arguing that Its Provisions Have Been Violated

Defendants previously explained how both Plaintiffs have schools on their reservations that comply with Article 7 of the Fort Laramie Treaty of 1868, April 29, 1868, 15 Stat. 635 ("Treaty"), which provides that "for every thirty children  . . . a house shall be provided and a teacher competent to teach the elementary branches of an English education shall be furnished." Defs.' Mem. at 42-43.  Defendants also explained how they have complied with Article 5—"that the agent for said Indians shall in the future make his home at the agency-building" and will "keep an office open . . . for the purpose of prompt and diligent inquiry"—as both tribes acknowledge having a BIA representative stationed on their reservation.  *Id.*  Plaintiffs entirely ignore these points.

Instead, Plaintiffs assert that *ambiguities* are "interpreted for their benefit," *County of Oneida v. Oneida Indian Nation of N.Y State*, 470 U.S. 226, 247 (1985), and may cause the reviewing court to "look beyond the written words to the larger context," *Minnesota v. Mille Lacs Band of Chippewa Indians,* 526 U.S. 172, 196 (1999).  That may be, but the "starting point for any analysis" of Indian treaties "is the treaty language itself . . . interpreted in light of the parties' intentions," *id.* at 206, and Plaintiffs fail to establish any ambiguities in the text at issue here.  Indeed, Plaintiffs do not even recite any text in their replies, or explain how Defendants are wrong and that the text is not as plain as it appears.  Instead, they accuse Defendants of "attempt[ing] to parse out the Treaty into separate and independent provisions cut off from any sense of history or context." CRST Reply at 9.  To the contrary, Defendants explained that Article 4 calls for the United States to create "an agency-building for the residence of *the agent*,"

(emphasis added), and Article 5 provides that "*the* agent" should keep "*an* office open" for "prompt and diligent inquiry into such matters of complaint" (emphases added).  The Treaty simply cannot be read to require Defendants to install a dedicated education office on Plaintiffs' reservation and staff that dedicated office with assigned education specialists, and thus Plaintiffs' Treaty claim fails.

## CONCLUSION

For the foregoing reasons, the Court should enter judgment in Defendants' favor with respect to all of Plaintiffs' claims and should deny RST's and CRST's motions for summary judgment.

Dated: April 16, 2018                    Respectfully submitted,

CHAD. A. READLER
Acting Assistant Attorney General

RONALD A PARSONS, JR.
United States Attorney

CHERYL SCHREMPP DUPRIS
Assistant United States Attorney
United States Attorney's Office
325 S. 1st Street, Suite 300
Sioux Falls, S.D. 57104
Telephone: (605) 357-2340

ERIC WOMACK
Assistant Branch Director

/s/Kevin M. Snell
DANIEL BENSING
Senior Trial Counsel
KEVIN M. SNELL
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 6108
Washington, D.C.  20530
Tel.: (202) 305-0924

Fax: (202) 616-8470
E-mail:  Kevin.Snell@usdoj.gov

Attorneys for Defendants

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned attorney for Defendants certifies that this memorandum complies with

this Court's January 25, 2018 Order that allows Defendants to file a 35-page brief.  ECF No. 75.

<u>/s/Kevin M. Snell</u>
KEVIN M. SNELL
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 6108
Washington, D.C.  20530
Tel.: (202) 305-0924
Fax: (202) 616-8460
E-mail:  Kevin.Snell@usdoj.gov